# Exhibit C

*1.*

STATE OF ILLINOIS )
                  ) SS
COUNTY OF COOK    )

Olympia Dillard
FILED

DEC 2 9 2001

DOROTHY BROWN
CLERK OF CIRCUIT COURT

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT-CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS,        )
      Plaintiff,                        )
                                        )
vs.                                     )    No. 98 CR 30064
                                        )
KEVIN PATTERSON, et al.,                )
      Defendant.                        )

### MOTION IN ARREST OF JUDGMENT

NOW COMES KEVIN PATTERSON, by and through his attorney, CHARLES G. MURPHY, and moves that this Honorable Court grant his Motion In Arrest of Judgment. In support, he avers:

1.   That your petitioner is a defendant in the captioned cause.

2.   That your petitioner was found guilty at the conclusion of a bench trial of 1) U.U.W. by felon and 2) 3 counts of attempt armed robbery.

3.   That this Motion addresses the attempt armed robbery counts only.

4.   That the Indictment alleges in pertinent part that your petitioner "...attempted to remove U.S.C. from the person of (a) Mr. Beals (b) Mr. Jones and  c) Mr. McGee." (emphasis added).

5.   The ILCS sets forth that the robbery statute has been violated when "...he or she takes property...from the presence or person of another..."

6.   That Messrs. Beals, Jones and McGee each testified on cross-examination that no property was taken from their person and

*2,*

that no property was requested or commanded to be taken from them

7.  That the prosecution's theory was that your petitioner was attempting to take the property, to wit: U.S.C. from an organization d/b/a Connexions, albeit unsuccessfully.

8.  That your petitioner as well as his attorney relied upon the theory advanced by the prosecution which was contained in the Indictment in preparing a defense.

9.  That your petitioner persisted in his plea of not guilty to these counts of the Indictment as he believed that no evidence would be introduced at trial that he attempted to take property from the person of anyone.

10.  That this belief was borne out at trial.

11.  That your petitioner through his attorney was at all times prepared to concede all matters that he believed the prosecution could prove at trial as evidenced by both the opening and closing arguments at trial concerning the U.U.W. by felon counts.

12.  That the theory argued by the prosecution at trial is at fatal variance with allegations in the Indictment.

WHEREFORE, your petitioner respectfully prays that this Honorable Court grant his Motion In Arrest of Judgement,

CHARLES G. MURPHY
ATTORNEY FOR MICHAEL POWELL
542 S. Dearborn
Suite 750
Chicago, IL 60605
312-697-0022
Attorney I.D. #25073

2

1          MS. DILLON:  I have nothing further.

2

3

4                    CROSS-EXAMINATION

5                         BY

6                    MR. MURPHY:

7     Q    Mr. Beals, on the date and time in question,

8 did I hear you correctly that Mr. Patterson came into

9 the office of Connections, announced that he was

10 associated with St. Clemmons' House?

11    A    Leonard's.

12    Q    Leonard's?

13    A    St. Leonard's House.

14    Q    I misunderstood you. Is that also a social

15 services agency?

16    A    Yes, it is.

17    Q    Now, sir, you testified that at some point in

18 time, after Miss Byrdson --- did you say her mother or

19 daughter was with her?

20    A    It was her mother that was with her.

21    Q    They left?

22    A    Yes.

23    Q    And at some point, after they left, Mr.

24 Patterson began to wander back towards the location

1    you were seated at your desk, is that right?

2         A    Yes.

3         Q    When he came back there, you testified here

4    today that he said to you that he wanted you to get

5    up, turn around and get on the ground?

6         A    No.  He indicated that --- told me to get up,

7    turn around and walk to the back of the office.

8         Q    And he said that he had a gun?

9         A    Yes.

10        Q    Showed you that he had a gun?

11        A    After I looked up the second time, I saw that

12   he had a gun, yes.

13        Q    At least initially, you complied with what he

14   told you to do. By that I mean you got up and started

15   to walk to the back, did you not?

16        A    Yes.

17        Q    You testified here today that he said --

18   someone was asking him why he was there or what he was

19   doing and you said here today that he brought up some

20   philosophical concerns he had about money, is that

21   correct?

22        A    More so about people, in terms of poor people

23   and money.

24        Q    He never said to you that he was there to rob

A-26

5.

1   you, did he?

2       A    No.

3       Q    He never said to you or any one else in the

4   back, back of the office, that he wanted your money or

5   their money, is that correct?

6       A    That's correct.

7       Q    He never attempted to take money -- I don't

8   know if you had any money on you, but he never

9   attempted to take anything from you personally,

10  did he?

11      A    No.

12      Q    Same question of the other two people that

13  were in the back of the office. Did he attempt to take

14  anything from them?

15      A    No, sir.

16      Q    Sir, you decided that you had an opportunity

17  to escape. You chose to attempt to escape through the

18  back door, isn't that right?

19      A    Yes.

20      Q    And the back door had on it two wooden

21  two-by-fours, or something like that, and they were

22  lodged in the back as security bars, were they not?

23      A    Yes.

24      Q    You testified that when you made that

b.

1  that -- to get behind the desk; to walk back behind

2  the desk with Mr. Jones and get down on the floor,

3  face down.

4      Q    Can you see Mr. Beals at this time?

5      A    He was standing on the side of Mr. Patterson.

6      Q    What happened when the Defendant told you to

7  get down?

8      A    I pleaded with him not to shoot me, not to

9  kill me. I never actually got down on the floor. I

10  knelt down on one knee. He continually told me to get

11  down on the floor, get face down. I continued to

12  plead with him not to shoot me, not to shoot me. At

13  this point, Mr. Beals ran toward the back door. Mr.

14  Patterson pursued him,

15     Q    What did you do?

16     A    I jumped up off the floor and ran out the

17  front door.

18     Q    As you were running out the front door, what

19  happened?

20     A    There was a shot that went off. I sort of

21  turned around. I really didn't look back. I was

22  really trying to get to the front door, because you

23  key in, and I needed to get out the front door.

24     Q    Were you able to get out the front door?

1  A    Yes.

2  Q    What happened after you got out the front

3  door?

4  A    Immediately after I exited the building, I

5  headed north toward 51st and Western. I saw a police

6  car there. I flagged the police car down. I told him

7  there was a guy in there with a gun, he had just shot

8  one of my colleagues.

9  Q    Did you see where the police went at this

10  time?

11  A    They immediately jumped out of the car. They

12  ran inside the building. The next thing I saw, because

13  I was on 51st and Western at that point, was the young

14  lady and a man -- the police officer chasing Mr.

15  Patterson down the alley. He ran across 51st Street,

16  continued to run north until he was out of my sight.

17  Q    And do you recall what the Defendant was

18  wearing?

19  A    Yes, I do.

20  Q    What was he wearing?

21  A    He was wearing a black satin jacket, white

22  shirt, tie, dark-colored die. I'm not sure what color

23  tie it was.

24  Q    You said he had a handgun. In addition to

*8.*

1  the handgun, was he holding anything?

2      A     A briefcase, a cloth-type briefcase.

3      Q     Some time after you saw the police chasing

4  after the Defendant, Patterson, did you lose sight of

5  the Defendant, Patterson?

6      A     Yes, I did.

7      Q     Did you see him later on that day?

8      A     After the police brought him back, yes, to

9  identify him.

10     Q     About how long was it until the police

11 brought him back?

12     A     Approximately fifteen to twenty minutes.

13     Q     And when the police brought him back, did you

14 recognize him?

15     A     Yes, I did.

16     Q     Who was he?

17     A     I'm sorry?

18     Q     Who did you recognize him as?

19     A     I recognized the guy, Mr. Patterson, sitting

20 there with the turtleneck on.

21     Q     The same guy you had seen in Connections with

22 the gun, who ordered you to the ground?

23     A     Right.

24     Q     The same guy you saw fleeing and the police

1    chasing him?

2        A    Correct.

3        Q    When the police brought him back, you

4    identified him, was he wearing that same shirt and tie

5    that you had seen him in earlier?

6        A    No, he wasn't.

7        Q    I'm going to show you what has been

8    previously marked as People's Exhibit No. 6 for

9    identification. Do you recognize what that is?

10       A    It is a bag, the bag he was carrying.

11       Q    A photograph of the bag?

12       A    That is a photograph of the bag he was

13   carrying.

14       Q    I'm going to show you People's Exhibit No.7.

15   Do you recognize what is that a photograph of?

16       A    The jacket that he was wearing.

17       Q    Do People's Exhibits Six and Seven truly and

18   accurately show the bag and the jacket that the

19   Defendant was carrying that day and wearing?

20       A    Yes.

21            MS. DILLON:  I have nothing further.

22            THE COURT:  Cross.

23

24

A - 44

10.

1                    CROSS-EXAMINATION

2                         BY

3                    MR. MURPHY:

4         Q     Mr. McGee, am I correct that at the time you

5    went out of the front door of the Connections Office,

6    Mr. Beals was still behind you inside of the office?

7         A     Yes.

8         Q     And you had an occasion to flag down a police

9    car and ask for assistance, is that correct?

10        A     Correct.

11        Q     Either time you were actually doing that or

12   shortly after you did that, did you see Mr. Beals come

13   out of the front of the Connections Office?

14        A     I never saw him come out, no.

15        Q     You never saw him come out?

16        A     No.

17        MR. MURPHY:   I have nothing further.

18        MS. HOWARD:   No questions.

19        MS. DILLON:   Nothing further.

20        THE COURT:   Thank you, sir.

21

22            (Witness excused)

23        THE COURT:   Call your next witness.

24

A-45

1    People's Exhibit Nine, truly and accurately show the

2    gun as it appeared to you that day?

3        A    Yes.

4        Q    And does People's Exhibit No. 10 truly and

5    accurately depict the car that you saw that day?

6        A    Yes.

7        Q    Now, you indicated that you had been working

8    for Connections for eight years?

9        A    Yes.

10       Q    And you said that the first of the month is

11   the time that you collect rent?

12       A    Yes.

13       Q    Has that been so for the past eight years?

14       A    Yes, it has.

15           MS. DILLON:   I have nothing further.

16           MR. MURPHY:   May I approach the witness, your

17   Honor?

18           THE COURT:   Please?

19

20               CROSS-EXAMINATION

21                    BY

22               MR. MURPHY:

23       Q    Mr. Jones, I'm going to show you what has

24   been previously marked as People's Exhibit No. 3 for

12.

1  identification. And that photograph depicts the office

2  area at Connections as it appeared on October 1st of

3  1998, does it not?

4      A    Yes.

5      Q    You testified that you were seated at your

6  desk at some point in time with some money on top of

7  your desk, and then you took the money.  You put it in

8  your desk drawer, right?

9      A    Yes.

10      Q    Is your desk depicted in that photograph?

11      A    Yes, it is.

12      Q    Would you take the pen I just handed you, put

13  an X or a star or something like that over the desk

14  that you were seated at that time?

15      A    (Indicating)

16      Q    So, your desk, on the date and time in

17  question, was the desk at the furthermost rear point

18  of the office space, was it not?

19      A    When you say "rear" the back of the office,

20  yes.

21      Q    So, when you testified that Mr. Beals and Mr.

22  Patterson were walking towards your desk, they were

23  walking toward your desk essentially together?

24      A    Yes.

13.

1    Q    Yes, Mr. Beals was in front of him?

2    A    He was right behind Mr. Beals with the gun.

3    Q    You saw Mr. Patterson seated at the front in

4    the reception area, did you not?

5    A    Yes.

6    Q    Your view of him was unobstructed, was it

7    not?

8    A    What do you mean "unobstructed"?

9    Q    There was nothing between you and him from

10   seeing something?

11   A    No.

12   Q    When Mr. Patterson got to the location where

13   you were seated, which is before you get to the rear

14   door, did he tell you to give him the money that was

15   in the desk drawer?

16   A    No.  He didn't ask me about the money.

17   Q    Now, you testified that you heard a shot

18   fired.  When you heard the shot fired you turned

19   around a little bit to see if everything was okay?

20   A    Well, I really didn't have to turn too far,

21   because the office is not that big of an office.  I

22   looked to the side.  It was right on the side. I could

23   look to see if Mr. Beals was okay.

24   Q    Was he and Mr. Beals at that point, when the

14.

```
1    STATE OF ILLINOIS )
                       )
2    COUNTY OF C O O K )

3          IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
                COUNTY DEPARTMENT - CRIMINAL DIVISION
4
     THE PEOPLE OF THE      )
5    STATE OF ILLINOIS,     )
                            )
6                           )    Indictment No. 98-30064
               vs.          )    CHARGE: ATTEMPT MURDER
7                           )
     KEVIN PATTERSON,        )
8                           )

9                    REPORT OF PROCEEDINGS

10   had at the hearing of the above-entitled cause, before
     the Honorable RONALD A. HIMEL, Judge of said Court on
11   the 19th day of December, A. D., 2001.

12
          APPEARANCES:
13

14                          HONORABLE RICHARD A. DEVINE,
                            State's Attorney of Cook County,
15                          by:
                            MS. CATHLEEN DILLON & MR.
16                          WILLIAM DELANEY:
                            Assistant State's Attorneys,
17                          on behalf of the People;

18
                            MR. CHARLES MURPHY:
19                          on behalf of the Defendant,
                            Kevin Patterson.
20

21   Helen M. Hackney, CSR, RPR
     CSR License #084-001452
22   Official Court Reporter
     2650 South California
23   Chicago, Illinois 60608

24
```

15.

1      THE CLERK:  Kevin Patterson

2      MR. MURPHY:  Judge Himel, I'm Chuck Murphy.  Mr.

3  Patterson is standing next to me.  With your

4  permission this morning I filed a document entitled a

5  Motion in Arrest of Judgment and also hand up a copy

6  of a case which I believe supports the position in the

7  defendant's motion.  I tender a copy not only of the

8  motion to you but the state's attorney.  Might it be

9  wise to pass the case?

10     THE COURT:  Let me take a look here.  Okay.

11              Are you ready to argue?

12     MR. MURPHY:  I am.

13     THE COURT:  I'm not familiar with this case.

14  Judge Louis Garippo, 1977?  All right.  Motion in

15  Arrest of Judgment.  Argue.

16     MR. MURPHY:  Judge, undoubtedly you recall by my

17  opening comments at the bench trial as well as closing

18  comments I conceded to you that I believed that the

19  prosecution had established something during the

20  course of trial; and what I was eluding to, of course,

21  was the count or counts, if it were multiple, of

22  unlawful use of a weapon by felon.

23           I was unwilling to concede that the

24  prosecution could establish other matters which were

16.

1   set forth the way that they were pled.  In this

2   particular case which I have cited which is a good

3   discussion of the law -- the facts in that case,

4   though, are the other side of the legal coin of the

5   way that the indictment read in this particular case.

6           In this case, Mr. Patterson's case, the

7   way the indictment was formed it's alleged little my

8   client purportedly took or attempted, I should say, to

9   take money from the presence of the three named

10  individuals who testified.  The State elected for

11  reasons I would not know not to include in the

12  charging document that this attempt was done merely in

13  the presence of those three people.

14          What I did is I relied upon the charging

15  document in the preparation of my defense.  I relied

16  upon the fact that I did not believe that the

17  prosecution could establish that my client attempted

18  to take property from these three named individuals.

19          Now, the way the case developed, the way

20  the testimony came out, I did ask those three named

21  individuals when they would testify if my client ever

22  attempted, commanded, or directed them to give

23  property to him; and, of course, they agreed with what

24  I thought was going to be their obvious answer, having

14.

1    read the police reports, that my client never did

2    that.

3              In sum what I did is I relied upon that

4    charging document.  I did not ask for a 402 Conference

5    in this particular case because I believe the

6    prosecution had confined themselves to proof that

7    would show, if they could do it, that my client sought

8    to take property from those people.  The evidence did

9    not support that theory.

10              Mr. Patterson and his attorney relied

11    upon it.  It's not being raised for the first time on

12    appeal.  It was raised at trial, and it's been

13    reviewed again at this juncture of the proceedings in

14    a post-trial fashion.

15              I believe that there was a fatal

16    variance, and that Mr. Patterson, the defendant, is

17    entitled to the benefit of the doubt where it exists.

18    It does exist.

19       THE COURT:  State?

20       MS. DILLON:  Judge, our position was that the

21    defendant did attempt to take --

22       THE COURT:  Well, I think I made my position

23    pretty clear on this.  Not only did he attempt, I

24    think he completed the armed robbery.  You know, I

18.

1    think we have an office.  We have got a place where

2    the evidence would show that the rents were collected,

3    that there was money present in the place, and the man

4    comes in with the gun and accosts three people in the

5    officer there and is rummaging around.  All the

6    elements of an armed robbery was proven except that he

7    didn't get away with the proceeds.

8              It's clear to me that if this is the law

9    in the United States of America, that's a joke.

10   Because the overall facts would make what you're

11   saying a real joke because the facts themselves are

12   clear.  The facts as stated in this Court showed an

13   armed robbery took place.  He's charged with attempt

14   armed robbery.  The facts overwhelmingly proved to me

15   that he, with the intent to commit a robbery armed

16   with a gun, went into this establishment and attempted

17   to remove items from that establishment by threatening

18   the people involved there with a gun.

19             There's no question about his guilt.

20   You citing me that this case is paramount to you

21   saying that if in fact somebody comes up to somebody

22   with a gun and then turns their back maybe and it's

23   outside their presence, he's going through all the

24   drawers in the house, that would not be an armed

19.

robbery.  I say to you that's ridiculous.  I say your
argument is ridiculous.  Motion in Arrest of Judgment
is denied.

The evidence is clearly that
overwhelmingly that he entered this place for the
purpose of robbing it, that the only thing he didn't
do was to get away with the proceeds from this armed
robbery.

The State indicted him for attempt
because he didn't get away with the proceeds.  I think
robbery -- the armed robbery is completed even if he
doesn't get the proceeds by the mere fact he went in
there, he made his wishes known in the manner in which
he spoke.  It's the clear meaning.  The facts would
indicate that he was there to take money.  His Robin
Hood approach that the money was going to be given to
somebody else more worthy than the people in this
establishment, it is something that should be done in
court, not at gunpoint by an individual vigilante.

He may have every friend in the world,
but this man committed an armed robbery.  He was only
charged with attempt armed robbery.  I found him
guilty of attempt armed robbery.  There's a judgment
on my finding.  Your motion in arrest of judgment is

1    denied.

2        MR. MURPHY:  There should be a Presentence Report.

3        THE COURT:  Okay.

4                    Did everybody get a copy?

5        MS. DILLON:  No.

6        MR. MURPHY:  No.

7        THE COURT:  Olympia, is there a Presentence

8    anywhere?  Have you talked to someone from Probation?

9        DEFENDANT PATTERSON:  No.

10       THE COURT:  It's not done.  What's the next

11   question?  Presentence isn't done.

12       MR. MURPHY:  Reorder it.

13       THE COURT:  Presentence Investigation ordered

14   again.  By agreement what date?

15       MR. MURPHY:  I would be in your courtroom on an

16   unrelated matter the 25th of next month.

17       THE COURT:  January 25, '02, hearing in

18   aggravation and mitigation and hopefully the -- and

19   the Motion for New Trial, hopefully on this date.

20       MR. MURPHY:  Judge, could I ask your deputy with

21   your permission not to take my client back?  There

22   were a couple of individuals who are present in the

23   courtroom who may have been here today to give their

24   testimony concerning their knowledge at least of the

```
 1                      OFFICER GREENAN,

 2   called as a witness on behalf of the people of the

 3   state of Illinois, having been first duly sworn, was

 4   examined and testified as follows:

 5

 6                    DIRECT EXAMINATION

 7                           BY

 8                      MS. DILLON:

 9

10        Q    Officer, please state your name, spell your

11   last name, give your star number and unit of

12   assignment.

13        A    My name is Officer Paul Greenan,

14   G-R-E-E-N-A-N, star number 19169, I'm currently

15   assigned to the 9th District Chicago Police

16   Department.

17        Q    Officer Greenan, I'm going to direct your

18   attention back to October 1, 1998, afternoon hours

19   just after 5 p.m..  Were you work that day?

20        A    Yes, I was.

21        Q    Who were you working with?

22        A    Officer McMurray.

23        Q    Were you and Officer McMurray in uniform?

24        A    Yes.
```

22.

1     Q    Were you in a marked car?

2     A    Yes.

3     Q    At about 5:10 in the evening what happened?

4     A    We received a call of a suspicious auto that

5 was in the alley of 2212 West 50th Place with

6 occupants.

7     Q    What happened then?

8     A    We responded to that call.

9     Q    And did you respond to 2212 West 50th Place?

10     A    Yes, we did.

11     Q    What happened as you responded to that call?

12     A    Pulling up on the scene we -- I observed two

13 male Blacks standing on the southeast corner of 50th

14 and Oakley, at which time one of them ran westbound

15 and the other one walked southbound.

16     Q    The people that you saw on the corner of 50th

17 and Oakley, do you see them in court today?

18     A    Yes.

19     Q    Could you please point to those individuals,

20 indicate something each of those individuals is

21 wearing?

22     A    The gentlemen wearing the gray striped shirt

23 and the gentlemen wearing the white shirt with the

24 blue tie.

23.

1    MS. DILLON:  May the record reflect in court

2    identification of defendant Patterson and defendant

3    Akbar.

4    THE COURT:  Okay.

5    BY MS. DILLON:

6    Q    You indicated you saw defendant Patterson --

7    strike that.

8         Who did you see running from 50th and Oakley?

9    A    Defendant Patterson, westbound from Oakley on

10   50th Street.

11   Q    And with regard to the two individuals you

12   identified in court which individual?  Tell us what

13   he's wearing.

14   A    The gentlemen with the gray shirt ran

15   westbound on 50th Street from Oakley, the gentlemen

16   with the white shirt and blue tie walked southbound on

17   Oakley from 50th Street.

18   Q    What did you do then?

19   A    At which time Sergeant McMurray, working beat

20   920, and officer Alagna and Dwyer working beat 955

21   placed Akbar in custody.

22   Q    From the time that you saw defendant Akbar

23   and defendant Patterson at the corner of 50th and

24   Oakley to the time you saw your fellow officers stop

24.

1    defendant Akbar did you ever lose sight of him?

2        A    I never lost sight of Akbar but I did lose

3    sight of Patterson.

4        Q    What happened after you saw officers Alagna

5    and Dwyer and McMurray stopping defendant Akbar?

6        A    Akbar was then placed into custody with

7    handcuffs and my partner and I proceeded to chase

8    after Patterson, running parallel in the alley of 50th

9    Street from Oakley.

10        Q    What happened as you went after defendant

11    Patterson?

12        A    Officer Giglio was chasing Patterson on 50th

13    Street.   Patterson then ran southbound in the T alley

14    running right into my partner and I.

15        Q    Where was that that you were able to stop

16    defendant Patterson?

17        A    Around 2345 West 50th Place in the T alley.

18        Q    How far away from 2212 West 50th Place is the

19    location where you were able to stop defendant

20    Patterson at 23457 West 50th.

21        A    Little more than a block.

22        Q    With regard to defendant Akbar, where you saw

23    Officers Dwyer and McMurray stop defendant Akbar, how

24    far was that from the location of 2212 West 50th

25.

1     Place?

2          A     Half a block.

3          Q     Once defendant Patterson was detained by you

4     and Officer Giglio what happened with regard to

5     defendant Patterson?

6          A     Patterson was then detained at that location,

7     Officer Giglio then went to get his vehicle.  He was

8     then placed into that vehicle and brought back to the

9     scene where he was positively ID'ed.

10         Q     You traveled back to the scene and observed

11    that?

12         A     Yes, I did.

13         MS. DILLON:  I have nothing further.

14         THE COURT:  Cross.

15         MR. MURPHY:  Nothing.

16         THE COURT:  Thank you.

17                          (Witness excused.)

18         MS. DILLON:  State calls Officer Dwyer.

19                          (Witness sworn)

20

21

22

23

24

1                    OFFICER DWYER,

2     called as a witness on behalf of the people of the

3     state of Illinois, having been first duly sworn, was

4     examined and testified as follows:

5

6                    DIRECT EXAMINATION

7                    BY

8                    MS. DILLON:

9

10     Q     Detective, please state your name, spell your

11     last name, give your star number and current unit of

12     assignment?

13     A     My name is Kevin Dwyer, D-Y-W-E-R, star

14     20311.  I'm currently assigned to Area 2 detective

15     division.

16     Q     Detective, I'm going to direct your attention

17     back to October 1 of 1998.  Where were you assigned

18     then?

19     A     I was assigned to the 9th District.

20     Q     And on October 1st of 1998 in the afternoon

21     hours shortly after 5 p.m. were you working?

22     A     Yes, I was.

23     Q     Who were you working with that day?

24     A     My partner, old partner, Steve Alagna,

27.

```
 1    A-L-A-G-N-A.

 2         Q    Were you and Officer Alagna in uniform or

 3    plain clothes?

 4         A    Uniform.

 5         Q    Were you in a marked car or unmarked car?

 6         A    Marked car.

 7         Q    Now, shortly after 5:00 o'clock that

 8    afternoon what happened?

 9         A    We had monitored -- there was a armed robbery

10    that occurred over at 51st and Western.

11         Q    You monitored a call?

12         A    We monitored the initial call there was a

13    suspicious vehicle in the alley at approximately 50th

14    and Oakley.

15         Q    What did you do after you received that call?

16         A    We proceeded to the suspicious vehicle.  It

17    was parked in the alley.

18         Q    You said that that was in the area of 50th

19    and Oakley?

20         A    Yes.

21         Q    Do you recall the address?

22         A    Not offhand, no.

23         Q    When you went to that location what did you

24    see?
```

28.

1       A       There is a gray Cadillac parked in a lot off

2   the alley.

3       Q       And what happened once you saw that vehicle?

4       A       When we arrived to the vehicle two citizens

5   informed us that two male black subjects --

6       MR. MURPHY:    Objection.

7       THE COURT:    Sustained.

8   BY MS. DILLON:

9       Q       What did you do after you were about to

10  testify?   What did you do without going into any

11  conversation?

12      A       We recovered items out of a trash can.

13      Q       The individuals that you spoke to, did you

14  learn their names?

15      A       Yes.

16      Q       Was that Rosindo and Alvaro Ruiz?

17      A       Yes.

18      Q       After that conversation with the Ruizes you

19  said you went to a trash can?

20      A       Yes.

21      Q       Where was the trash can located?

22      A       Near the vehicle.

23      Q       When you went in the trash can what did you

24  see?

29.

1      A      Two bags, one a green plastic bag and a blue

2    satchel bag.

3      Q      Did you remove those bags from the trash can?

4      A      Yes.

5      Q      With regard to the green bag, what type of

6    green bag was that?

7      A      Garbage bag.

8      Q      Did you look inside that garbage bag?

9      A      Yes.

10      Q      What did you see?

11      A      There was a smaller bag that contained a

12    handgun, there was a black jacket, some other

13    clothing, there were some number of twist ties, two

14    walkie talkies and a police scanner that was on

15    monitoring our police zone.

16      Q      You said there were two bags.  What was the

17    other bag.

18      A      The other bag was a blue like cloth bag, it

19    contained a number of twist ties.

20      Q      The gun that you recovered from that green

21    garbage bag, did you observe whether it was loaded or

22    unloaded?

23      A      It was loaded.

24      Q      What was it loaded with?

1          A      Four live rounds and one spent casing.

2          THE COURT:   A revolver?

3          THE WITNESS:   Yes, sir, it was.

4    BY MS. DILLON:

5          Q      Once you recovered those items what did you

6    do?

7          A      We put them in the vehicle cause at that time

8    we monitored that other officers had observed two men

9    fleeing so we backed up the alley and we placed Jamal

10   Akbar in custody along with Sergeant McMurray.

11         Q      Where did you place Jamal Akbar in custody?

12         A      Right at 50th and Oakley.

13         Q      How far was that from where you got the items

14   from the garbage can where you saw that vehicle?

15         A      Approximately three quarters of a block.

16         Q      And the person that you indicated that you

17   detained in that area, Jamal Akbar, do you see him in

18   court today?

19         A      Yes.

20         Q      Please point to that individual and indicate

21   something he's wearing today.

22         A      He's the man sitting at the table wearing a

23   blue tie and eyeglasses.

24         MS. DILLON:   May the record reflect in court

31.

1    identification of defendant Jamal Akbar.

2       THE COURT:   Okay.

3    BY MS. DILLON:

4       Q    With regard to the items that you recovered

5    from that garbage can did you keep those in your

6    custody?

7       A    Yes, I did.

8       Q    Did you bring items back to the original

9    scene at 5102 South Western?

10      A    Yes, I did.

11      Q    Did you show those items to anyone?

12      A    Yes.

13      Q    Who did you show them to?

14      A    The victims at the scene.

15      Q    And what did you show them?

16      A    The jacket, the handgun, the blue satchel,

17      Q    Did they recognize them?

18      A    Yes, they did.

19      Q    With regard to the gun with the four live

20   rounds and one spent casing, did you inventory that

21   weapon?

22      A    Yes, I did.

23      Q    Did you inventory that under 2074452?

24      A    Yes.

32.

1    Q    With regard to the items of clothing, the

2    shirt, tie, green plastic bag, did you inventory those

3    items?

4    A    Yes.

5    Q    Did you inventory those under 2074454?

6    A    Yes.

7    Q    With regard to the remainder of the items

8    that you recovered from the garbage can, the black

9    jacket, blue bag, walkie talkies, police scanner, zip

10   ties, brown bag, did you inventory those Items under

11   2074453?

12   A    Yes.

13   Q    Officer, I'm going to show you what's marked

14   People's Exhibit Number 12, for identification.  Do

15   you recognize what that's a photograph of?

16   A    Garbage can.

17   Q    The garbage can that you removed the gun as

18   well as the other items from?

19   A    Yes.

20   Q    Does it truly and accurately portray the

21   garbage can as it appeared on that day?

22   A    Yes.

23   Q    Showing you People's Exhibit 10, for

24   identification, do you recognize what that's a

33.

1    photograph of?

2        A    Yes.    The vehicle we responded to, the gray

3    Cadillac.

4        Q    Is that the same vehicle that you observed in

5    the area of 50th and Oakley?

6        A    Yes.

7        Q    Does it truly and accurately portray the

8    vehicle as you observed it that afternoon?

9        A    Yes.

10       Q    I'm now going to show you what was previously

11   marked People's Exhibit Number 5, for identification.

12   Do you recognize what that's a photograph of?

13       A    Yes.    The shirt, tie, pistol holster that we

14   found in the green garbage bag.

15       Q    I show you People's Exhibit Number 6, for

16   identification.    Do you recognize what that's a

17   photograph of?

18       A    Yes.    That's the blue satchel bag that I

19   recovered.

20       Q    Also from the garbage can?

21       A    Also from the garbage can.

22       Q    People's Exhibit Number 7, for

23   identification, do you recognize what that's a

24   photograph of?

34.

1    A    Yes.  It's a photograph of the black jacket

2    that we recovered.

3    Q    People's Exhibit Number 13, do you recognize

4    what that is?

5    A    Yes.  Those are the two walkie talkies and

6    the police scanner that were recovered from the green

7    bag from the trash can.

8    Q    And I'm showing you what's been marked as

9    People's Exhibit Number 14, for identification.  Do

10    you recognize what that is a photograph of?

11    A    Yes.  The handgun that was recovered.  It was

12    inside the little bag.

13    Q    People's Exhibits 5 through 7, do they truly

14    and accurately portray the items that you recovered

15    from the garbage can, that being the shirt and tie,

16    the blue satchel bag, the black jacket?

17    A    Yes.

18    Q    And People's Exhibit Number 13, does that

19    truly and accurately portray the scanner and walkie

20    talkies you recovered?

21    A    Yes.

22    Q    Does People's Exhibit Number 14 truly and

23    accurately portray the gun and the bag that it was in

24    that you recovered?

1    A    Yes.

2    MS. DILLON:  I tender the witness.

3    THE COURT:  Cross.

4

5                    CROSS EXAMINATION

6                         BY

7                    MR. MURPHY:

8

9    Q    Detective, I'm going to show you People's

10   Exhibit -- first of all, show you People's Exhibit 14,

11   for identification.

12   A    Yes, sir.

13   Q    That's a photograph that depicts a revolver,

14   some bullets and a bag, is that correct?

15   A    Yes.

16   Q    Is the bag that's shown in that photograph a

17   bag that you retrieved from the garbage can?

18   A    The gun was within that little bag, that bag

19   was inside the green garbage bag.

20   Q    Okay.  The bag that's portrayed in the

21   photograph, the gun was inside of it.  Anything else

22   though?

23   A    Just the gun.

24   Q    Sir, you testified here today, if I

1   understood you correctly, that you took items that you

2   recovered back to individuals who described themselves

3   as victims in this case, is that correct?

4       A    Yes, sir.

5       Q    Of the things that they did identify or

6   recognize, that's the word you used?

7       A    Yes.

8       Q    That bag shown in the photograph that has the

9   gun, they didn't recognize that, did they?

10      A    No.  That wasn't shown.

11      Q    No one told you they had seen this bag

12  depicted in this photograph?

13      A    No.

14  MR. MURPHY:   I have nothing else.

15

16                  CROSS EXAMINATION

17                       BY

18                  MS. HOWARD:

19

20      Q    Officer, you didn't hear any noise coming

21  from that garbage can before you approached it, did

22  you?

23      A    Not at all, ma'am.

24      Q    And you didn't hear any noise coming from the

37.

1    bags before you opened them, did you?

2        A    No.

3        MS. HOWARD:  I have no further questions.

4        MS. DILLON:  Nothing based on that.

5        THE COURT:  Thank you.

6        THE WITNESS:  Thank you.  Sir.

7                        (Witness excused)

8        MS. DILLON:  Judge, at this time I would be

9    seeking a continuance.

10        THE COURT:  What date?

11        MS. DILLON:  Judge --

12        THE COURT:  Who are we missing?

13        MS. DILLON:  Alvaro and Rosindo Ruiz.  I would

14    request a two week date in order to be able to serve

15    them.

16        THE COURT:  Two weeks?

17        MS. DILLON:  Yes.  I was not able to serve them in

18    a week but two weeks I should be able to get them in

19    here.

20        MR. MURPHY:  First of all, we object.

21        THE COURT:  I object also.

22        MS. HOWARD:  I join in that, Judge.

23        THE COURT:  I just can't understand.  What is it

24    that these two important witnesses saw that bolsters

38.

1    or hinders your case?  Is there an offer of proof that

2    maybe they would be willing to stipulate to?  I'm not

3    going to continue this case for two weeks while you

4    look for a witness.  We've answered ready a long time

5    ago.  I have already continued it one week.

6        MS. DILLON:  Judge, these are witnesses that have

7    been here multiple times in the past.

8        THE COURT:  You know where they're at.  I can hold

9    it on day-to-day and you should be able to get them

10   here.  What is it you need from them?  They directed

11   the police to the garbage can.

12       MS. DILLON:  Judge, as an offer of proof, the

13   witnesses that are not here today would identify Jamal

14   Akbar as placing the -- one of the two people placing

15   the bags in the garbage can.  I believe it's a very

16   crucial part of our case and we're seeking a

17   continuance.

18       MS. HOWARD:  One second, your Honor.

19       THE COURT:  Again, I'm not continuing it for two

20   weeks.  I'll issue a warrant for their arrest, I'll do

21   everything you want.  You can tell me they've been

22   here each and every time.  Right now they're hindering

23   the fair and impartial administration of justice at

24   this time.  They're not here.  It's the type of

39.

1    conduct that brings the Court in disrepute.  They're

2    not here.  This case has been commenced and continued.

3        Certainly I see how important that is to your

4    case, depending on their testimony I don't think it's

5    going to have any great impact on the final

6    determination of this case but certainly I'll let you

7    put your best foot forward.  And so far that is the

8    only link that I have heard connecting Akbar other

9    than he was nearby with this car.  And one of the

10    defendants may have gotten a short lift in that car.

11    I don't know.  He's accountable for the aggravated

12    discharge, he's accountable for the attempt murder,

13    he's accountable for the attempt armed robbery.  So

14    certainly I'll allow you time but I'm not going to

15    continue it for two weeks.

16        MS. DILLON:  How about one week.

17        MS. CHAMBERLAIN:  The problem is next week is

18    Thanksgiving.

19        MR. MURPHY:  Judge, if we don't finish it this

20    week we're talking about late December.

21        THE COURT:  I'll try the 20th.  11-20.  They've

22    been here each and every time, they're not out of the

23    country.  I'm giving you due diligence.  Right now I

24    think there is a lack of due diligence.  Trial has

40.

1    started.   I recognize state's right to fairly and

2    impartially try this case but again, the witnesses are

3    important.

4        MR. MURPHY:   Judge, in view of the fact that

5    you're willing to give them a continuance can I

6    suggest the 21st.

7        THE COURT:   Okay.   Whatever you want, counsel.

8    Convenience of you I always take into consideration so

9    11-21 it is.   Trial commenced and continued 11-21.

10                         (WHEREUPON, those were all the

11                          proceedings had on this date

12                          with the cause being continued

13                          until the 21st day of

14                          November, A.D., 2001.)

15

16

17

18

19

20

21

22

23

24

41.

```
 1              IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
                   COUNTY DEPARTMENT - CRIMINAL DIVISION
 2

 3              I, Cecilia A. Peterson, an Official Court

 4       Reporter of the Circuit Court of Cook County, County

 5       Department - Criminal Division, do hereby certify that

 6       I reported in shorthand the proceedings had in the

 7       above-entitled cause; that I thereafter caused the

 8       foregoing to be transcribed into typewriting, which I

 9       hereby certify to be a true and accurate transcript of

10       the proceedings had before the Honorable RONALD A.

11       HIMEL, Judge of said court.

12

13

14

15

16                                      Official Court Reporter
                                        CSR # 084-001826
17

18

19

20

21

22

23

24
```



# Exhibit D



Br. 48-2
(Court Branch)                    2 Oct.98
                              (Court Date)

CCCN-0662-100M-11/14/97 (83420157)
(This form replaces CCG-0662 & CCMC-216)

FELONY

# IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

**The People of State of Illinois**
**Plaintiff**

v.                                    **COMPLAINT FOR PRELIMINARY EXAMINATION**

NO. .........98114310....................

Kevin Patterson
...................................
**Defendant**

Connexions          Timmy Jones
.................................................................... **complainant, now appears before**
                 **(Complainant's Name Printed or Typed)**

the Circuit Court of Cook County and states that

Kevin Patterson                9642 S. Lowe          Chgo, Il.
..................................................................... **has, on or about**
**(defendant)**                  **(address)**

1 Oct. 98                      5012 S. Western       Chgo, Il.
.............................**a t** ...........................................
**(date)**                                **(place of offense)**

committed the offense of ............        Attempt Armed Robbery        ..................... **in that he/she**

with the intent to commit the offense of Armed Robbery .., the defendent entered Connexions...

and attempted to rob them of USC,. while armed with a firearm,.Smith & Wesson revolver, 38 Cal.

........................................................................................

........................................................................................

........................................................................................

in violation of ..........   720   **ILCS** ...............   5   .......... / ........   8-4   .............
              **(Chapter)**              **(Act)**                        **(Section)**

X Timmy Jones   Det.JCD #20204
                                            **(Complainant's Signature)**

▭▭▭▭ F I L E D

CHARGE CODE

OCT 06 1998

STATE OF ILLINOIS }
COOK COUNTY     } ss.

AURELIA PUCINSKI
CLERK OF CIRCUIT COURT

...................................          ...................
**(Complainant's Address)**              **(Telephone No.)**

          Timmy Jones
.......................................
**(Complainant's Name Printed or Typed)**

being first duly sworn, .............   his   ............... **on oath, deposes and says that he/she read the foregoing**
complaint by him/her subscribed and that the same is true.

Timmy Jones   Det.JCD #20204
.......................................
**(Complainant's Signature)**

Subscribed and sworn to before me ................        01 OCT        ................ ,19 98
                                    .................................
                                    **(Judge or Clerk)**

I have examined the above complaint and the person presenting the same and have heard evidence thereon, and am satisfied that there is
probable cause for filing same. Leave is given to file said complaint.

Summons Issued,
     or
Warrant Issued,
     or
Bail set at

Judge.................................................................
.......................................................................
                                                        **Judge's  No.**
Bail set at, ..........................................................
.......................................................................

............................... Judge...................................
                                                        **Judge's No.**

**AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY**

48 - 2
(Court Branch)          (Court D...)

FELONY

CCG-6662-250M-12/06/94 (53420160)

2.

# IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

The People of State of Illinois
                    **Plaintiff**

**COMPLAINT FOR PRELIMINARY EXAMINATION**

v.                                             NO. ..................................

KEVIN  PATTERSON
........................................
                    **Defendant**

P.O.  P.  GREENAN  # 19169  (STATE  OF  ILLINOIS) ........... complainant, now appears before
........................................
(Complainant's Name Printed or Typed)

The Circuit Court of Cook County and states that

KEVIN  PATTERSON ............ 9642  S.  LOWE ... CHGO.  IL.  60628 ........... has, on or about
........................................
(defendant)                         (address)

01. OCT. 98 ..................... at 5102  S.  WESTERN   CHGO.  IL.  60609   COOK COUNTY.
........................................
(date)                                        (place of offense)

committed the offense of ... U.U.W. (BY FELON) ................................. in that he/she
A. PERSON. WHO. HAS. BEEN. CONVICTED. OF. A. FELONY. UNDER. THE. LAW. OF (STATE. OF. IL.)
KNOWINGLY. POSSESSED. ON. HIS. PERSON. A. SMITH. AND. WESSON. BLUE. STEEL. 5. SHOT.
REVOLVER. WITH. A. 2. INCH. BARREL. SERIAL. No.. R. 23319. , 38. CALIBER.
........................................
........................................

in violation of ...... 720 .......... ILCS .......... 5 .......... / 24-1.1 (a) ......
........................................
(Chapter)                      (Act)                          (Section)

P.A. Paul T. Green ..... #19169 ......
........................................
(Complainant's Signature)

CHARGE CODE

3501. S. LOWE ..... (312) 747-8327
........................................
(Complainant's Address)          (Telephone No.)

STATE OF ILLINOIS }
COOK COUNTY      } SS.

**FILED**

OCT 06 1998

P.O. PAUL GREENAN  #19169
........................................
(Complainant's Name Printed or Typed)

being first duly sworn, .......... AURELIA PUCINSKI .......... on oath, deposes and says that he/she read the foregoing
complaint by him/her subscribed and that the same is true. COURT

P.O. Paul T. Green ..... #19169
........................................
(Complainant's Signature)

Subscribed and sworn to before me .................................................. ,19.....

Aurelia Pucinski A... 6713
........................................
(Judge or Clerk)

I have examined the above complaint and the person presenting the same and have heard evidence thereon, and am satisfied that there is probable cause for filing same.  Leave is given to file said complaint.

Summons issued,
or          Judge...............................................................................
Warrant Issued,                                                              Judge's  No.
or          Bail set at, ........................................................................
Bail set at ................................. Judge .................................
                                                                            Judge's  No.

**AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY**

_4-V.2_

(Court Branch)     (Court Date)

CCR-N662-250M-10-10-97 (85291350)
This form replaces CCG-0662 & CCMC-216)

**FELONY**

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

3.

The People of State of Illinois
**Plaintiff**

**COMPLAINT FOR PRELIMINARY EXAMINATION**

**NO.** 981154412

v.

_Tamar Akbar_
................................
**Defendant**

_Ferse ..... CLARENCE BEALS_ complainant, now appears before
(Complainant's Name Printed or Typed)

The Circuit Court of Cook County and states that

_Tamar Akbar_ .......................... _4343 S Mongan_ .......................... has, on or about
(defendant)            (address)         5102 S. WESTER

_1 Oct 97_ .......................... at .......................... _Cook County Ill_    CHICAGO, IL
(date)                        (place of offense)

committed the offense of .......... _AGGRAVATED DISCHARGE_ .......... in that he/she
_while armed with a handgun case use them five
person or ferse at 616 by knowingly the most
force KNOWINGLY AND INTENTIONALLY DISCHARGED A
FIREARM IN THE DIRECTION OF CLARENCE BEALS_

in violation of .......... _720_ .......... **ILCS** .......... _5_ .......... _/5/24-1.3_
(Chapter)           (Act)             (Section)    (9)(2)

_Clarence Beals_
(Complainant's Signature)

| | | | | |
|---|---|---|---|---|
| | | | | |

**CHARGE CODE**

**STATE OF ILLINOIS**
**COOK COUNTY** } ss.

(Complainant's Address)        (Telephone No.)

_Ferse McGee Asst Connerslr_
(Complainant's Name Printed or Typed)

being first duly sworn, .......... _Ferse McGee_ .......... on oath, deposes and says that he/she read the foregoing
complaint by him/her subscribed and that the same is true.

_Clarence Beals_
(Complainant's Signature)

Subscribed and sworn to before me ......................................................... ,19.....

.........................................................
(Judge or Clerk)

I have examined the above complaint and the person presenting the same and have heard evidence thereon, and am satisfied that there is probable cause for filing same. Leave is given to file said complaint.

Summons Issued,    **Judge** .......................................................... Judge's No.
    or
Warrant Issued,    Bail set at, ..........................................................
    or
Bail set at .......................................... Judge ..........................................
                                                                     Judge's No.

**AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY**

COURT FILE COPY

# Exhibit E

1.

Identify and describe all property or possible evidence recovered at the end of the Narrative in column form. Show exactly where found, when found, who found it and it's description (include Property Inventory numbers). If property taken is scribed for Operation Identification, indicate I.D. number at the end of Narrative. Offender's approximate description, if possible, should include name if known, nickname, sex, race code, age, height, weight, color eyes and hair, complexion, scars, marks, etc. If suspect is arrested, give name, sex, race code, age, C.B. or I.R. number, if known, and state "In Custody." All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

## AREA 1 SUPPLEMENTARY REPORT
### CHICAGO POLICE-FOR USE BY B.I.S. PERSONNEL ONLY

NFF          C630222

| Offense Classification / Last Report | | IUCR Code | Offense Reclassification / DNA | | | Revised IUCR |
|---|---|---|---|---|---|---|
| Robbery/attempt armed-handgun | | 033A | DNA | | | |

| Address of Occurrence | Type of Location | Location Code | Date of Occurrence | Time of Occurrence | Beat of Occ. | Beat Assigned |
|---|---|---|---|---|---|---|
| 5102 S. Western | Business office | 140 | 1 Oct 98 | 1908 | 941 | |

| Victims | Victim's Name | Relation | Method Code | Method Assigned | Unit | Sale Method | If Residence / Where Occupants |
|---|---|---|---|---|---|---|---|
| 1 | Connexions Soc. Ser. | 24 | | FIELD | 610 | DNA | DNA |

| Offenders | Offender's Name | Relation | Num Arrested | Arrest Unit | Adults | Juveniles | Fire Related | Gang Related |
|---|---|---|---|---|---|---|---|---|
| 2 | PATTERSON, Kevin | | 2 | 009 | 20 | 0 | No | No |

**Update Information    *See Narrative For Updated Information**   EPC XCOCδ

| Victim | Verified | [ X ] | Offender Verified | [ X ] | Property Verified | [ X ] | Circumstances Verified | [ X ] |
| Victim | Update | [ ] | Offender Updated | [ ] | Property Updated | [ ] | Circumstances Updated | [ ] |

### STATUS

0 - Prog   1 - Sus   2 - Unf   3 - C/C   4 - C/O   5 - C/C/X   6 - C/O/X   7 - C/N/C
[ ]       [ ]       [ ]       [ X ]     [ ]       [ ]         [ ]         [ ]

### HOW CLEARED

1- Arrest   2- Juv-Cl.   3- Ref Pros   4- Comm Adj   5- Other Ex
[ X ]       [ ]          [ ]           [ ]           [ ]

THIS IS AN AREA 1 FIELD INVESTIGATION 3-CLEARED CLOSED REPORT

DATE & TIME ASSIGNED:          1 Oct 98/3rd watch.

VICTIM:          Connexions Social Services,
5102 S. Western, (773) 778 0928

ADDITIONAL VICTIMS:          JONES, Timmey, L., M/1, 36 yrs,
25 Dec 61, SS# 343 493 5950,
residing at 6728 S. Ridgeland,
(773) 493 2558,
employed Connexions Social Service,

**INV FILE**

McGEE, Felise, M/1, 39 yrs,
26 Nov 68, SS# 345 52 6498,
residing at 1523 Deer Creek Lane, Ford Heights, Il
(708) 757 6032,
employed Connexions.

BEALS, Clarence M/1, 44 yrs,
14 Aug 53, SS# 351 46 6745,
residing at 1401 E. 55t St., 712 N,
(773) 363 6728,

OCT 21 1998

| 90.EXTRA COPIES REQ'D | | 91.DATE SUBMITTED | TIME | 92 SUPERVISOR APPRV-STAR |
|---|---|---|---|---|
| Normal | | 17 Oct 98 | 1834 | Sgt. Murphy 20259 |
| 93.REPORTING OFFICER--PRINT | STAR | 94 REPORTING OFFICER | STAR | SIGNATURE |
| J. Riley | 20250 | J. DeRosa | 26209 | B. Murphy |
| SIGNATURE | | SIGNATURE | | DATE APPROVED---TIME |
| | | | | 17 Oct 98  1938 |

CPD-11.411/C-B(Rev 3/97)COMPUTER GENERATED          SIGNATURES IN BLUE INK

C630222

2.

Robbery/attempt armed-handgun                                          C630222
Connexions Soc. Ser.                                                   17 Oct 98

Page 2

| | |
|---|---|
| | employed at Connexions. |
| IN CUSTODY: | PATTERSON, Kevin, M/1, 47 yrs., |
| | 16 Jan 51, SS# 329 48 3912, |
| | residing at 9642 S. Lowe, |
| | (773)-239 4441, |
| | IR#207100, |
| | No gang affl. |
| | |
| | AKBAR, Jamal, A., M/1, 45 yrs, |
| | 28 Mar 53, SS# 354 42 1998, |
| | residing at 4343 S. Michigan, 2nd fl., no tel., |
| | IR#824631, |
| | No gang affl. |
| ARRESTING OFFICERS: | PATTERSON: |
| | P.O. B. McDermott #8852, 009 |
| | P.O. P. Greenan #19169, 009 |
| | AKBAR: |
| | P.O. K. Dwyer #16603, 009 |
| | P.O. S. Azagna #6049, 009. |
| DATE, TIME, LOC. OF ARREST: | Patterson; 1 Oct 98/1725 hrs, 2345 W. 50th St., (alley). |
| | Akbar; 1 Oct 98/1726 hrs., 5015 S. Oakley. |
| CHARGES, CT. BR., DATE: | Robbery/Armed |
| | Br. 48-2/4 oct 98. |
| WEAPON: | S/W, .38 cal., B/S, snub nose, #R28319. |
| LOCATION: | 5102 S.  Western. |
| WEATHER & LIGHTING: | Inside scene/artificial & natural light, |
| MANNER/MOTIVE: | Use of Force/personal gain. |
| IDENTIFIED BY: | Patterson identified by; |
| | Timmy JONES, Clearence BEALS, Felise McGEE. |
| | Akbar identified by: |
| | Rosendo RUIZ & Alvaro RUIZ. |
| VEHICLE USED: | "86 2dr Cadillac, grey, Il. Lic. #XSS961, |
| | V.I.N. 1G6CD4781G4218233, |
| | registered owner Jamal AKBAR. |
| PROPERTY TAKEN: | None/attempt armed robbery. |
| EVIDENCE: | (1) Smith & Wesson .38 cal. snub nose revolver, |

| PREPARER–SIGN OR INITIAL | APPROVAL–SIGN OR INITIAL |
|---|---|
| JR | BM |

Robbery/attempt armed-handgun                                              C630222
Connexions Soc. Ser.                                                       17 Oct 98

Page 3

|  |  |
|---|---|
|  | Ser. #R28319, (4) live bullets, (1) spent casing. |
|  | (2) walkie talkies, |
|  | (1) police scanner, |
|  | plastic twist ties, |
|  | brown satchel bag, |
|  | black jacket, |
|  | photos of lineup. |
| NOTIFICATIONS: | Felony Review Unit , ASA M. Gemeski responded. |
| PERSONNEL ASSIGNED: | P.O. J. Fudacz #7441, 009 |
|  | P.O. W. Campbell #5193, 009 |
|  | P.O. K. Dwyer #16603, 009 |
|  | P.O. S. Azagna #6049, 009 |
|  | P.O. B. McDermott #8852, 009 |
|  | P.O. P. Greenan #19169, 009 |
|  | E.T. T. Giglio #12658, 009 |
|  | Sgt. J. McMurray # 1962, |
|  | Det. J. Riley #20250, 610 |
|  | Det. J. Doroba #20209, 610. |
|  | Det. D. Nugent #20422, 610. |
| WITNESSES: | RODRIGUEZ, Hibolito, M/4, 33 yrs., |
|  | 12 May 65, SS#355 62 9479, |
|  | residing at 2949 W. 55th St., |
|  | (773) 925 6761, |
|  | employed at Ortiz Builders, |
|  | 3332 W. 111th Street, |
|  | (773) 429 1701. |
|  | (EYE). |
|  | RUIZ, Rosendo, M/4, 23 yrs., |
|  | 31 Dec 74, residing at 2212 W. 50th Pl. |
|  | (773) 476 6534. |
|  | (EYE). |
|  | RUIZ, Alvaro, M/4, 62 yrs., |
|  | 25 Jun 36, residing at 2212 W. 50th Pl., |
|  | (773) 476 6534, |
|  | (EYE). |
| STATEMENTS: | PATTERSON, Kevin,-oral. |
| INVESTIGATION: | The Reporting Detectives were assigned to this |
|  | investigation by the 3rd watch commander of Area One |

PREPARER - SIGN OR INITIAL          APPROVAL - SIGN OR INITIAL

4.

Robbery/attempt armed-handgun                                                                    C630222
Connexions Soc. Ser.                                                                             17 Oct 98

Page 4

Det. Div. Sgt. F. Bonke. R/D's were informed that the offenders and victims were located in the 009th
District and proceeded to that location.

Upon arrival the R/D's spoke with 009th District personnel
and learned that P.O.'s Campbell and Fudacz were flagged down by the victims, who fled from the
Connexions business office at 5102 S. Western. They informed these officers that a subject was in their
business armed with a handgun. P.O. Campbell entered the business through the front door as P.O.
Fudacz proceeded to the rear of this location.

Upon entering the location Officer Campbell observed the
offender, kna, Kevin PATTERSON. Patterson had a gun in his hand and was going through a desk at
the rear of the office. Upon seeing Officer Campbell, the offender fled through the rear door. The
offender ran north in the alley, observed by Officer Fudacz, who gave chase on foot. The offender ran
north, crossing 51st St., and then west on 51st St. to Artesian. The offender entered a vehicle which was
waiting with the engine running and driven by a second m/1 subject. This vehicle fled north on Artesian.
The license number was obtained by witness, Hibolito RODRIQUEZ, and this was related to the
officers.

A flash message was sent relative to the offenders and
their vehicle. A short time later the vehicle was located. The vehicle was observed to be locked and the
keys in the ignition. The vehicle is registered to Jamal Akbar. The responding officers were informed by
witnesses Rosendo RUIZ and Alvaro RUIZ that the offenders had left the vehicle and had thrown a bag
into a garbage can. The offenders were pointed out by the witnesses and were taken into custody by
009th District personnel. The officers also recovered a bag from the garbage can containing a handgun,
walkie talkies, plastic twist ties, a police scanner, and clothing. The revolver that was recovered had
four live rounds and one spent shell casing under the hammer.

The offenders were transported to the scene and
Patterson was identified as the offender who had entered the business armed with a hand gun. The
second offender, Jamal AKBAR was identified as a former employee of Connexions. All were
transported to the 009th District.

**JONES, Timmy,** was then interviewed and related in
summary but not verbatim the following; that he is an employee of Connexions. It a social service
business obtaining housing for the poor and homeless. He stated that they collect rents on the first
couple of days of each month. He stated that prior to the attempted robbery, he and Felise McGee and
Clarence Beals were in the office. McGee and he were counting money at the rear of the office and
Beals was in the front part, when the offender, Patterson entered the office. Patterson spoke with Beals
identifying himself as a representative of another agency.

When Patterson entered the office Jones and McGee
decided to put the money in the desk drawer, not knowing who Patterson was. A short time later
Patterson produced a handgun and ordered Beals to the rear of the office with McGee and Jones,
The offender then orders the victims to lie face down on the floor, threatening to kill them. They kneel
on the floor and McGee pleads with the offender not to kill them. At this time Beals attempts to flee out

| PREPARER-SIGN OR INITIAL | APPROVAL-SIGN OR INITIAL |
|---|---|

5.

Robbery/attempt armed-handgun
Connexions Soc. Ser.

C630222
17 Oct 98

Page 5

the rear door. The offender chases Beals to the door and they struggle, with the offender firing a shot at Beals' head. While Beals and the offender struggle, Jones and McGee flee the office through the front door. They see the officers in front and inform them of what had happened.

Jones further related that Beals fled the office after they did and when the officer entered through the front door the offender fled through the rear door. Jones stated that he observed the offender run to Artesian and saw him enter a vehicle. Jones recognized this vehicle as that of a former employee, Jamal AKBAR. The vehicle then fled north on Artesian. Jones further related that a short time later the police returned with the offenders and he identified Patterson as the subject who entered the office and displayed a handgun.

**BEALS, Clarence,** was then interviewed and related in summary but not verbatim the following; that he was in the front of the office when the offender entered the office. Mcgee and Jones were towards the rear of the office counting money. He stated that the offender identified himself as a representative of St. Leonard's House, a social service agency. The offender then produced a handgun and ordered him to the rear, where Jones and McGee were located. They were then ordered to lie face down on the floor. Beals stated he kneeled on the floor and the offender then told him to get up and move towards the center of the room. Beals got up and ran towards the back door and attempted exit, but was caught by the offender. They struggled and the offender attempted to shoot Beals in the head, but missed. Beals then was able to knock the offender to the floor. Beals then fled the office. McGee and Jones had fled the office as Beals struggled with the offender. The police returned the offender to the scene a short time later and Beals identified him.

**McGEE, Felise,** was then interviewed and related in summary but not verbatim the following; that he and Jones were in the rear of the office counting money when the offender entered. He stated that he told Mr. Jones that they should quit counting the money, as they did not know the person who was in the front of the office with Mr. Beals. The offender then produced a handgun and ordered Mr. Beals to the rear of the office. The offender ordered them to lie on the floor. The offender threatened to kill them. McGee stated as he pleaded with the offender not to kill them. Beals ran to the rear door and attempted to flee. The offender chased him and they struggled, with the offender firing a shot at Beals. McGee and Jones fled as the offender and Beals were struggling. McGee stated that the police caught the offender and he identified him at the scene.

**RODRIGUEZ, Hipolito,** was then interviewed and related in summary the following; that he was working at a construction site on Artesian. He saw a M/1 run from 51st St. and then north on Artesian. He ran to a car parked at the curb. He was yelling Go! Go! Go!. He then jumped into the vehicle and the car fled north on Artesian. Rodriguez was able to get the license number and gave the number to the police. He stated that he was at the scene when the police returned with the offender, whom he identified as the person he saw run to the waiting vehicle.

**PATTERSON. Kevin,** was then advised of his rights. After stating that he understood each of these rights, Patterson was interviewed and related in summary but not verbatim the following; he at first denied any knowledge of the incident. He then related that he only meant to intimidate the victims, as they were taking money from poor people.

Robbery/attempt armed-handgun
Connexions Soc. Ser.

C630222
17 Oct 98

Page 6

**AKBAR, Jamal,** was advised of his rights. after stating that he understood each of these rights, AKBAR requested an attorney, and was not interviewed.

The R/D's were not able to locate the witnesses Rosendo and Alvaro RUIZ at this time.

The R/D's then contacted the Felony Review Unit and ASA Michelle Gemeski responded to the 009th District. After reviewing reports and interviewing all available witnesses, Felony charges were placed lodged against Kevin Patterson. Charges were left pending on Jamal Akbar, pending a lineup to be viewed by Rosendo and Alvaro Ruiz.

On 2 Oct 98 at 1800 hours a lineup was conducted in the 009th District. Rosendo Ruiz and Alvaro Ruiz positively identified Jamal Akbar as the person who drove the vehicle abandoned by the offenders. Felony charges were subsequently lodged against Jamal Akbar. This case is submitted as Cleared Closed.

Det. J. Riley
Det. J. Doroba
Area One Detective Division

# Exhibit 1

NOTICE

The text of this order may be
changed or corrected prior to the
time for filing of a Petition for
Rehearing or the disposition of
the same.

*1-14,*

FOURTH DIVISION
June 19, 2003

No. 1-02-0694

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 98 CR 30064 |
| | ) | |
| KEVIN PATTERSON, | ) | Honorable |
| | ) | Ronald A. Himel, |
| Defendant-Appellant. | ) | Judge Presiding. |

O R D E R

Following a bench trial, defendant Kevin Patterson was found guilty of three counts of attempted armed robbery and unlawful use of a weapon by a felon. The trial court imposed a Class X sentence of 18 years in prison. On appeal, defendant contends that there was a fatal variance between the indictment for attempted armed robbery and the proof; namely, the indictment charged taking property from the *person* of another while the proof showed taking property from the *presence* of another. Defendant further contends that although he was in the presence of the three victims, he did not commit attempted armed robbery. Defendant also asserts and the State concedes that defendant was improperly sentenced under the Class X mandatory statute provision. 730 ILCS 5/5-5-3(c)(8) (West 1998). Defendant

1-02-0694

additionally contends that the three convictions for attempted
armed robbery violate the one-act-one-crime doctrine.  We affirm
in part, vacate in part, and remand.

Defendant was indicted, in relevant part, for the offense of
attempted armed robbery "by threatening the imminent use of force
and while armed with a dangerous weapon, to wit: a gun, did any
act, to wit: attempted to remove United States currency from the
person of Clarence Beals."  Two additional, identical indictments
charged defendant with committing the same crime against Felise
McGee and Tim Jones.  Beals, McGee and Jones testified at trial
to the events surrounding the crimes.

At trial, Clarence Beals testified that he works at
Connections, an agency that provides assisted housing for
homeless individuals who are mentally ill and have substance
abuse issues.  On October 1, 1998, shortly after 5 p.m., Beals
was working at Connections when defendant entered the office
carrying a bag and indicated that he was from a social services
agency.  Defendant first sat down in the reception area and then
approached Beals at his desk.  Beals' head was down, and he heard
defendant say, "Stand up.  Turn around, and don't say anything.
I have a gun."  Beals looked up, saw defendant's gun and
complied.  Beals walked to the back of the office where Beals'
two colleagues, Tim Jones and Felise McGee, were talking.  Beals,
Jones and McGee all testified that defendant told them to get

1-02-0694

down on the floor and lie face down.  Beals testified that his
two colleagues asked defendant why he was there and defendant
said "he was there because of some philosophical reason,
something about money and poor people."  While his colleagues
were talking to defendant, Beals began to move towards the back
exit.  Beals, Jones and McGee testified that they then heard a
gunshot.  Beals testified that he felt something graze his left
ear.  Beals ran out the back doors into the lunchroom.  At that
time, defendant was right behind Beals.  There was no exit in the
lunchroom, and when Beals turned around, he saw defendant right
in front of him.  Beals struggled with defendant and was able to
get away from defendant.  Beals ran out the front door of the
main office.  While Beals was standing outside, he saw defendant
being pursued by police officers through an alley.

    Felise McGee testified that when he arrived at work, he
immediately walked to the back of the office to give his boss,
Tim Jones, their clients' rent money.  Beals, Jones and McGee all
testified that the first of the month is rent collection day, and
Jones further testified that for the last eight years he has
worked at Connections, rent has always been collected on the
first of the month.  McGee testified that he saw defendant at the
front door of Connections, and defendant had a cloth-type
briefcase.  McGee asked Jones if he knew defendant because there
was a large amount of money sitting on the desk.  Jones told

1-02-0694

McGee that defendant was there to refer clients from another
agency. McGee told Jones, "You really don't know him, so you
need to put the money away." McGee and Jones testified that
Jones then put the money in the drawer of the desk. McGee
testified that when he was about to leave the office, he turned
around and saw defendant standing with Beals next to him. McGee
testified that defendant had a gun pointed at him and told him to
get behind the desk with Jones and lie face down on the floor.
McGee further testified that Beals ran towards the back,
defendant went after Beals, and McGee ran out the front door.
McGee flagged down a squad car and the officers ran into the
building.

Tim Jones testified that once he put the money in his
drawer, defendant walked over to his desk with Beals. Jones
kneeled while defendant pointed a gun straight at his face.
Beals then got up and went toward the back of the office.
Defendant told Jones and McGee not to move and went after Beals.
Jones testified that he got up and left the office. Jones stated
that McGee flagged down a police car and a female police officer
jumped out. Jones testified that he followed the police officer,
who was chasing defendant through the alley. Jones further
testified that he came across a Cadillac, two blocks away from
Connections. Jones recognized the car and the driver, Jamal
Akbar. Jones testified that Akbar used to drive the same

1-02-0694

Cadillac when he worked for Connections about a year ago. Jones
stated that Akbar worked for Connections for over a year and a
half and drove the Cadillac daily. Jones testified that he saw
defendant enter Akbar's car.

Officer Wayne Campbell testified that he was in a marked
police car with his partner Officer Jane Fudash when a number of
people came running out of a building screaming they were being
robbed and shot at. Officer Campbell exited the police car,
entered the building, and saw defendant behind the last desk in
the back of the office. Defendant was looking down while he
rifled and rummaged through a drawer of the desk. Officer
Campbell testified that when defendant noticed his presence,
defendant looked up with a gun in one hand, dropped "some stuff"
in his other hand back into the drawer, turned around and ran out
the back door with a bag.

Esalvaro Ruiz testified that on October 1, 1998, shortly
after 5 p.m., he saw Akbar and defendant standing by a parked
car. Ruiz testified that he saw Akbar throw a bag inside a
garbage can. Ruiz further testified that the officers found the
garbage can that Akbar threw the bag in.

Officer Kevin Dywer testified that on the day in question he
was working with Officer Steve Alagna. The officers were
monitoring a call about the armed robbery and proceeded towards
the location where a suspicious Cadillac was parked in the alley.

1-02-0694

Officer Dywer testified that he recovered a green plastic garbage bag and a blue satchel bag out of a trash can near the vehicle. The green bag contained a smaller bag, which contained a loaded handgun, a jacket, twist ties, two walkie talkies and a police scanner. The blue cloth bag contained twist ties. The victims recognized the jacket, the handgun and the blue satchel.

At the close of the evidence, the trial court found defendant guilty beyond a reasonable doubt of three counts of attempted armed robbery and unlawful use of a weapon by a felon. Specifically, the trial court found that defendant had the specific intent to commit armed robbery when he went armed with a handgun to Connections "to rob this place of the proceeds to which he had inside information were there." The trial court stated that the officers' testimony along with the victims' testimony established that defendant came very close to removing the proceeds "but no cigar." The trial court found that the discharge of the gun was an aggravating factor. The trial court further found that defendant took a substantial step towards the commission of armed robbery, and defendant committed the offense "in the presence of the three individuals who are named as victims."

At the sentencing hearing, defendant's extensive criminal background was outlined in a presentence investigation report (PSI). The State reviewed the PSI and informed the trial court

1-02-0694

that in 1969 defendant was convicted of aggravated robbery and
sentenced to five years probation; in 1970, he was convicted of
robbery and sentenced to 12 years in prison; in 1978, there were
four separate cases of armed robbery in which defendant was
sentenced to 14 years to run concurrently; in 1978, defendant was
convicted of two more armed robberies and sentenced to 18 years
in prison; and in 1987, he was convicted of armed robbery and
sentenced to 15 years in prison.  The defense attorney stated
that "[t]he Presentence Report is accurate."  The trial court
found that defendant's sentence was a Class X by statute based
upon two prior Class 2 or greater felonies.  The trial court then
asked if there was "anything further?"  Defense counsel replied,
"[n]o, sir."  The trial court sentenced defendant to 18 years in
prison.

On appeal, defendant contends that there was a fatal
variance between the indictment and the proof; namely, that the
indictment for attempted armed robbery charged taking property
from the *person* of another (Beals, Jones and McGee) while the
proof showed taking property from the *presence* of another.

A variance between the crime charged and the crime proven is
not fatal to the conviction unless the variance is material and
misleads the accused in making her defense or exposes her to
double jeopardy.  <u>People v. Jones</u>, 245 Ill. App. 3d 674, 677
(1993).  The defendant must show that the defect in the charge

1-02-0694

actually prejudiced her in preparing her defense.  People v.
Whitamore, 241 Ill. App. 3d 519, 524 (1993).  A variance between
the proof and the charging instrument is not fatal where the
proof conformed to the essential allegations of the charging
instrument.  People v. Taylor, 84 Ill. App. 3d 467, 470 (1980).

The Illinois Supreme Court in People v. Funk, 325 Ill. 57,
61 (1927), held that there was no fatal variance where an
indictment for armed robbery charged taking from the victim's
*person* and the proof showed taking from the victim's *presence*.
We find the decision in Funk dispositive of this case.  In Funk,
the defendant and two accomplices robbed a bank after they had
bound, gagged and placed the bank's president, James S. Kelly,
into another room.  Funk, 325 Ill. at 59.  The defendant alleged
on appeal the exact issue defendant is alleging in this case -
that there was a fatal "variance" because "the evidence fails to
show the commission of the crime as charged in the indictment, as
the indictment charges the taking of property from the *person* of
Kelly while the proof shows it was taken from his *presence*."
Emphasis added.  Funk, 325 Ill. at 60-61.  The indictment in Funk
charged that while putting Kelly in bodily fear of his life and
while against the will of Kelly, the defendant through force and
intimidation robbed from the person of Kelly a large amount of
property.  Funk 325 Ill. at 61.  The court stated the following
in holding there was no variance:

1-02-0694

> "The gist of the offense of robbery is the
> force or intimidation and taking from another
> against his will, a thing belonging to him or
> in his custody.  Such taking may be either
> from the person or the presence of the one
> assaulted.  The indictment was in the
> language of the statute.  The proof was
> sufficient."  <u>Funk</u>, 325 Ill. at 61.

In the instant case, defendant used force and intimidation in placing the three victims in bodily fear of their lives. Jones testified that once he put the rent money in the drawer of the desk in the back of the office, defendant walked over to him with a gun in his hand and said "something about money."  Beals, Jones and McGee all testified that defendant pointed a gun at them and commanded them to lie face down on the ground.  All three victims further testified that they heard a gunshot as Beals tried to run away from defendant.  Officer Campbell testified that he saw defendant rummaging in the drawer of the desk in the back of the office with a gun in one hand and "some stuff" in his other hand.  In accord with <u>Funk</u>, we find there was no fatal variance.

Defendant next contends that although he was indeed in the presence of the three victims, he did not commit attempted armed robbery.

1-02-0694

When a defendant challenges the sufficiency of the evidence, the proper standard of review is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. People v. Williams, 193 Ill. 2d 306, 338 (2000). A conviction will not be disturbed on the basis of insufficient evidence unless the evidence is so improbable or unsatisfactory that there is a reasonable doubt as to the defendant's guilt. Williams, 193 Ill. 2d at 338.

A person commits an attempt when, with intent to commit a specific offense, he does any act which constitutes a substantial step toward the commission of that offense. 720 ILCS 5/8-4(a) (West 1998). A person commits robbery where he takes property "from the person or presence of another by the use of force or by threatening the imminent use of force". 720 ILCS 5/18-1 (West 1998). A person commits armed robbery when he commits robbery while armed with a dangerous weapon or firearm. 720 ILCS 5/18-2 (West 1998). The gist of the offense of armed robbery is the taking of another's property by force or threat of force. People v. Cackler, 317 Ill. App. 3d 645, 647 (2000).

The intent to commit a crime can be inferred by the defendant's actions and all the surrounding circumstances. People v. Murray, 194 Ill. App. 3d 653, 657 (1990). No evidence of a specific demand for money is required where the surrounding

1-02-0694

circumstances are sufficient to establish the requisite intent
for armed robbery.    Murray, 194 Ill. App. 3d at 657.

In the case at bar, the record clearly established that
defendant intended to commit armed robbery and took a substantial
step towards the commission of the offense.  Beals, McGee and
Jones all testified that rent is collected on the first of the
month.  Jones further testified that Jamal Akbar, who drove the
car that defendant used to escape, worked at Connections for a
year and a half and left Connections about a year before.  Jones
also testified that for the last eight years he has worked at
Connections, the rent has always been collected on the first of
the month.  Jones testified that the rent money was on his desk
while defendant was in the reception area.  Jones stated that
once he put the rent money in the drawer of the desk, defendant
walked over to him with a gun in his hand and said "something
about money;" Beals, Jones and McGee all testified that
defendant pointed a gun at them and commanded them to lie face
down on the ground.  See People v. Laramore, 163 Ill. App. 3d
783, 787 (1987) (property is taken in the "presence" of the
victim where the victim is in such proximity or control of the
property that he could prevent the taking if not subjected to
force or threat of force by the robber).  When Beals tried to
escape, Beals, Jones and McGee all testified that they heard a
gunshot.  The timing of defendant's attack shortly after Jones

1-02-0694

removed the money from the top of the desk into the drawer and
heard defendant say "something about money" was sufficient to
establish that defendant intended to commit armed robbery.   See
<u>Murray</u>, 194 Ill. App. 3d at 657-58.   Furthermore, as the trial
court recognized, defendant clearly had "inside information" that
rent money was collected on the first of the month.   Officer
Campbell testified that when he entered Connections, he saw
defendant behind the last desk in the back of the office.
Defendant was looking down while he rifled and rummaged through a
drawer.   Officer Campbell testified that when defendant noticed
his presence, defendant dropped "some stuff" in his hand back
into the drawer, and ran out the back door with a bag.   The
evidence in the record more than established that defendant took
a substantial step in committing armed robbery where the only act
missing was leaving with the money.    Only the arrival of Officer
Campbell prevented defendant from completing his crime.

Defendant also asserts and the State agrees that defendant
was improperly sentenced under the mandatory Class X sentencing
provision because defendant did not have the required number of
prior Class 2 or higher felonies after the effective date of the
statute.    730 ILCS 5/5-5-3(c)(8) (West 1998).

Any claimed inaccuracy or deficiency in a pre-sentence
report must first be raised in front of the sentencing court and
the failure to do so results in waiver of the issue on review.

1-02-0694

People v. Williams, 149 Ill. 2d 467, 493 (1992). Here, defendant
failed to contest the sentence and, thus, waived this issue. As
urged by defendant, however, we will consider the sentencing
issue under the plain error rule. 134 Ill. 2d R. 615(a).

The Class X sentencing provision imposes an enhanced
sentence based on a defendant having previously been convicted of
two or more Class 2 or greater Class felonies. 730 ILCS 5/5-5-
3(c)(8) (West 1998). The first Class 2 or greater felony must
have been committed after the effective date of the statute. 730
ILCS 5/5-5-3(c)(8) (West 1998). The effective date of the
statute was February 1, 1978. 730 ILCS 5/5-5-3(c)(8) (West
1998).

In the instant case, the pre-sentence report listed June 12,
1978 and October 31, 1978 as the dates for the prior armed
robberies. The actual dates defendant committed the prior armed
robberies are January 24 and January 27, 1978, and, therefore,
preceded the effective date of the Class X mandatory statute
provision. Accordingly, defendant was not eligible for a Class X
sentence. We vacate defendant's sentence and remand for a new
sentencing hearing.

Defendant also mentions in a footnote that the three
convictions for attempted armed robbery violate the one-act-one-
crime doctrine. People v. King, 66 Ill. 2d 551 (1977). A single
act can result in multiple convictions if there are multiple

1-02-0694

victims.   People v. Britt, 265 Ill. App. 3d 129, 154-55 (1994).
Here, there were three different victims, Beals, Jones and McGee,
and defendant was convicted of attempted armed robbery for each
victim involved (counts III, IV and V).   Therefore, the three
convictions for attempted armed robbery do not violate the one-
act-one-crime doctrine.

For all the foregoing reasons, we affirm defendant's three
convictions for attempted armed robbery, vacate the 18-year
sentence, and remand for a new sentencing hearing.

Affirmed in part; vacated in part and remanded.

KARNEZIS, J., with THEIS, P.J., and HARTMAN, J., concurring.

15.

96900

**SUPREME COURT OF ILLINOIS**
**CLERK OF THE COURT**
SUPREME COURT BUILDING
SPRINGFIELD, ILLINOIS 62701
(217) 782-2035

December 3, 2003

Mr. Kevin Patterson
Reg. No. A-83515
P. O. Box 1900
Canton, IL 61520

No.  96900 - People State of Illinois, respondent, v. Kevin
            Patterson, petitioner.  Leave to appeal, Appellate
            Court, First District.

The Supreme Court today DENIED the petition for leave to
appeal in the above entitled cause.

The mandate of this Court will issue to the Appellate Court
on December 26, 2003.

# Exhibit 2

∠ NOTICE
The text of this order may be
changed or corrected prior to the
time for filing of a Petition for
Rehearing or the disposition of
the same  *Lainy-Reyes*

*1-10,*

THIRD DIVISION
March 29, 2006

No. 1-04-2140

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 98 CR 30064 |
| | ) | |
| KEVIN PATTERSON, | ) | Honorable |
| | ) | Daniel P. Darcy, |
| Defendant-Appellant. | ) | Judge Presiding. |

O R D E R

Following a bench trial, defendant Kevin Patterson was
convicted of unlawful use of a weapon by a felon and three counts
of attempted armed robbery. Based on his criminal history, the
trial court sentenced defendant to 18 years' imprisonment as a
Class X offender. 730 ILCS 5/5-5-3(c)(8) (West 1998). On direct
appeal, this court affirmed defendant's convictions, but vacated
his sentence and remanded the cause for a new sentencing hearing
because defendant was not, in fact, eligible for a Class X
sentence. People v. Patterson, No. 1-02-0694 (2003) (unpublished
order under Supreme Court Rule 23). On remand, a circuit court
judge, other than the one who presided over defendant's trial,
ordered a new presentence investigation report (PSI), conducted a
new sentencing hearing, and resentenced defendant to 18 years'
imprisonment under the extended-term sentencing statute. 730
ILCS 5/5-8-2(a)(3) (West 1998).

1-04-2140

Defendant now appeals contending that this court should either reduce his sentence or remand his case for another resentencing hearing because, in determining his sentence, the trial court relied on its mistaken belief that defendant's prior convictions from the 1970s occurred in the 1990s, and consequently, failed to give adequate consideration to his potential for rehabilitation.  Defendant also contends that his mittimus should be amended to reflect the correct number of days' credit he is due for time served in custody.  We affirm.

At the resentencing hearing, both parties indicated that the information contained in defendant's PSI was correct.  The State then asserted that although defendant was not eligible for a Class X sentence, he did qualify for an extended-term sentence.  The prosecutor pointed out that the PSI showed that defendant had prior convictions for armed robbery, which were crimes of violence, and that in the instant case, he was convicted of three counts of attempted armed robbery and had fired a gunshot at one of the victims.

In mitigation, the defense presented testimony from Reverend Dr. Frank White, defendant's pastor, who testified that he has known defendant since 1999, at which time defendant gave him $200 to aid a group of children with a church trip.  White further testified that defendant did volunteer work with the Community Administers Alliance teaching children how to use computers.

1-04-2140

The parties then stipulated to the testimony of three
mitigation witnesses.  They first stipulated that Rasan Tamir
would testify that he has known defendant as a community activist
and volunteer for 10 years and that defendant assisted him with
teaching children computer literacy, and distributed food baskets
and gifts in the community.  Tamir would further testify that
defendant served with him on the executive board of Delores'
Place, a homeless shelter, and that defendant engaged in
fundraising and made personal financial donations to the shelter.

The parties next stipulated that Michael Kulczyski, a dean
of students at DeVry University, would testify that he knew
defendant as a student in the engineering program, that defendant
worked in the intramural program, that he graduated from DeVry
and volunteered to serve on the school's board, and that he
regularly visited the school to speak with the faculty and attend
graduation ceremonies.  Finally, the parties stipulated that
Eugene Murphy would testify that he has known defendant for over
25 years, that they have a professional relationship and serve on
the board of Delores' Place together, and that defendant taught
him and others, particularly young children, how to use a
computer.  The trial court ruled that the stipulated testimony
would be admitted as mitigating evidence.

The State then argued that defendant had at least seven
prior armed robbery convictions dating as far back as 1975, and

1-04-2140

maintained that he should be resentenced to 18 years'
imprisonment.  Defense counsel responded that the 18-year term
was extremely harsh based on the facts and circumstances involved
in this case.

Counsel first noted that defendant's most recent prior
conviction was in 1987, and that the bulk of his convictions
occurred in the 1970s.  She further noted that since the 1987
conviction, defendant had obtained an associate's degree in
applied sciences, and in 1997, graduated from DeVry, where he
held numerous jobs.  Referring to the PSI and the stipulated
testimony, counsel pointed out that defendant worked as an
independent contractor from 1998 to 2001, that he also worked at
Radio Shack and United Postal Service, and that he was a founder
of Delores' Place.  She argued that the mitigating evidence,
including being a good student and being involved in his church,
occurred in the 1990s, which indicated that there was a marked
change in his life and that he had turned his life around.
Counsel further claimed that the evidence at trial suggested that
defendant had not acted with malice, but instead, acted out of
compassion for a friend.  Counsel asserted that, given
defendant's background, a sentence in the mid-range for a Class 1
felony of seven to eight years' imprisonment was appropriate.  In
allocution, defendant claimed that he was innocent.

The trial court first announced that its determination of

1-04-2140

defendant's sentence was based upon only the proper evidence
presented in aggravation and mitigation, the arguments of the
parties, and its review of the PSI and the court file.  The court
pointed to page four of the PSI and noted that defendant was
arrested for aggravated battery on March 15, 1969, and was
sentenced to five years' probation.  It then noted that there was
a violation of probation based on a robbery arrest "which
occurred -- it looks like July 12, 1994."  The court stated that
defendant was sentenced to 4 to 12 years' imprisonment on that
robbery, which was his second felony conviction, and that "[h]e
was paroled June 14, 1974."

Immediately thereafter the court stated that in "1975 he was
arrested" for three armed robberies, sentenced to 18 years'
imprisonment, and "was released December 16, 1993 -- strike that,
1983."  Continuing on, the court noted that defendant was
convicted of four additional armed robberies "that occurred in
1998," that he was sentenced to a 14-year prison term which ran
concurrently with his sentence for the three armed robberies, and
that defendant was released "on all those Armed Robberies on
December the 16th, 1993."  The court then stated that defendant
"was again arrested for another Armed Robbery in 1986," that he
was sentenced to 15 years' imprisonment "on September 18, 1987,"
and that he "was discharged or paroled on April 7, 1996."  The
court also noted that defendant was arrested for the offenses in

- 5 -

1-04-2140

the case at bar in 1998.

Thereafter, the trial court explicitly stated that "[b]ased on [its] review of the pre-sentence investigation," defendant was eligible for an extended-term sentence.  The court noted that defendant had 10 felony convictions, most of them being armed robberies, robberies and aggravated batteries, and that all of them were crimes of violence.  The court commented that defendant earned an education, but chose to throw it away.  It then stated that "based on the evidence presented before the Court, considering the aggravation, mitigation, arguments of the parties, [and] considering only the proper evidence" that defendant was eligible for an extended-term, and sentenced him to 18 years' imprisonment.

On appeal, defendant first contends that this court should either reduce his sentence or remand his case for another resentencing hearing because, in determining his sentence, the trial court relied on its mistaken belief that defendant's prior convictions from the 1970s occurred in the 1990s, and consequently, failed to give adequate consideration to his potential for rehabilitation.  Defendant does not dispute that he was eligible for an extended-term sentence.  Furthermore, he acknowledges that the dates stated in the PSI are correct and that the trial court corrected itself on one occasion.  However, defendant maintains that the court erroneously believed that his

1-04-2140

four armed robbery convictions from 1978 occurred in 1998, that
his 1970 robbery and probation violation occurred in 1994, and
that he received a longer sentence because the court thought that
his prior convictions were more recent.

The State argues that the trial court merely misstated some
of the dates while it was reading aloud from the PSI, and that it
did not misapprehend the facts or have a mistaken belief about
when the offenses actually occurred.  The State further argues
that the trial court did give consideration to defendant's
mitigating evidence, but found that he threw his education away,
and notes that the 18-year sentence is closer to the lower end of
the Class 1 extended term range of 15 to 30 years.

Initially, we note that defendant asserts that the proper
standard of review in this case is de novo because the question
before this court is whether the trial court relied on an
improper aggravating factor, and as such, we are applying law to
uncontested facts.  We acknowledge that sentencing issues
involving pure questions of law are reviewed de novo (People v.
Watkins, 325 Ill. App. 3d 13, 18 (2001)); however, that is not
the circumstance in this case.  Here, there is a factual dispute
between the parties as to whether or not the trial court
misapprehended the facts of this case, i.e., the dates of
defendant's prior convictions.  Therefore, de novo review is not
appropriate.

- 7 -

1-04-2140

Attempted armed robbery is a Class 1 felony with an extended
term sentencing range of 15 to 30 years' imprisonment. 720 ILCS
5/18-2(b) (West 1998); 720 ILCS 5/8-4(c)(2) (West 1998); 730 ILCS
5/5-8-2(a)(3) (West 1998). The trial court has broad discretion
in imposing an appropriate sentence, and a sentence that falls
within the statutory range will not be disturbed on review absent
an abuse of discretion. People v. Jones, 168 Ill. 2d 367, 373-74
(1995). An abuse of discretion exists only where the court's
judgment is palpably erroneous or manifestly unjust. People v.
Blackwell, 325 Ill. App. 3d 354, 361 (2001). The most important
factor in determining the appropriate sentence is the seriousness
of the offense, not the existence of mitigating evidence, and
although defendant's potential for rehabilitation must be
considered, it is not given greater weight than the seriousness
of the offense. Blackwell, 325 Ill. App. 3d at 361. This court
defers to the trial court's judgment regarding sentencing and
presumes that the court considered only appropriate factors,
unless the record affirmatively shows otherwise. People v.
Quintana, 332 Ill. App. 3d 96, 109 (2002).

Here, we find no merit in defendant's claim that the trial
court misapprehended the dates of his prior convictions. We
acknowledge that the court misstated a few dates while it was
reading from the PSI; however, there is no indication in the
record that the court was under an erroneous belief as to when

1-04-2140

the convictions actually occurred.  The record shows that the
trial court was reviewing defendant's prior convictions from the
PSI in chronological order, and it did correct one of its
misstatements.  The record further shows that the State argued
that defendant had several prior armed robbery convictions dating
as far back as 1975, and defense counsel noted that the bulk of
defendant's convictions occurred in the 1970s.  The record thus
establishes that despite the misstatements, the trial court was
well aware of when defendant's prior convictions occurred.

In addition, the record indicates that the trial court gave
adequate consideration to defendant's potential for
rehabilitation.  After reviewing defendant's criminal history,
the court noted that he had earned an education, but commented
that defendant chose to throw it all away.  The court further
stated that it had considered all of the proper evidence in
aggravation and mitigation as well as the parties' arguments.

It is not this court's function to weigh the sentencing
factors differently and substitute our judgment for that of the
trial court.  People v. Fern, 189 Ill. 2d 48, 53 (1999).
Moreover, the 18-year prison term imposed by the trial court is
just three years above the minimum term of the statutory range.
Based upon the particular circumstances of this case, we cannot
say that the sentence constitutes an abuse of the trial court's
sentencing discretion.  Jones, 168 Ill. 2d at 374.

1-04-2140

Defendant next contends, and the State agrees, that he is entitled to sentencing credit for 962 days served, rather than 864, and that the mittimus should be amended to reflect the correct number.  Pursuant to our authority (134 Ill. 2d R. 615(b)(1); <u>People v. McCray</u>, 273 Ill. App. 3d 396, 403 (1995)), we direct the clerk of the circuit court to amend the mittimus to reflect that defendant is to receive 962 days of credit for time served.

For these reasons, we affirm the judgment of the circuit court of Cook County and amend the mittimus.

Affirmed; mittimus amended.

KARNEZIS, J., with THEIS and ERICKSON, J.J., concurring.