# Exhibit 3

Post - Conviction
Petition

pages 1-45

Exhibits 1-69 pages.

IN THE
Circuit Court of Cook County
First Judicial Circuit



FILED

DEC 02 2004

DOROTHY BROWN
CLERK OF CIRCUIT COURT

Kevin Patterson                                     )
Plaintiff,                                          )
                                                    )  Case No. 98 CR 30064
            v.                                      )
                                                    )
People of the State of Illinois                     )
Defendant                                           )

## PROOF/CERTIFICATE OF SERVICE

TO: Dorothy Brown–Clerk                    TO:
                                           Richard Divine

    Circuit Court of Cook County          Cook County States Attorney
    2650 S. California                     2650 S. California

    Chicago, Illinois 60608               Chicago, Illinois 60608

PLEASE TAKE NOTICE that on *November 24*, 20 04, I have placed the documents listed below in the institutional mail at _Taylorville_ Correctional Center, properly addressed to the parties listed above for mailing through the United States Postal Service: Post Conviction Petition with supporting memorandum of law. Proof/Certificate of Service

Pursuant to 28 USC 1746, 18 USC 1621 or 735 ILCS 5/109, I declare, under penalty of perjury, that I am a named party in the above action, that I have read the above documents, and that the information contained therein is true and correct to the best of my knowledge.

DATE: November 24, 2004

/s/ Kevin Patterson

NAME: Kevin Patterson
IDOC#: A83515

Taylorville   Correctional Center
P.O. BOX 900
Taylorville _____, IL 62568

*Exhibit #3*

**Courts Copy**

Revised Jan 2002

STATE OF ILLIN

SS

COUNTY OF Christian                IN THE

Circuit Court of Cook County

First Judicial Circuit

FILED

DEC 0 2 2004

DOROTHY BROWN
CLERK OF CIRCUIT COURT

| | | |
|---|---|---|
| People of the State of Illinois | ) | |
| Respondent | ) | |
| | ) | CASE NO. 98 CR 30064 |
| vs | ) | |
| Kevin Patterson | ) | |
| Petitioner | | |

### NOTICE OF FILING

TO: Dorothy Brown-Clerk    TO: Richard Divine         TO:_____
    Circuit Court of Cook, Co. States Attorney         _____
    2650 S. California         2650 S. California       _____
    Chicago, Ill. 60608        Chicago, Ill. 60608      _____
    1 Original & _1_ copy          _1_ copy(ies)         ____copy(ies)

PLEASE TAKE NOTE that on the 24ᵗʰday of _November_____, 2004, I
have filed, through the U.S. Mail, with the above named parties, the below listed
documents (number of copies & originals filed are listed below the addresses of
the parties):

1) _Post Conviction /w Supporting Memorandum of Law_
2) _____
3) _____
4) _____
5) _____
6) _____
7) _____
8) _____

### AFFIDAVIT OF SERVICE

I, ___Kevin Patterson_____, being first duly sworn on oath, deposes and avers
that he/she has caused the above stated documents in the above stated amounts, to be
served upon the above listed parties by placing the same in the U.S. MAIL BOX on
Housing Unit # _1_ located at _Taylorville_Correctional Center in _Taylorville_IL for
delivery as 1st Class Mail.

s/s _Kevin Patterson_____
NAME: _Kevin Patterson_____
IDOC Reg. No. _A83515_____

Subscribed and sworn to before me this _17ᵀᴴ_day of _November_, 2004

_Maria Macatwey_____
NOTARY PUBLIC

"OFFICIAL SEAL"
Maria Macatwey
Notary Public, State of Illinois
My Commission Exp. 04/24/2007

Revised Jan 2002

In the Circuit Court of
Cook, County

People of the State of Illinois        )
                                       )    IND. NO: 98 CR 30064   **FILED**
              vs                       )
                                       )
        Kevin Patterson                )                        DEC 0 2 2004

                                                            DOROTHY BROWN
                                                       CLERK OF CIRCUIT COURT

### PRO SE POST-CONVICTION PETITION

Now comes Kevin Patterson, Defendant, pro se, and petitions this Honorable
Court to grant him relief under post-conviction act. (725 ILCS 5/122-1,
1992)

In support of this petition, Defendant states:

1.  He was convicted of the offense(s) of, Attempted Armed Robbery, after a
    bench trial or entered a guilty plea before the Honorable Ronald Himel
    and was sentenced to 18 years on February 4, 2002.

2.  He appealed his conviction to the Illinois Appealet Court and that court
    affirmed his conviction in part and reversed the sentencing portion of
    said conviction on June 19, 2003, under Appellate No. 02-0694.

3.  He did Petition the Supreme Court of Illinois to take his case and his
    petition for leave to appeal was denied on _DECEMBER 3, 2003_ under
    Supreme Court No: ___96900___ .

4.  Petitioner appeared before the Honorable Daniel Darcy on June 15, 2004,
    and was resentenced pursuant to Appellate Court order of June 19, 2003
    under Appellate No: 02-0694.

5.  Petitioner filed an appeal from the resentencing of June 15, 2004 to the
    Illinois Appellate Court on and no issue of sentencing has been raised as
    a claim in this post conviction petition.

6.  This Petition was mailed to the Clerk of the circuit court within the time
    frame enumerated under 725 ILCS 5/122-1

7.  Petitioner's Constitutional Rights were violated as stated in this Petition
    and the attached memorandum of law.

Kevin Patterson, Defendant, pro se, states, under penalty of perjury, that the
facts set out in this petition are true and correct to the best of his know-
ledge and belief.

                                    Signed: _Ken Patterson_

Subscribed and Sworn to before this  _17TH_ day of _November_,

A.D., _2004_.

_Maria Nachtwey_
        Notary Public

> "OFFICIAL SEAL"
> Maria Nachtwey
> Notary Public, State of Illinois
> My Commission Exp. 04/24/2007

Petitioner on the Post Conviction memorandum alleges that both his trial attorney and his Appellate Attorney have performed below their objective reasonableness and as a result were ineffective in their duty in violation of the quarantees of the sixth amendment to the right of effective assistance of counsel in a criminal prosecution

1.   The trial attorney was ineffective on the following grounds:

A.   Petitioner's trial attorney refused to file a motion to quash the arrest based on the fact that Petitioner was held for six (6) days prior to being brought before a judge for a first appearance and that more than forty-eight (48) hours as prescribed by law for judicial determination of probable cause had long expired before the Petitioner was brought to court.

B.   Counsel was ineffective for his failure to highlight the discrepancies in the conduct detailed in police reports concerning the allegation of a specific "flash message" reportedly used to assist in the apprehension of the petitioner.   The content of these reports concerning the "flash message" was in contradiction of the facts alleged by the victims of the crime as well as on-scene reports of Chicago Police Department R/O's.   Counsel's failure to file for suppression of this alleged perjured information and reports is viewed by the petitioner as issue of ineffective counsel.

C.   Trial attorney was ineffective in denying the petitioner the opportunity to testify when petitioner asked that he be put on the stand to testify.

D.   The trial court was incorrect in failing to dismiss the indictment by the Grand Jury based on the presence of perjured testimony and it's use in obtaining the indictment in violation of petitioner's due process rights.

2.   The Appellate Attorney was ineffective as counsel on five (5) grounds:

A.   For not consulting with petitioner in any way or form before filing an appellate brief on direct appeal of this case.

B.   Appellate Attorney was ineffective for failure to raise an ineffective assistance of trial counsel claim based on the claims presented in this Petition under argument one (1), A,B,C, and D.

C.   Appellate Attorney was ineffective for not arguing in her appellate brief that the indictment charging petitioner for the commission of the crime in this case consist of perjured testimony and that it is insufficient to support the conviction.

D.   Appellate Attorney was ineffective for failure to raise "Plain Error" by trial court in it's finding where the allegation by the victims in the record did not support the indictment and the evidence at trial did not support the indictment.

E.  Appellate Attorney was ineffective for failure to raise the claim that the trial court erred in it's ruling on the insufficiency of indictment claim raised during trial by defense counsel in the Motion for Directed Finding and after trial in the Motion in Arrest of Judgement where the trial court based it's finding solely on evidence at trial rather than on a question of law.

F.  Petitioner's request to reserve issue on the legality of the complaints filed in court against the Petitioner which commenced prosecution against the Petitioner six (6) days after his arrest.

**IN THE**
**CIRCUIT COURT OF COOK COUNTY**
**CRIMINAL DIVISION**

| | |
|---|---|
| Kevin Patterson<br>　　　　　(Petitioner)<br><br>　　　　　vs.<br>People of the State of Illinois<br>　　　　　(Respondent) | Case No. 98CR 30064<br><br>The Honorable<br>Judge Ronald Himel<br>Presiding |

## Memorandum of Law in Support of Post Conviction Petition

**Now Comes** Defendant Kevin Patterson Pro Se, and in the above cause hereby submits this Memorandum of Law to support his claims on the petition for post conviction relief now filed before this court.

Petitioner on this Post Conviction Memorandum alleges that both his trial attorney and his appellate attorney have performed below their objective reasonableness and as a result were ineffective in their duty in violation of the guarantees of the Sixth Amendment to the right to effective asistance of counsel in a criminal prosecution.

Petitioner will hereby list his claims of counsel's deficiency of representation both on trial and on appeal and also present his arguments in support of those claims as stated in his post coviction petition.

(1) The trial attorney was ineffective on the following grounds:

(A) Petitioner's trial lawyer refused to file a motion to quash the arrest of Petitioner and suppress the fruits of the arrest based on the fact that Petitioner was held for six days prior to being brought before a judge for a first appearance and that more than forty-eight (48) hours as prescribed by law for judicial determination of probable cause had long expired before the Petitioner was brought before the Court.

## Argument

During the trial in the above cause Petitioner informed his attorney about his detention in various police stations for six (6) days. The Petitioner was not only held for the six (6) days, he was also transferred among three different stations of the Chicago Police Department during the six (6) days. The entirety of this period was spent without the benefit of legal counsel and was also spent without the benefit of consultation with his family.

Petitioner was booked into the custody of the Chicago Police Department at District 009, located at 3501 South Lowe, Chicago, Illinois on 1 October, 1998 at approximately eight o'clock p.m. He was allowed one phone call at eleven p.m. in which he informed his family of his whereabouts. However, later that night at about two a.m. (2 October, 1998), Petitioner was moved to Chicago Police Department District 002 Station, located at 51st and Wentworth, Chicago, Illinois.

The two day after Petitioner's arrest, his family telephoned Chicago Police Department, District 009 - 3501 South Lowe, looking for the Petitioner but was told the Petitioner was not there. District 009 claimed never seeing the Petitioner. Attached to this Memoramdum is a copy of an affidavit (See Exhibit _13_ ) confirming these facts.

Subsequently, on 4 October, 1998, the Petitioner was moved for a second time from the District 002 station to Chicago Police Department District 001 station at 11th and State Streets, Chicago, Illinois. The Petitioner was held at District 001 until he was brought before the Court. He was then moved for the third time and was brought back to Chicago Police Department District 002, located at 51st and Wentworth, Chicago, Illinois.

While the Petitioner was being moved around from one police district station to another, effectively being hidden, he was prevented from talking to his family

2

and from any possibility of securing and consulting with an attorney. Petitioner constantly demanded his right to speak to an attorney but was refused. He was also refused any further contact with his family who could have secured him an attorney.

The Petitioner is contending here that this conduct violates Illinois Statutes 725 ILCS 103-3 and 725 ILCS 5/109-1. This Petitioner also states here that this conduct is in violation of his right to due process of law under the Illinois State Constitution and the United States Constitution.

The Illinois statute provides, among other things, that;

> "A person arrested with or without a warrant shall be taken without unnecessary delay before the nearest and most accessible judge in that county".

Furthermore, the due process clause of the United States Constitution requires that all procedures of law at all critical stages of arrest and conviction of a citizen be adhered to. These due process rights are inherent in the 4th Amendment of the United States Constitution made available to the State of Illinois by the 14th Amendment.

Petitioner further informed his counsel that while he was being held incommunicado from his family and legal counsel, the police were buying time to rewrite and amend their reports which then became replete with discrepancy and errors.

The fact here is that Petitioner had been arrested without warrant and was being held in custody without a probable cause determination. As stated, this detention was for a duration of six (6) whole days and is clearly in violation of the United States Supreme Court's holding in **County of Riverside v. McLaughlin**, 500 U.S. 44, 114 L. Ed. 2d 49, 111 S.Ct. 1161 (1991). There the court stated:

> "that the jurisdiction that provides judicial determination

3

> of probable cause within 48 hours, will as a
> general matter, comply with the promptness
> requirement of Gerstein."

In that case the United States Supreme Court stated also that if the arrested individual could prove that his or her probable cause determination was delayed unreasonably, he will have proved a "Gerstein" violation.

The Petitioner believes that the arresting officers had all the information necessary to file reports in a timely manner; therefor the ability to present the Petitioner to the Court within a timely manner. The fact that the arresting officers did not do so warrants a review of their actions in the six (6) days that the Petitioner spent in detention with the Chicago Police Department.

Secondly, the Chicago Police did not allow the Petitioner to communicate with his family or to secure legal counsel. The fact that the officers of Chicago Police Department, District Station 009, either lied or failed to reveal information to the family of the Petitioner when they telephoned the district looking for the Petitioner also indicates alterior motive; a motive contrary to the rights of the Petitioner and contrary to the due process of law, thereby warranting review.

In these instances the burden is upon the law enforcement officer(s) involved in the detention of the Petitioner to show cause for the six (6) days of detention without the benefit of probable cause determination within 48 hours as prescribed by law.

Having shown that the Petitioner's right to due process of law has been violated, the Petitioner now asserts here that he allerted his trial attorney to this violation before trial and requested of him to file a motion squashing his arrest based on this violation. The Petitioner's attorney refused to initiate and institute this process at trial even though he had agreed to do so after extensive discussion of this issue. (See Affidavit as Exhibit 24)

This is ineffective assistance of counsel in violation of the Petitioner's Sixth Amendment rights under the United States Constition – Amendments VI, XIV and in violation of the Petitioner's rights under the Illinois State Constitution – ILL. Const. 1970, Art. 1, Sec.8, **Jones v. Barnes**, 463 U.S. 745 (1983); **Penson v. Ohio**, 488 U.S. 75 (1988); **People v. Frank**, 48 Ill. 2d 500, 272 N.E. 2d 25 (1971).

Counsel's failure to raise any arguable issue on appeal of a case when Petitioner demanded his doing so was found to be ineffective assistance of counsel in **Oliver v. United States**, 961 F. 2d 1339, 1342 (7th Cir. – 1992). In that case the court found that if the complaint is apparent in the face of the record and the Petitioner had asked that his counsel confront the issuue by raising it, that counsel should have done so.

Petitioner here believes that such a scenario is not only applicable on appeal but was also applicable at trial. Therefor, based on this finding, the Court should find the trial attorney as ineffective counsel and in dereliction of his duties as Petitioner's attorney, thereby granting post-conviction relief.

(B) Counsel was ineffective for his failure to highlight the discrepancies in the conduct detailed in police reports concerning the allegation of a specific "Flash Message" reportedly used to assist in the apprehension of the Petitioner. The content of these reports concerning the flash message was in contradiction of facts alleged by victims of the crime as well as on-scene reports of Chicago Police Department R.O.s. Counsel's failure to file for suppression of this alleged perjured information and reports is viewed by the Petitioner as an issue of ineffective counsel.

5

### Argument

The Chicago Police Department case report of on-scene acts and information merely stated that:

> "While on Routine Patrol at 5102 South Western, R/O's observed victim's 2,3, and 4 all running from the office at above location. Victims 2 and 3 yelled to R/O's '[Police help! He is in there, he has a gun']".
> (See Exhibit # 2-2A )

In the arrest report however, the officers wrote the following allegation to justify the arrest of the Petitioner:

> "Above subject placed under arrest after A/O's armed with a description via Flash Message from BT. 920 of above vehicle that was just used in an armed robbery and that above subject was observed fleeing from above vehicle. A/O's along with BT. 906 pursued subject on foot, apprehended above subject at above address of arrest. Above subject then positively ID by victims on the scene as an offender in an attempted armed robbery under above R.O. #."
> (See Exhibit # 1 )

The point of contention here is the allegation of Petitioner being arrested and detained for armed robbery according to the flash message that they claimed the R/Os received. Yet the initial CPD case report, which was written and signed by Officer J. Fudacz (star # 7441) and Officer W. Campbell (star # 5193), which Officer W. Campbell did not sign, did not allege that victims had identified the Defendant as an armed robber.

P/O J. Fudacz did not allege in her report that she sent a message for an armed robbery. Nor did any other police officer testify to ever receiving any flash message from Officer J. Fudacz. More specifically, CPD Sergeant McMurray (star # 1962 - BT. 920) has never testified to receiving any flash message from Officer Fudacz.

It is now clear that the arrest reports were founded on an allegation of armed robbery yet the narration contained within the initial two (2) police reports never mentioned an armed robbery or any type of robbery, thereby failing to connect the Petitioner with such an act.

Moreover, the testimony of the victims on the witness stand at trial during this case confirms that allegations of armed robbery that had been inserted into

6

the arrest reports were false and that they had been fabricated by the police. (See Trial Transcript page A42 / See Exhibit # A42 )

> Q: "What happened after you got out the front door?"
>
> A: "Immediately after I exited the building, I headed north, toward 51st and Western, I saw a police car there. I flagged the police car down.  I told him there was a guy in there with a gun, he had just shot one of my colleagues."

This is the victim's testimony.  The discrepancy found between the police reports and this testimony is that the police reports fail to mention a significant action contained within this testimony: **"I told him there was a guy in there with a gun, he had just shot one of my colleagues.".**

Failure to include this vital aspect of the crime in their reports may seem derelict.  Yet the insertion of the two words "armed robbery" into the statements made by the victims which were part of the reports makes the actions of the officers perjurious.

The Petitioner is well aware that this court realizes that perjury is the mortal enemy of justice and with the inclusion of false statments into their official reports the officers committed perjury.  These false statements and other allegations, which remain unsubstantiated by the victims of this crime, were intended to highlight the existence of probable cause allowing the arrest of the Petitioner.  These allegations and falsehoods also gave opportunity for the police to charge the Petitioner with a greater level offense as opposed to charging the Petitioner simple possession of a firearm or unlawful use of a weapon.

The Petitioner's trial attorney knew about this allegation of armed robbery and knew the facts as stated here by Petitioner.  **(See Exhibit # E3-4 Opening Statement E3 line 19-24, E4 line 1-2, A10 line 2-5)**  Petitioner also pointed out this information prior to trial and suggested that his attorney challenge the perjurious information within the reports.  After the victim McGee testified regarding the statements he made to Officer Fudacz when he first encountered her, the Petitioner's trial attorney should have pursued the suppression of the police reports and demanded that that attempted armed robbery sections of the

7

reports and statements be expunged.  In so doing the Court would have had the opportunity to see if the prosecution could substantiate their charges against the Petitioner without the use of the perjured statments of the officers in their reports.  See **Franks v. Delaware**, 483 U.S. 154, 98 S.Ct. 2674, 576 L.Ed. 2d 667 (1978) and **People V. Diaz**, 231 Ill. Dec. 523, 696 N.E. 2d 819.

The trial attorney was deficient in his duty for not filing a motion to suppress the evidence based on the perjured information in the arrest report and the indictment of Petitioner.  The Petitioner suffered prejudice as a result of the attorney's deficiency in as much as the alleged statement was the nucleus of the instrument used to substantiate the charge of attempted armed robbery.

Again, the Petitioner would like to substantiate his arguments by showing that CPD Officers McDermott and Greenan signed and filed reports of the incident stating:

> **"Above subject then positively ID by victims on scene as an offender in an attempted armed robbery under above RD #...."** *Exhibit 1*

The supplementary report filed by these officers contained the following statement:

> **"offender #1 (which was the Petitioner here) was taken to 5102 S. Western and was positively identified by three (3) victims as the subject that displayed and fired a hangun at them."** *See Exhibit 3*

As in aformentioned discrepancies detailed in this argument, the difference between these statements is stratospheric.  An attempted armed robbery is very different from the display and firing of a gun.  Certainly guns are, at times, involved in armed robbery, yet guns can be involved in domestic disputes, traffic disputes or any other dispute.

The fact that the victims of this crime stood under oath and did not at any time allege that their assailant attempted to rob them is proof of the fact that the police reports were falsified; concocted lies by officers of the Chicago Police Department.  The fact that the officers reported two sets of statments is evidence that falsified information, thereby perjuring themselves in at least one of their reports.

8

Therefore, the trial attorney should have filed a motion to suppress the arrest report on these grounds or the bad information in the arrest reports should have been otherwise expunged by the court upon the motion of counsel. Had counsel done this, the charge of attempted armed robbery for which petitioner was convicted would have been impossible to substantiate per the remaining information in the arrest reports.

For this reason, counsel in this case should be found ineffective in accordance with **Strickland v. Washington**, 466 U.S. 668; 80 L.Ed. 2d 674 and **Franks v. Delaware**, Supra. For not only did the federal law forbid the use of perjured testimony against a criminal defendant, Illinois law also forbids such an act. For it has long been recognized that a criminal conviction obtained through the knowing use of false testimony is contrary to fundamental principles of fairness in a civilized society and constitutes a violation of due process. **People v. Jimerson**, 166 Ill. 2d. 211, 223; 209 Ill. Dec. 738; 652 N.E. 2d 278 (1995); **People v. Cihlar**, 111 Ill. 2d 212, 216-17; 95 Ill. Dec. 297; 489 N.E. 2d 859 (1986).

Such conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict. **United States v. Bagley**, 473 U.S. 667, 678-80; 105 S.Ct. 3375, 3381-82; 87 L. Ed. 2d 481, 492 (1985); **People v. Olinger**, 176 Ill. 2d 326, 345; 223 Ill Dec. 588; 680 N.E. 2d 321 (1997).

(C)  Trial attorney was ineffective in denying the Petitioner the opportunity to testify when Petitioner asked that he be put on the stand to testify.

## Argument

During the trial the Petitioner realized that the Judge made a statement in response to his attorney's claim that none of the victims in this case ever testified to the allegation in the charging indictment that the Petitioner ever attempted to rob them. (See **Transcript** exhibit Page D 14 , line 1-16 and D 16 , line 18-22 The above cited pages and lines reflect conversation about the charge

9

of armed robbery in this case between counsel and the court.

When Petitioner heard the Judge in this case make a statement saying that he thinks the state has proved that the Petitioner had committed an armed robbery on the property, the Judge also called the attention of Petitioner's attorney to again ask the attorney to allow Petitioner to testify as to why he was in that office. At this time, counsel requested and received permission to speak with the Petitioner. During this conversation, counsel refused to allow the Petitioner to testify because he did not think that the State had proven the charge of armed robbery as charged in the indictment against him. Petitioner's attorney then walked toward the center of the court, away from the Petitioner. (See **Transcript** /Exhibit D-17, line 2-3)

> **Mr. Murphy: "All right. One second to speak with my client."**
> (See **Exhibit # 24-** 24b – supporting affidavit as to this claim)

In light of this fact, counsel is derelict and deficient in his duty for denying Petitioner the right to testify to aid in his own defense and this amounts to a violation of Petitioner's constitutional rights; the Sixth Amendment of the United States Constituion guarantees this right. **Strickland v. Washington,** Supra. See also **People v. Brocksmith,** (1994), 162 Ill. 2d. 224; 205 Ill. Dec. 113; 642 N.E. 2d 1230; **People v. Anderson**, (1994) 266 Ill. App. 3d 947; 204 Ill. Dec. 367; 641 N.E. 2d 591. Each of the above cases are in support of claims by the Petitioner that the ultimate decision of whether to testify at trial is left to the discretion of the petitioner. This discretion was usurped by Petitioner's counsel in that he refused to put him on the stand despite the Petitioner's insistence of his desire to testify in his own defense.

The actions of Petitioner's counsel here prejudiced the Petitioner, leaving the Petitioner exposed to any speculation as to the reason he was present in the office; allowing the police and the court to fill in gaps in the charge of attempted armed robbery with conjecture.

In particular, when Petitioner's counsel rested the case for the defense

as part of the plan to pursue and argument on a Motion for Directed Finding,
there was no logical or strategic reasoning to do so, other than preventing
the Petitioner from testfying on his own behalf,  Especially if the Court
maintained its  position and counsel's argument failed.

(D)  The trial court was incorrect in failing to dismiss the indictment
by the Grand Jury based on the presence of perjured testimony and its  use in
obtaining the indictment in violation of Petitioner's due process rights.

### Argument

During the trial, Petitioner reviewed a copy of the grand jury indictment
and saw that a witness for the state, in the person of Chicago Police Department
officer Greenan - Star #19169 had testified to the following:

Grand Jury No: 502, Nov. 30, 1998
Transcript Page 3, Line 21-24  (Exhibit 7)

Q:  What did Patterson then do?

A:  He proceeded to the rear of the business, he instructed all
the employees to lay down and face the floor.  Then he
attempted to enter the cash drawer.

Transcript Page 5, Line 5-9  (Exhibit 9)

Q:  Did Campbell have occasion to see Patterson trying to get the
money out of the drawer?

A:  Yes, he did.

Transcript Page 7, Line 17-24  (Exhibit 10)

Q:  Did a citizen named Ruiz have occasion to see what happened
to Patterson's original clothing and to his handgun?

A:  Yes, he did.

Q:  What did Patterson do with his original clothes and the handgun?

A:  He was disposing of the handgun and his clothes in a trash
can in the alley.

Based on the above testimony, Officer Greenan clearly committed perjury in
his answers to these questions, as the only possible evidence in the record that
he could have been speaking truthfully of was the Case Report, which reads as
follows:

"[While on Routine Patrol at 5102 South Western, R/Os observed
victims 2, 3 & 4 all running from the office at above location.
Victims 2 & 3 yelled to R/Os "Police Help!, He's in there. He has
a gun." R/O Campbell entered the office through the front as R/O
Fudacz headed towards the rear of the location. As PO Campbell
entered the office, offender #1 was standing in the rear of the
office rummaging through a desk. Offender #1 was holding a blue
steel revolver. Offender #1 looked up towards R/O Campbell and
fled witht he gun in his right hand through the rear door of the
office......]"

(See Exhibit #2-2A)

   This is the officers own report stating that victims were outside the

building even before they knew of any crime in this case. This case report

also prooves that the Petitioner was alone in the building when Officer Campbell

entered the office. So why would Officer Greenan testify falsely, as he did

before the Grand Jury, if the revealed otherwise? The officer simply, to put

it in a layman's words, lied. And he did so with reckless disregard for the truth.

Officer Greenan had the case report at his disposal when he went before the Grand

Jury. He read the report and he knew what it's contents were, yet he decided

to attempt to sway the jury in an attempt to secure an indictment.

   Secondly, in reviewing at the testimony quoted on page 5, line 5-9, which

represent Officer Greenan's response to questions from the State, Officer

Greenan again lied before the Grand Jury when he testified in response to the

state's question in saying that Officers Campbell and another officer on the

scene saw Patterson trying to get money out of the drawer.

   During the trial on cross-examination of Officer Campbell, Officer

Campbell admitted to the following:

Transcript Page B-15, Line 15-24 (see Exhibit B-15 Line 15-24)

   Q:  When he fled out the back door am I correct or maybe I'm
       incorrect, did you see him with a bag?

   A:  Yes. He had --well I thought it was a case but it turned
       out to be a bag.

   Q:  You could not actually see the drawer that you say that he
       was rummaging in, is that right?

   A:  When I first walked in, no 1 couldn't see it.

Now, these questions and answers were predicated on the earlier testimony of Officer Campbell before the Court; that as soon as he entered the building, he saw Petitioner rummaging through a drawer to take some money. This statement or inference was what Officer Greenan also tried to testify to when he said that Officer Campbell saw the Petitioner attempting to enter the cash drawer.

First, a photographic picture of Officer Campbell's vantage point on the scene of the crime was presented at trial in an attempt to resolve and or rebuke his testimony that he was able to see the Petitioner upon entering the office, rummaging through the drawer. The photograph indiciated that it was impossible for the officer to observe the events on scene as he had testified.

It is then clear that the testimony of this Officer before the Grand Jury, that Patterson was seen attempting to enter a cash drawer, was a lie.

However, the testimony of all of the victims at trial refuted the testimony of these officers, specifically that the Petitioner was looking for money when he came upon them.

Also, on Page 5 of the transcript of Grand Jury testimony, in lines 5-8, Officer Greenan again lied when asked if he had occasion to see Patterson trying to get money out of the drawer. Officer Greenan said, "Yes. I did." This was another lie used to highlight or clarify the charge of attempted armed robbery so the state could use the grand jury as a rubber stamp for their indictment against the Petitioner.

As the above argument reveals that Officer Campbell never saw Mr. Patterson in any act as testified to and that Mr. Patterson did not ever take money from the drawer, it was never established at trial that money was even present in a particular drawer in that desk or that the drawer referred to in Officer Campbell's testimony contained any money. According to photographs displayed at trial, there are seven, or at least seven, drawers in that desk.

In Officer Greenan's testimony, on Page 7 of the grand jury transcript, the Petitioner finds another false statement(s) that was used to secure the

indictment.

Officer Greenan testified to a citizen by the name of Ruiz who allegedly saw Mr. Patterson dumping his clothing and a handgun into a trash can found in the alley.

Mr. Ruiz testified on the stand at trial that Mr. Patterson's co-defendant (this co-defendant was exonerated on all charges) was the person whom he saw throw a bag into the garbage can. According to this testimony, Mr. Patterson was on 50th Street at this time, no where near the particular garbage dumpster which was located in the alley off of 50th Street.

(See Transcript Page D-8, Line 2-7)  (Exhibit  D - 8)

Q: Which of the two men was by 50th Street?

A: The tallest one.  I don't know his name.

Q: And then the man near the alley would be the other man
   you have identified as Mr. Akbar?

A: Yes, he  is the one who asked me for the water.
   (Please note here that Mr. Patterson is referred to as the tallest)

(See Transcript Page D-9, Line 18-22)  (Exhibit D 9)

Q: Before you saw the defendant Akbar lock the car, did you
   see him do anything else?

A: (Through the interpreter):  Oh, yes.  He threw a bag.  I don't
   know what it was but he threw it inside the garbage can.

According to the above testimony, it is clear from the Grand Jury Transcript of the indictment that the Petitioner has again been made the victim of false statements by police officers involved in this case.  Officer Greenan testified that Mr. Ruiz saw Mr. Patterson throw a bag into the garbage can.

This false testimony was used to assist the state in their inference that Mr. Patterson was trying to discard the evidence of an attempted armed robbery.

This act of making false statements was not only perjurious it was also A conspiracy by the state to set up a malicious prosecution of a citizen, as the State knew from the start of the testimony that Mr. Ruiz did not see Mr. Patterson throw any bag away.  The State knew that Mr. Ruiz would not testify at trial

14

that Mr. Patterson was the person he saw throwing a bag into the garbage, they simply used that lie to gussy-up their inferences in order to secure the indictment; a wrongful indictment, an indictment which the state secured for a crime that was not committed by any means necessary.

Obtaining an indictment through false testimony is akin to obtaining a conviction through incorrect testimony. For once the indictment is authorized by the grand jury, the prosecution is validated and the citizen's liberty is thence at risk.  The indictment kick starts the conviction process.

Therefore, it has long been recognized that a criminal conviction obtained through the knowing use of false testimony is contrary to fundamental principles of fairness in a civilized society and constitutes a violation of due process. People v. Jimerson, 166 Ill. 2d 211, 223; 209 Ill. Dec. 738; 652 N.E. 2d 278 (1995).  People v. Cihlar, 111 Ill. 2d 212, 216-17; 95 Ill. Dec. 297; 489 N.E. 2d 859.  Napue v. Illinois, 360 U.S. 264; 79 S.Ct. 1173; 3 L.Ed. 2d 1217 (1959).

Such a conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict.  United States v. Bagley, 473 U.S. 667, 678-80; 105 S.Ct. 3375, 3381-82; 87 L.Ed. 2d 481, 492 (1985): People v. Ohlinger, 176 Ill. 2d 326, 345; 223 Ill. Dec. 588; 680 N.E. 2d 321 (1997).

This court should assume with all due respect to the grand jury members, that they are not stupid.  That without the lies and false statements that were integral parts of the testimony of state's witnesses in this case, that the grand jury would not have and could not have authorized the indictment of the Petitioner for attempted armed robbery in this case.

The main issue here is that absent the perjured testimony, there is not sufficient proof that an alleged armed robbery occured and without sufficient proof the grand jury cannot indict the Petitioner in this case.

Had the Petitioner's attorney filed a motion to have the indictment thrown out based on these reasons at trial, the Petitioner believes that the court would have seen fit to do so based on the record.

The failure of the Petitioner's attorney to file for a dismissal of the indictment along with his motion for arrest of judgment on this issue is a grievous error that caused prejudice against the Petitioner in this case.

Petitioner is hereby requesting this court to find that his counsel was deficient in his duty and that the deficiency has prejudiced the Petitioner. Therefore, he is asking that this court reverse his conviction and re-visit these issues on appeal for proper adjudication according to fundamental fairness and the rule of law.

(2)  The Appellate Attorney was ineffective as counsel on five grounds:

(A)  For not consulting with Petitioner in any way or form before filing an appellate brief on direct appeal of this case.

### Argument

After the Petitioner was sentenced to eighteen (18) years in prison and before the appeal of this case the Petitioner filed a Late Notice of Appeal on March-29, 2002.  The Petitioner embarked on this action because his trial attorney did not ever inform the Petitoner that he had filed a Notice of Appeal two days after his sentencing on February 4, 2002.

The Appellate Court of the First District returned the Late Notice of Appeal filed by the Petitioner on April 4, 2002, informing him that he had no need to file a late notice as his appointed counsel had properly and timely filed a notice of appeal.

Even though Petitioner was represented at trial by a paid attorney, he indicated to the trial court, at sentencing, that his resources to further retain an attorney had diminished.  The trial court agreed and stated that it would appoint an attorney for the Petitioner to prosecute the appeal. **(See transcript/ Exhibit I Line 11-24)**

Thereby, from the day the Court made this pronouncement, the Petitioner waited for the Office of the Public Defender to notify him of the appointment of counsel and to identify counsel.

16

The First District Court then sent correspondence to the Petitioner indicating that his Notice of Appeal had been filed as well as directing the Petitioner to contact the Office of the Public Defender to find out any further information. **(See Exhibit #** *13* **)**  The Petitioner then promptly, on the date of receipt of this correspondence, called the Office of the Public Defender.

However, this first call yielded no results as the Petitioner was informed that the head of the appeals division was on vacation and would not be back in the office until two weeks.

Two weeks later the Petitioner again called the public defender's office and was informed that their office had not received the record in his case and that the office would not appoint a counsel until they received that record. During this call the Petitioner informed the lead counsel of the appeals division of the public defender's office that he wanted them to file for an appeal bond. The head of the department took issue with the idea. He did not want to do what the Petitioner had requested. Whereby the Petitioner informed the head of the appeals division that he would have to file the request for an appeal bond Pro Se if it were to much of a job for the public defender's office. At this point the gentleman agreed promptly telling the Petitioner to send the office a copy of the request as soon as he had filed one.

However, this gentleman failed to inform the Petitioner that the Circuit had made a decision to not accept Pro Se Petitions from criminal defendants who are actively represented by counsel. The Petitioner asserts that this failure was based on the fact that the gentleman did not want to file an appeal bond request for the Petitioner.

On July 22, 2002, the Pro Se motion was denied consideration and a letter was sent to the Petitioner, from the public defender's office, indicating this denial and introducing appellate counsel. **(See Exhibit #** *13* **)**  Until this letter, Petitioner had not been introduced to the attorney that would handle his case. Again he had been told that the office was waiting for receipt of the record before the appointment of appellate counsel.

On August 7, 2002 the Petitioner then filed a complaint against the head of the appellate division of the public defender's office with Rita A. Fry, the director of the public defender's office for Cook County.  Until this complaint was filed a specific attorney had not been identified to the Petitioner as appellate counsel.  **(See Exhibit #** _17_ **)** 17A

On August 15, 2002, over seven months after the Court had delivered the Petitioner's case to the appellate division of the public defender's office, Rita Fry directed the Petitioner's complaint for a follow-up investigation to Lauren B. Simon, who at that time was supervisor of James Reddy.  Evidently until Rita Fry's office delivered the case to Lauren B. Simon, nobody had been appointed to handle the case.  **(See Exhibit #** _18_ **)** Also see exhibit 18A

Now, four (4) days after Ms. Fry delivered the case to Lauren B. Simon for investigation, Emily Eisner, of the appellate division of the public defender's office, sent a letter to Mr. Patterson informing him of her appointment as the counsel of record for his appeal and of her intent to file a brief in a week's time.  **(See Exhibit #** _19_ **–** the court will notice in the Exhibit the date as August 19, 2002-)

Petitioner, upon receipt of this letter, immediately called the public defender's office.  The office informed the Petitioner that attorneys return to the office each day around 2 p.m. and that Petitioner should call back at that time.  The Petitioner made repeated attempts to contact Ms. Eisner by telephone, at the specified time of 2 p.m., but was not able to reach Ms. Eisner until approximately two (2) weeks later.

However, the very day after the Petitioner received the letter of introduction from counsel, he received another letter.  This letter was accompanied by an opening brief for his case which had been filed by counsel.  Yet most of the issues which the Petitioner had identified as points of error, points for counsel to confront in this brief, were missing from the brief.  **(See Exhibit #** _21_ **)**

The Petitioner then sent his appellate counsel correspondence advising her

of his disagreement with the content of the brief and her failure to consult with the Petitioner prior to filing the brief. (SEE Exhibit 22)

This disagreement became a heated argument between Petitioner and Counsel but there was not an avenue for the Petitioner, at that time, to redress the mistakes of his appellate counsel for two reasons:

(1) Petitioner believed he could not file another brief as it was clear that the brief would not be accepted by the appellate court. That it would be simply labelled as hybrid representation as had been done with his Pro Se Motion for Appeal Bond; and

(2) the Petitioner was not admonished by Appellate Counsel that the Petitioner could amend the brief in accordance with **S.Ct. Rule 362** as a statutory right.

Finally, the counsel of record would not cooperate to advise the Petitioner as to a method to proceed on those issues. She simply refused to include or work on anything other than the issues she raised IN the brief, slamming the phone down, hanging-up with the Petitioner during this heated argument.

The actions of Counsel, in this regard by not consulting with the Petitioner before filing the appeal brief, were contrary to his duty and function as counsel and assistant to the defendant; to advocate the cause of the defendant and more particular duties to consult with defendant on important decisions and to keep defendant informed of important developments in the course of the prosecution. **U.S.C.A. Const. Amend. 6.**

The counsel's conduct here so undermined the proper functioning of the adversarial process that the results of the appeal were completely unreliable. The issues that could have been raised and confronted, issues which would have resulted in a reversal of Petitioner's conviction, were left out of the arguments.

More importantly, counsel should have argued the insuffiency of the indictment which was used to convict the Petitioner as a matter of law instead of the frivolous argument she presented basing that issue on evidence. This frivolous

19

argument ended up running the appeal into a wall, eliminating any possibility of success.

The fact on this matter, was that a motion for an arrest of judgment was made during the trial, based on the sufficiency of the indictment. Yet, counsel acted in a manner which was contrary to the fact and did not raise or argue the sufficiency of the indictment as a matter of law and fact. This appears in the record. Instead, she proceeded to argue the same argument which the public defender's office uses in many of the cases they present on appeal for indigent clients. **"The suffiency of the evidence to sustain the conviction."** This is an argument that the office of the public defender, and more importantly defendants, lose ninety percent of the time.

The sufficiency of the indictment in this case was the heart of the matter. The perjured or false statements contained in the indictment were fact as testified to at trial by victims of the crime and this should have been a primary issue to confront or argue on appeal. Instead, this issue was neglected and a frivolous issue was raised on behalf of the Petitioner, by his counsel, on appeal.

Appellate Counsel was a contractor, appointed by the State, at the request of the Petitioner, to do an effective job. Thus, this begs the question of why a contractor (counsel) would fail to contact the contractee (Petitioner) prior to embarkation on a project contracted upon (the appeal).

The accused are entitled to assistance of counsel, whether retained or appointed, and this counsel plays a role necessary to ensure that the trial and all other proceedings are fair. This language, of course, is applicable to all aspects of the appeals process.

The role of counsel is to assist a convicted felon in the appeal process. At minimum, counsel could and should have consulted with the Defendant on which issues to raise and confront, hearing out the client's opinions. Strickland, at least demanded so. **Strickland v. Washington**, 104 S.Ct. 2052 at 2063 (1984); **Geders v. United States**, 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed. 2d 592 (1976) – (bar on attorney-client consultation during overnight recess was ineffective).

The counsel refusal to consult with petitioner in this case before embarking on the appeal itself in this case prejudiced the defendant that no further prejudice is required to be shown by petitioner. One of the most important duty of counsel is to consult with his or her client and provide effective "legal assistance" and in this regard, logic dictates that the failure to consult with petitioner was completely unreasonable.

However, petitioner states here that had the attorney consulted with him, he would have pointed out to her that the motion for arrest of judgment that was filed by counsel at trial was predicated on the sufficiency of the indictment. He would have further explained to the attorney that the arguments should be made that the indictment itself contained perjured testimony and was therefore invalid and that if the perjured information was taken out of the indictment, the indictment will be contrary to petitioners conviction and the conviction cannot therefore stand. (See argument B under trial counsel's ineffective claim.)

B. Appellate attorney was ineffective for failure to raise an ineffective assistance of trial counsel claim based on the claims presented in this Petition under Argument one (1) A,B,C,and D.

Again, because appellate counsel fail to consult with petitioner before embarking on the appeal, she has failed to argue the issues to which petitioner claim here that his trial counsel was ineffective for.

Had counsel consult with the petitioner she would have highlighted this issues for him and the discussion will only

21.

be on whether she will agree to raise them or not. Here, counsel
did not even give petitioner any chance of consultation on those
issues and based on that, no strategy on appeal could be said
to have been followed by counsel here other than neglect of
her duty to consult with her client which resulted in the neglect
of those claims discussed here.

The fact here is that counsel's conduct here seriously
undermined the proper functioning of the adversarial process
so that the appeal cannot be relied on as having produced a
just affirmance.

The merit of the issues petitioner's counsel should have
argued here is apparent on the face of the record. ( See argument
under trial counsel's ineffective claim.)

Strickland, dictates that counsel present arguable issues
on appeal of a conviction in as much as the issue is not frivolous
or in as much as it appears to have merit in the face of the
record. Strickland, supra, counsel in this case failed to provide
reasonable assistance of counsel to petitioner for her failure
to consult with petitioner and her failure to present those
meritorious argueable issues on petitioners appeal.  see Trapnell
v. United States, 725 F.2d at 151-152.

The Sixth Amendment refers specifically to counsel's duty
as one of consultation with his client in every critical stage
of the conviction. Petitioner's counsel failed in this regard
as previously argued in (a) part of this argument. Had petitioner
presented the argument here under the trial counsel's ineffectiveness,
most especially the failure of trial counsel to file a motion
to quash the arrest of petitioner and suppress the fruit of
the arrest based on the fact that petitioner was held in police

22.

custody for six days before appearing before a magistrate judge
for determination of probable cause in violation of both Illinois
law and the federal constitution, the result of the appeal would
have been different.

So would the other remaining issues claimed under the trial
counsel's ineffective representation, would have changed the
outcome of the appeal had those issues been briefed on that
appeal.

Based on the above fact and under the rule of <u>Strickland</u>,
supra, this court should find prejudice and find counsel ineffective
thereby allowing petitioner to re-prosecute the appeal. However,
in the interest of preserving judicial resources, this court
should visit the record de-novo and decide the merit of the
complaint here presented by petitioner.

    (C) Appellate attorney was ineffective for not arguing
        in her appellate brief that the indictment charging
        petitioner for the commission of the crime in this
        case consist of perjured testimony and that it is
        insufficient to support the conviction.

Again, petitioner maintains here first that attorney's
delibrate mistake for not consulting with petitioner before
sending in the first brief on the appeal of this case resulted
in the error of the omission of this argument in the brief on
appeal. This error therefore constituted a violation of petitioner's
Sixth Amendment Rights. However, petitioner will hereby use
the record as presented at trial and the indictment itself to
show that the indictment consisted of perjured testimony and
that without this perjured testimony, the indictment did not

23.

allege the crime for which petitioner was later convicted.

The indictment stated as follows:

Kevin Patterson (as the only person of relevance) committed the offense of attempt armed robbery in that, "They with the intent to commit the offense of armed robbery by threatening the imminent use of force and while armed with a dangerous weapon, to wit: A gun, did ANY act, to wit: Attempted to remove united states currency from the person of Clarence Beals which constituted a substantial step towards the commission of the offense of armed robbery in violation of chapter 720, Act 5, Section 8-4 (720-5/18-2) of the Illinois Compiled Statutes 1992, as Amended, and ..... (See exhibit  //   )

According to the language of this indictment, the state charged and convicted petitioner for "attempted armed robbery by attempting to remove United States currency from the person of Clarence Beals".

However, here are the statements and testimony as appeared in the record.

Transcript A-26 Lines 17-24, and A-27 lines 1-15.

Question:

"You testified here today that he said -- someone was asking him why he was there or what he was doing and you said here to here today that he brought up some philosophical concerns he had about money, is that correct?"
Answer: "More so about people, in terms of poor people and money."
Q: "He never said to you that he was there to rob you, did he?"
A: "No".

Q: "He never said to you or anyone else in the back, back of the office that he wanted your money or their money, is that

24.

correct ?"

A: "That's correct."

Q: "he never attempted to take any money - I don't know if you

had any money on you, but he never attempted to take anything

from you personally did he ?"

A: "No!"

Q: "Same question of the other two people that were in the back

of the office. Did he attempt to take anything from them^?

A: "No Sir."

On page. A-58 lines 12-16, states witness Tim Jones stated

on cross examination:

Q: "When Mr. Patterson got to the location where you were seated

which is before you get to the rear door, did he tell you to

give him the money that was in the desk drawer ?"

A: "No," "He didn't ask me about the money. " (See exhibit A-58)

Based on the above facts from the record, Mr. Clarence

Beals who was the focus of one of the indictments in this case

for the alleged attempt armed robbery And one of the person(s)

whom the petitioner was charged for attempting to take money

from his person and Tim Jones who stated he placed money in

a desk drawer denied any such act. They emphatically said "No",

nothing like that happened to anyone in that office at the time

of the incident. Whether the attempt to rob was directed at

them or their place of business, they Said "No" to the act that

allegedly constituted the "substantial step" to the commission

of the offense of attempt armed robbery as charged in the indictment.'

(See exhibit A26-27,A58). Equally important to this matter is

the testimony of Felise McGee who was synonymously one of the

25.

victims of this incident.

Here is his words: (exhibit/transcript A-42 lines 2-8)

Q: "What happened after you got out the front door?"

A: "Immediately after I exited the building I headed north toward 51st and Western. I saw a police car there. I flagged the police car down. I told him there was a guy in there with a gun, he had just shot one of my colleagues."

Here again, Mr. Felise McGee did not allege that petitioner came to rob them for if it was so, he would have told the officer in the patrol car that he and his colleagues were being robbed, and the robber shot one of his colleagues.

The record is devoid of any witness, i-e, the victims of this crime, testifying at any time that petitioner came to rob them.

It is clear that the police officers in this case inserted the accusation of robbery, and proceeded on the line of argument that money was kept in that office and used the unexplained confrontation between the petitioner and the victims as a pretext upon which to base the allegation of the attempt armed robbery offense. It is also evident from the record that the state knew that the indictment and charge of attempt armed robbery against petitioner was false. Why this conclusion ? The record clearly reflects that the state charged petitioner with "attempting to remove U.S. Currency from the person(s) of " the alleged victims" in the indictment. At trial, the state put the alleged victims on the stand but never asked them if petitioner attempted to rob them. In fact, the state never questioned them about any attempted robbery of them or their place of business by the petitioner.

26.

This in it self shows that the state engaged in "malicious prosecution" of petitioner. It shows the state knew that the attempted armed robbery against petitioner as outlined in the record and pled in the indictment was false but the state nontheless proceeded to charge and prosecute the petitioner for it contrary to chapter 720, act 5, Section 8-4 (720 IlCS 5/18-2) of the Illinois Compiled Statutes, 1992, as amended.  210 Key 56 Law under indictment and information in the state of Illinois stated that " a statute cannot dispense with a statement in the indictment of the essential elements of the crime charged, but it may provide that the property which is the subject of the crime may be described by general words.

Under 210 Key 110(2) most cited cases.

"As a rule, a statutory offense is sufficiently charged in substantially the language of the statute, though the indictment must, by statutory description or other apt words, so identify the offense as to meet the requirements of S.H.A. Const. Bill of rights §9, giving accused the right to demand the nature and cause of the accusation."

Based on the languages of the two statutes quoted above, the language of the indictment in petitioner's case here did not identify the offense for which the victims testified to that petitioner has committed against them.

Victim Mr. Clarence Beals in his own words stated under oath on the witness stand as shown above that the petitioner was not in that office to rob him. He was there for a philosophical reason.

This fact is also buttress by the appellate court's statement in it's opinion in the "Order of June 19, 2003, on the appeal

27.

of this case. On page three of that order, the court acknowledge·
the fact that Beals testified that his two colleagues asked
defendant why he was there and defendant said "he was there
because of some philosophical reason; something about money
and poor people.

Nothing in the testimony in the record that supports the
charge of attempt armed robbery for which petitioner was indicted
for. The record was quite the contrary. A philosophical reason
about money and poor people may mean that some poor peoples
money had been taken by the people in that office and petitioner
was there to see that problem resolved. It did not in any way
support a finding or even give inference of an attempt armed
robbery by petitioner.

Therefore, the charge of attempt armed robbery in the indictment
here in this case is false and perjury at best by the charging
officers. Therefore, the indictment as a whole should be dismissed
with prejudice. Because it violates the statutes mentioned above,
that is, 210 key 56 and 210 key 110(2) of the indictment and
information. See People v. Clark, 256 Ill. 14, 99 N.E. 866.

The dismissal must also be with prejudice because bringing
a new indictment will simply violate petitioner's right based
on the double jeopardy clause of the U.S. Constitution.

    (D) Appellate attorney was ineffective for failure to raise
        "plain error" by trial court in it's finding where
        the allegation by the victims in the record did not
        support the indictment and the evidence at trial did
        not support the indictment.

During the trial and at the conclusion of the state's case
defense counsel moved and argued a motion for directed finding.
At the conclusion of that argument the court stated.

" I have pretty much heard the evidence. I believe based
on the evidence that I heard that Kevin Patterson went
there, like Robinhood to rob from someone he disagreed
with, to maybe it wasn't for his own personal use but he
went there to rob this place and did in fact take a substantial
step towards that by not getting any proceeds. But he went
there armed with a 38.

They prove to me beyond a reasonable doubt that Kevin Patterson
is guilty of attempt armed robbery, three counts and felony
possession of a weapon based on a prior a armed robbery conviction
and him being armed with that 38. I certainly believe that an
aggravating feature is the discharge of this gun during the
course of this, what I believe, is an armed robbery.

Certainly the specific intent was to commit armed robbery
and a substantial step was taken. The only thing missing was
proceeds and certainly the armed robbery was done in the presence
of the three individuals who are named as victims." ( See transcript/
exhibit  D 24-25 ).

Certainly, the court's opinion was completely erronously
based on the testimony in the record. First, the court committed
"Plain Error" when in his finding he stated:

".....but he went there to rob this place and did in fact
take a substantial step towards that by not getting any proceeds"...

The court used the alleged failure it self to complete
the robbery as an element of proof of the charge of attempt
armed robbery. Not the substantial step of the act?

"Attempt to remove United State's Currency from the person
of....

As the indictment alleges. (See exhibit  _//_ ). Through out
the courts summation the court never states  what constitutes
the substantial step element of the charge of "attempt". Less-

29.

more the court never stated what act performed by the petitioner
constituted the substantial step of attempting to remove U.S.
currency from any person as stated in the indictment when the
alleged victims stated no attempt was made to take U.S. currency
from them or their place of business.

It is very clear from the record in this case that the
court was going off of petitioner's record to arrive at this
conclusion of attempted armed robbery as the court so alluded
to in his opinion.   ( See lines 7 thru. 11, page D-25 )

"..... They proved to me beyond reasonable doubt that Kevin
Patterson is guilty of attempt armed robbery, three counts,
and felony possession of a weapon (based on) a prior armed robbery
conviction ......."

This statement by the court alone is so prejudicial as
to question the integrity of the fairness of the court's conclusion.
It bears on the core of the judge's finding that petitioner
committed the offense of attempt armed robbery regrardless of
what the facts in the record were. However, the facts negate
the finding of the court. As the record reflects through the
testimony of the victims themselves that petitioner did not
at anytime announce any intention of committing as armed robbery.
Testimony also reflects from the record that the petitioner
never took or attempted to take any money from the person(s)
or in the presence of the alleged victims as the court stated
because the alleged victims never brought or validated the charge(s)
of attempt armed robbery as stated by the police and charged
by the state. Appellate counsel's failure to raise "Plain Error"
by the trial court under an insufficiency of indictment claim

30

prejudiced petitioner on appeal. For as the indictment charged.

>"Kevin Patterson committed the offense of attempt armed
robbery in that they, with the intent to commit the offense
of armed robbery by threatening the imminent use of force
and while armed with a dangerous weapon to wit: a gun,
did any act to wit: attempted to remove United States
Currency from the person of ......... which constituted
a substantial step towards the commission of the offense
of armed robbery in violation of Chapter 720 Act 5 Section
8-4 (720-5/18-2) of the Illinois Compiled Statutes, 1992.....

The charging instrument as stated herein requires that petitioner

be found as a matter of fact to support the law, to have attempted

to take money from the person(s) of clarence Beals, Felise McGee

and Tim Jones. This is the act required by law the state had

to prove at trial to support any determination of petitioner

having committed the offense as charged. However, it is this

act that the record is devoid of. As the record reflects that

the victims categorically stated that the petitioner did not

attempt to take or remove anything from them. As they stated:

Q: "He never said to you that he was there to rob you did
   did he ?"

A: "No"

Q: "He never said to you or anyone else in the back, back
   of the office that he wanted your your money or their
   money is that correct ?"

A: "That's Correct."

Q: "He never attempted to take money....I don't know if
   you had any money on you, but he never attempted to
   take anything from you personally did he ?"

A: "No"

Q: "Same question of the other two people that were in
   the back of the office. Did he attempt to take anything
   from them ?"

31

A: "No Sir."

(See Transcript/exhibit A27-28)

(See also Tim Jones testified)

Q: " when Mr. Patterson got to the location where you were
seated, which is before you get to the rear door, did
he tell you to give him the money that was in the desk
drawer ?"

A: "No, he didn't ask me about the money.
(See transcript/exhibit A-58)

Besides all these facts, there is also the testimony of
Felise MCGee as the record reflects he stated that he (Felise
McGee) ran out of the office building and approached the patrol
officer(s) and told them that:

"There is a man inside with a gun and he has just shot
one of my colleagues" (See transcript/exhibit A-42)

The fact of the matter here is that the arresting officers
charged petitioner with a crime and based that charge on information
from the victims that was never stated, alleged or supported.

The state followed through on that charge by using the
same police offer who submitted this allegation as a witness
before the grand jury who through his testimony, mislead the
grand jury by insinuating that the alleged victims could/would
testify that petitioner attempted to rob them by attempting
to enter a cash drawer while holding them at gun point in their
place of business and this attempt was done "in their presence."
(See Grand Jury Transcript exhibit 7 L. 22-24).

Therefore looking in the face of record, the indictment
is insufficient to support the record, and the evidence at trial
did not support the indictment which rendered the indictment
insufficient. The allegation of attempt armed robbery not alleged

32

by the victim(s) to support the indictment because the victims allegation (for attempt armed robbery) did not form the core of the indictment but rather the allegation contained in the indictment was a charge created by the police and the trial court should have accepted the testimony of the victim as to the specific act of the crime and base it's finding accordingly rather than on speculation and conjecture.

Therefore, petitioner asserts that the trial court committed "Plain Error" as a matter of law in relation to the evidence in the record on this case. See People v. Young, 128 Ill.2d 1, 131 Ill.Dec. 78, 538 N.E.2d 453. Plain Error as a rule is applied in criminal cases where the evidence is closely balanced or the error is of such magnitude that it's commission denies the accused a fair and impartial trial Young, 128 Ill.2d at 47, 131 Ill.Dec. 78, 538 N.E.2d 453. In light of this, petitioner asked this court to reverse the conviction.

(E) Appellate Attorney was ineffective for failure to raise the claim that the trial court erred in it's ruling on the Insufficiency of Indictment claim raised during trial by defense counsel in the Motion for Directed Finding and after trial in the motion in arrest of judgement where the trial court based it's finding solely on evidence at trial rather than on a question of law.

During trial and at the conclusion of the state's case counsel for the defense stated:

"On behalf of my client, Judge I would be moving at this time for a directed finding of not guilty".......

Counsel moved in numerical order of the indictments from count to count until getting to the attempt armed robbery counts.

33.

(See D-15, line 22) when counsel stated:

> Mr. Murphy: "Attempt armed robbery's count 3. and I wish
> to argue."

The court then stated:

> The court: "Well, you can argue in the light most favorable
>                 to the state. At this time I believe they prove
>                 an armed robbery."

Counsel proceeded to argue based on the court's assertion of
an armed robbery that nothing was taken. (See exhibit D-15-16)

> ONce counsel began to argue counsel stated"

> "Judge, during the course of the trial when Mr. Deals was
>  on the witness stand I asked him on cross examination
>  a question. I asked him the following questions and he
>  gave the following answer. I am speaking of Patterson."
>  "He never said to you or any one else in the back of the
>   office that he wanted your money or their money, is that
>   correct ?"
>  "He never attempted to take money .... I don't know if
>   you had any money on you .... but he never attempted to
>   take anything from you personally, did he ? "No." "I then
>   said same question of the other two people that were in
>   the back of the office. "Did he attempt to take anything
>   form them ?" "No Sir."

> My client is charge in three of the counts with attempt
> armed robbery. In regard to the way the charging documents read,
> count(s) 3, it allege's that my client while armed with a hand
> gun, attempted to remove United States Currency from the person
> of ......( See indictment exhibit   //   )
> Counsel then begin to outline question's and answers from each
> of the alleged victim's of the attempt armed robbery charges.
> (See transcript D-19 line 14-24)

Counsel then stated in his argument:

"The prosecution's theory in this case as I now understand
it, is that my client was trying to take United States Currency
that was in a drawer but not from the person of any person who
was in the business premises"

"The prosecution's theory is that my client was bending
over when the officer came in and was rammaging around in a desk
drawer. Well you now know and the officer had conceded, that
he couldn't see my client's hand in any drawer because he was
looking at the wrong side of the desk".......

Counsel further argued:

"The charging document was very specific in what it alleged
in regard to the offense of attempt armed robbery, it alleges
he was attempting to take property from the person of three
different individuals that were present and there is not
one scintilla of evidence to support that that is what
he did. Indeed the prosecution---- very briefly, at the
risk of repeating myself---- will argue to you he was there
to take the currency from connections, an Entity not a
person" (See transcript/exhibit D-20-21)

In the state's rebuttal argument the following exchange occurred
between the court and the state"

The court "Okay, How about part of counsel's argument where
it charges specifically attempted to remove united
states currency from the person without the added
word or presence of Clarence Beal, Timmy Jones, Felise
McGee?"

Ms. Dillon: "Judge I believe the case law supports the fact
taking from something from the presence of someone. It doesn't
have to be exactly on the person ."

The court: "He is charged with "from the person".

35.

Ms. Kuruc: "Well, on the person, The case law as well would".

The court: "Include presence ?"

Mr. Dillon: "Yes".

The Court: "On the persons or in their persence?".

Ms. Dillon: "That's correct. and case law".

The Court: "You are secure in that these charging documents

are sufficient to support the fact's as testified

to in this case".

Ms. Dillon: "Yes judge". (see exhibit D-23-24)

At the end of the states argument the court ruled summarily
stating:

The court: "I have pretty much heard the evidence. I believe
based on the evidence that I heard that Kevin Patterson went
there like Robinhood to rob someone he disagreed with, to maybe
it wasn't for his own personal use, but he went there to rob
this place and did in fact take a substantial step towards that
by not getting any proceeds"

The court further stated: "Certainly the specific intent
was to commit armed robbery and a substantial step was taken.
The only thing missing was the proceeds and certainly the armed
robbery was done in the presence of the three individuals who
are named as victims." (see exhibit D-25 line(s) 15-19)

Thus the motion for directed finding was denied and petitioner
was found guilty of attempt armed robbery subsequently, the
petitioner was taken into custody and the sentencing hearing
was continued until December 19th, 2001. On that day, trial
counsel filed a motion in arrest of judgement (See exhibit E-2)

36.

During argument on said motion defense counsel stated:   Mr.
Murphy: "I was unwilling to concede that the prosecution could
establish other matters which were set forth the way that they
were pled. (See exhibit E-2 lines 23-24, E-3 lines 1-5.)

Counsel further stated: "In this case, Mr. Patterson's
case, the way the indictment was formed it's alleged little
my client purportedly took or attempted I should say to take
money from the presence of the three named individuals who testified.
The state elected for reason's I would not know, not to include
in the charging document that this attempt was done merely in
the presence of those three people. What I did is I relied upon
the charging document in the preparation of my defense. I relied
upon the fact that I did not believe that the prosecution could
establish that my client attempted to take property from these
three named individuals. Now the way the case developed, the
way the testimony came out, I did ask those three named individuals
when they would testify if my client ever attempted. Commanded
or directed them to give property to him; and, of course, they
agreed with what I thought was going to be their obvious answer,
having read the police reports, that my client never did that.
In sum what I did is, I relied upon that charging document.
I did not ask for a 402 conference in this particular case because
I believed the prosecution had confined themselves to proof
that would show, if they could do it, that my client sought
to take property from those people. The evidence did not support
that theory.

Mr. Patterson and his attorney relied upon it. It's not
being raised for the first time on appeal. It was raised at

at trial and it's being reviewed again at this juncture of the proceeding in post trial fashion.

I believe that there is a fatal variance and that Mr. Patterson, the defendant, is entitled to the benefit of the doubt where it exist. It does exist ". ( See exhibit E-2, line 23-24, E-3 line 1-24 E-4, line 1-18.)

The court interrupted the state's argument injecting it's summation and ruling stating: The Court: "Well, I think I made my position pretty clear on this. Not only did he attempt, I think he completed the armed robbery....." (See E-4, line 20-24) The court further stated: "All the elements of an armed robbery was proven except that he didn't get away with the proceeds. It's clear to me that if this is the law in the United States of America thats a joke...." (See exhibit E-5, Line 5-14.)

And in the court's ruling he stated: " There's no question about his guilt. You citing me that this case is paramount to you saying that if in fact somebody comes up to somebody with a gun and then turns their back maybe and it's outside their presence, he's going through all the drawers in the house, that would not be an armed robbery. I say to you that's ridiculous. I say your argument is ridiculous. Motion in arrest of judgement denied." (See exhibit E-5, line 19-20, E-6, line 1-3.)

It is well recognized that a defendant has a fundamental right under both the federal (U.S. Const, amend VI) and State Constitutions (Ill. Const. 1970, Art. 1 sec. 8, to be informed of the nature and cause of the criminal accusation made against him.

38.

In Illinois this general right is given substance by section 725 ILCS 5/111-3 of the Illinois criminal Code which states: (so much as applicable here)

"Form of charge. (a) a charge shall be in writing and allege the commission of an offense by (1) stating the name of the offense (2) citing the statutory provision alleged to have been violated; (3) setting forth the nature and elements of the offense charged............

Contemporarily it is a cardinal rule that it is not sufficient for a charging instrument merely to set forth the name of the offense and cite the statute which defines it as an offense; it must set forth also the nature and elements of the offense. People v. Pujoue, 61 Ill.2d 335, 335 N.E.2d 437.  People v. Smith, 99 Ill.2d 467, 77 Ill.Dec. 108, 459 N.E.2d 1367, People v. Sirinsky, 47 Ill.2d 183, 260 N.E.2d 505. While the cases in this state have stopped short of requiring absolute compliance with each step, People v. Smith, 77 Ill.Dec. at 110, 459 Ill.Dec. at 1359, they nonetheless require that a charging instrument give notice of the elements of a charge and paticularize it sufficiently with allegations of the essential facts to enable the accused to prepare a defense which if successful would bar further prosecution for the same offense. People v. Hall, 96 Ill.2d 315, 70 Ill.dec. 836, 450 N.E.2d 309, People v. Heard, 47 Ill.2d 501, 266 N.E.2d 501; People v. Shelton, 42 Ill.2d 490, 248 N.E.2d 65: However, no statute can dispense with a statement in the indictment of the essential elements of the crime charged. People v. Clark, 256 Ill. 14, 99 N.E. 866. This requirement maybe satisfied by proper allegations in the body

39.

of the charging instrument even when they vary from the statement
of the offense in the caption People v. Sirinsky, 47 Ill.2d
183 at 187, 265 N.E.2d 505 at 509; People v. Sellers, 30 Ill.2d
221, 196 N.E.2d 481; People v. Shaw, 300 Ill. 451, 133 N.E.
208. The petitioner, (as counsel stated in his argument on the
motion in arrest of judgement (see exhibit E-2, E-3) And the
motion For directed finding (see exhibit D-20-21)) Contends
that the way the indictment(s) was pled:

"Kevin Patterson (as the only defendant of relevance )
committed the offense of attempt armed robbery in that they,
with the intent to commit the offense of armed robbery by threatening
the imminent use of force and while armed with a dangerous weapon,
to wit: a gun, did any act, to wit; attempted to remove United
States Currency from the person of .............which constituted
a substantial step towards the commission of the offense of
armed robbery (See exhibit ___//___ ) Mislead counsel in preparing
his defense and prompted counsel to with hold evidence that
would have changed the outcome of the trial. (See affidavit/exhibit
#23-23A) The court acknowledged the sufficiency of indictment
claim raised by counsel during his argument on the motion for
directed finding when the court questioned the state on the
wording of the indictment. (See exhibit D-2324) The court cited
the indictment has having charged the petitioner with attempt
armed robbery from the person only when the court stated:

The court: "He is charged with "from the person."
                (See exhibit D-23, line 20-21)

It is well established when the sufficiency of the charging
instrument is attacked in trial court before or during trial

a court determines whether the charging instrument strictly
complies with the requirements of section 725 ILCS 5/111-3(a)
People v. Bentez, 169 Ill.2d 245, 214 Ill.Dec. 490, 661 N.E.2d
344; People v. Thingvold, 145 Ill.2d 441, 164 Ill.Dec. 877,
584 N.E.2d 89. The failure to allege an element of the offense
sought to be charged is a fundamental defect that renders the
complaint void People v. Johnson, 69 Ill.App.3d 248, 25 Ill.Dec.
732, 387 N.E.2d 388. While the charging instrument may have
stated a charge on it's face, it failed to charge an offense
based on the facts in the record and to particularize the allegation
with enough information so as to inform petitioner of the act
it was alleged he committed which constituted the offense of
attempt armed robbery and what petitioner was attempting to
rob.   The charging instrument also failed to specify who the
victim was as the state theorized, the "business connections"
as stated in the police reports). (see exhibit __2__ ) The indictment
failed to include "Presence" or any name or reference to anyone
other than a person named in the indictment. That person(s)
never stated, insinuated or supported an allegation of robbery.
Therefore, the court erred in it's ruling on the motion for
directed finding when it failed to ensure that the charging
instrument strictly complies with the requirements of section
725 ILCS 5/111-3(a). See People v. Scott, 285 Ill.App.3d 95,
220 Ill.Dec. 731, 673 N.E.2d 1152, and to require the state
to particularize it's theory in the charging instrument. See
People v. Smith, 259 Ill.App.3d 492, 197 Ill.Dec. 516,k 631
N.E.2d 738.

41.

In this case the charging instrument not only failed to quote
the language of the statute for robbery but also to specifically
articulate and present the state's theory of who the actual
victim was in it's allegation. Further, petitioner states the
court also erred when it used trial evidence for its  judgement
on the motion in arrest of judgement filed by the defense.   It
is well established that the judgement on a motion iN arrest
of judgement raises a question on the sufficiency of the indictment
and if filed in post trial, the court must determine whether
the charging instrument sufficiently appraised the accused of
the precise offense charged with sufficient particularity to
enable a defendant to prepare a defense and allow pleading a
resulting conviction as a bar to future prosecution arising
out of the same conduct. People v. Hughes, 229 Ill.App.3d 469,
170 Ill.Dec. 232, 592 N.E.2d 668. And a ruling on a motion in
arrest of judgement opens the entire record for review and reach
any defect apparent upon it's face. People v. Lutz, 73 Ill.2d
204, 22 Ill.Dec. 695, 383 N.E.2d 171, and may be based only
upon matters appearing on the face of the record and in considering
such a motion the court may not consider trial evidence. Scott
v. Freeport Casualty Co, 392 Ill. 332, 64 N.E.2d 542.   In Re
Munzer, 329 N.E.2d 366, at 369.

    Motions iN arrest of judgement must be decided upon the
record and the record in a criminal prosecution includes no
more than the indictment the plea, the verdict. (when the plea
is not guilty) and the sentence United States v. Bradford, 194
F.2d 197, United States v. Zisblatt, 172 F.2d 740. Such a motion
should be granted where there is an error or defect apparent

42.

on the face of the record or because of some matter which properly
should have appeared of the record but did not. In Re Munzer,
329 N.E.2d 366 at 369. The indictment failure to charge the
material allegation "attempt armed robbery from the presence
of ....." also, rendered the pleading insufficient People v.
Taranto, 2 Ill.2d 476, 119 N.E.2d 221; People v. Figgers, 23
Ill.2d 516, 179 N.E.2d 626. An allegation is so deemed "material"
only if it is one which is essential to the crime. People v.
Adams, 45 Ill.App.3d 334, 4 Ill.Dec. 7, 359 N.E.2d 890. "Attempting
to remove U.S. currency from the person" does not sufficiently
describe the act or acts which form the basis of the state's
theory which gave rise to this charge, so as to afford petitioner's
defense the specificity required that would enable it's preparation
to defend against. The indictment did not describe the nature
of the acts that constitute the crime alleged. The court erred
when it based it's ruling on the motion is arrest of judgement
from trial evidence rather than a sufficiency of indictment
claim which raised a question of law. This claim would have
included how the trial court erred in it's ruling and how the
failure to adequately notify the petitioner as to the nature
of the offense prejudiced the defense thereby prompting the
defense to withhold evidentiary testimony that would have changed
the outcome of this case. This abstinence left the record void
of adversarial testing of the state's case. Thus allowing the
court to fill in unanswered questions with surmise and conjecture
on the chief issue at trial which was undefined. The allegation
in the charging instrument rested on one point while petitioner's

conviction rested on another thus violating the very conceptual core of Due Process of law under the fourteenth Amendment of the United States' constitution See <u>Russell v. United States</u>, 369 U.S. 749, 8 L.Ed.2d 240, 82 S.Ct. 1038 and the Illinois Constitution Article 1 Section 2, See <u>People v. Hughes</u>, 229 Ill.App.3d 469, 170 Ill.Dec. 232, 592 N.E.2d 668 (1992). The failure to raise this issue on appeal was due in part to appeal counsel's failure to consult with petitioner before filing an appeal brief. (See claim 2 (A) of this petition. pg. 16). Thus resulting counsel's actions to fall below a reasonable standard of effectiveness on appeal in violation of the Sixth Amendment of the U.S. Constitution. See <u>Strickland v. Washington</u>, 104 S.Ct. 2052 at 2063 (1984).

(F) The petitioner seeks to reserve issue on the legality of the complaints filed in court on Oct. 6, 1998, (6 days after petitioners arrest) Which commenced prosecution against the petitioner for attempt armed robbery. (This complaint is listed in the common law record on this case under C.L. line 13-14) The petitioner has attempted to ascertain a copy of this document and another document from sources including the clerk of the circuit court with no success. ( See exhibit(s) 25, 26, 27, 28 ) Failure to provide a copy documents in this case to the petitioner while the petitioner is proceeding pro-se during his appeal when the document could assist the petitioner in his appeal or support a claim of a violation of constitution. 725 ILCS 5/109-1 (b-1) and the Fourteenth Amendment of the United States Constitution. See <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S.Ct. 1194 (1963).

Petitioner is still attempting to get these documents. At which time the petitioner will either amend this petition with an additional claim or move the court to drop sub-claim "F" under claim (2)"ineffective assistance of appeal attorney", in violation of petitioner Sixth Amendment Rights under the United States Constitution.

STATE OF ILLINOIS

COUNTY OF _Christian_

## AFFIDAVIT

I, _Kevin Patterson_____, a prisoner incarcerated at the _Taylorville_____

Correctional Center, in _Taylorville_____, Illinois, have read and understand the

above Petition for Post-Conviction Relief.  All of the facts presented in this Petition  are

true and correct to the best of my recollection.


_____
AFFIANT


Subscribed and sworn to before me this _17TH_ day of _November 2004_

_Maria Nachtwey_____
Notary Public

"OFFICIAL SEAL"
Maria Nachtwey
Notary Public  State of Illinois
My Commission Exp. 04/24/2007

**ARREST REPORT**
CPD-11.420 (REV. 6/92)

PATTERSON - KEVIN    M / I / 1 K / 16 JAN

| 7. ALIAS OR NICKNAME | 8. DIST. R | | 10. WEIGHT | 11. HAIR | 12. HAIR STYLE | 13. EYES | 14. COM |
|---|---|---|---|---|---|---|---|
| NONE GIVEN | 022 | 602 | 175 | BLK | SHORT | BRN | ME |

16. RESIDENCE ADDRESS: 9642 S. LOWE    APT. NO./FLOOR: N/V    17. DISTING. MARKS, SCARS, DISABILITIES, ETC.    18. SOCIAL SECURITY NO: 329 - 48 - 3912

16A. CITY - STATE: CHICAGO IL.    ZIP CODE: 60628    HOME TELEPHONE: 773 239-4441    20. STATE/PLACE OF BIRTH: IL.    21. DRIVERS LICENSE NO: P 362 - 5005 - 1010

22. RD NO: C - 630222    23. OCCUPATION: CONSULTANT    24. BUSINESS NAME - ADDRESS: 9642 S. LOWE CHGO IL. 60628    773 239-4441

25. ADDRESS OF ARREST: 2345 W 50TH ST (ALLEY)    26. 2 ARRESTED    27. LOCATION CODE OR NATURE OF PREMISE: 092    28. BEAT OF ARREST: 915    29. DATE OF ARREST DAY MONTH YEAR: 01 OCT 98    TIME: 1756    30. ARRESTEE TRANSPORTED TO UNIT: 009    BY BEAT: 906

31. RESISTED ARREST: NO    32. WEAPON: PISTOL-REVOLVER, SHOT-GUN, RIFLE (SPEC), OTHER, KNIFE    33. I.R. INVENTORY NOS: 2674453, 2674464    36. FOR NARCOTIC ARREST: SUSPECT CANNABIS, SUSPECT CONTROLLED SUBSTANCE: N

35. VEHICLE OF ARRESTEE: YEAR 86    MAKE CADILLAC    MODEL CPE/DVL 2-DOOR    BODY STYLE    COLOR SILVER    STATE LICENSE NO OR V.I.N. X55961    DISPOSITION OF VEHICLE: TOWED

36. PERSON IN INVESTIGATIVE UNIT NOTIFIED: RILEY # 20250    UNIT NOTIFIED: A1/VC    TIME: 1930    37. DOES ARRESTEE HAVE DEPENDENT CHILDREN AT HOME: NO    IF YES - NAME OF Y'D MEMBER NOTIFIED: TIME    38. NAME OF A.S.A./PE. REV.    CHARGES APPROVED: YES / NO

39. VICTIM/COMPLAINANT: BEALS - CLARENCE    SEX M / RACE I / AGE 44    HOME ADDRESS: 1401 E. 55TH ST.    CITY - STATE: CHGO - IL.    ZIP CODE    TELEPHONE NO

VICTIM INJURED: NO    IF YES - DESCRIBE INJURIES    VICTIM HOSPITALIZED: NO    TREATED & RELEASED    HOSPITAL NAME

| 40. REFERENCES (CH - PAR.) | 41 OFFENSES | 42. DISPOSITIONS | 40. REFERENCES (CH - PAR.) | 41 OFFENSES | 42 DISPOSITION |
|---|---|---|---|---|---|
| 1 | | | 5 | | |
| 2 | | | 6 | | |
| 3 | | | 7 | | |
| 4 | | | 8 | | |

43. NARRATIVE (The facts for probable cause to arrest AND to substantiate the charges include, but are not limited to, the following:)

ABOVE SUBJECT PLACED UNDER ARREST AFTER A/OS ARMED WITH A DESCRIPTION VIA FLASH MESSAGE FROM BT 920 OF ABOVE VEHICLE THAT WAS JUST USED IN AN ARMED ROBBERY AND THAT ABOVE SUBJECT WAS OBSERVED FLEEING FROM ABOVE VEHICLE. A/OS ALONG WITH BT 906 ~~AND BT 955~~ PURSUED SUBJECT ON FOOT. APPREHENDED ABOVE SUBJECT AT ABOVE ADDRESS OF ARREST. ABOVE SUBJECT THEN POSITIVELY ID BY VICTIMS ON SCENE AS AN OFFENDER IN AN ATTEMPTED ARMED ROBBERY UNDER ABOVE RD #. SUBJECT THEN PLACED INTO CUSTODY, ADVISED MIRANDA PER PRE PRINTED CARD AND THE TRANSPORTED INTO THE 009 DISTRICT FOR FURTHER PROCESSING.

ALSO ARRESTED: AKBAR - JAMAL M/I/45    ALSO ARRESTING: BT-906 BT-955 ALAGNA 6619 R. GIGLIO #1 DWYER 16603

I do solemnly, sincerely, and truly declare and affirm that the facts stated herein are accurate to the best of my knowledge.

FIRST ARRESTING/APPEARING OFFICER'S SIGNATURE: B. McDermott    STAR NO: 8852    UNIT: 009    DEPT 31 CLERK'S SIGNATURE

44. FIRST ARRESTING/APPEARING OFFICER - PRINT NAME: B. McDERMETT    BEAT NO: 947    FUP/LO: 12A    D.O. CAR: 7    MISD ORD CAT: R    65. SECOND ARRESTING OFFICER - PRINT NAME - STAR NO: P. GREENAN 1969    UNIT: 009    46. VEHICLE ASSIGNED: 1 OR 2 TWO

47. STATING APPROVAL OF PROBABLE CAUSE: SIG - STAR    48. RESULTS OF FINGERPR. CHECK WAIVED BY: SIG - STAR    DATE    TIME    49. APPROVAL OF CHARGES: SIG - STAR    DATE

WATCH COMMANDER'S NOTATIONS

50. ARRESTEE SEARCHED BY    STAR/EMP. NO    UNIT    51. DATE RECEIVED - LOCKUP    TIME    52. PERS. PROPERTY RECEIPT NO    52. TELEPHONE NO. CALLED - TIME

54. BOOKING OFFICER    STAR/EMP. NO    UNIT    55. TIME FINGERPRINTED    56. TIME PHOTOGRAPHED    57. TIME FED    58. PLACED IN CELL NO

**COURT INFORMATION**

59. ARR OFF DESIRED COURT DATE    BRANCH - CALL    60. COURT SGT. TO HANDLE: NO    61. INITIAL COURT DATE    BRANCH - CALL    62. FINAL CRT DATE    BRANCH - CALL

63. BONDED - DATE    TIME    64. BOND RECEIPT NO    65. COURT DOCKET NO    66. TRIAL JUDGE'S NAME

Exhibit 1

CASE REPORT
CHICAGO POLICE

ROBBERY

| | | |
|---|---|---|
| CASE REPORT NO. | | |

CONNEXIONS - BUSINESS OFFICE

1 0 3 3 A | ATTEMPT | ARMED - HANDGUN

8 TYPE OF LOCATION OR PREMISE WHERE AN OFFENSE OCCURRED HAVE NAME OF LOCATION IF APPLICABLE

| NAME | | RACE | SEX | AGE | HEIGHT | WEIGHT |
|---|---|---|---|---|---|---|
| CONNEXIONS - Social Services | 5102 S. Western | | | | | |
| McGEE, Felise (wm) | 1523 Deer Creek, Deer Heights | F | | 39 | | |
| JONES, Jimmy L. | 8236 S. Prairie | M | 1 | 36 | | |
| BURTON, ROSEMARY | | F | 1 | 31 | | |
| RODRIGUEZ, HIPOLITO | 2549 W. 55 St. | M | 4 | 35 | | |
| AKBAR, Jamal A. | 4843 S. Michigan (2) | M | 1 | 45 | 5'01" | 125 |
| PATTERSON, Kevin (wm) | 1401 E. 55 St. | M | 1 | 47 | | |

EVENT # 10158 - IN SUMMARY: While on routine patrol at 5102 S. Western, this observer, Victims 2,3
He was a Gov." R/O Campbell entered the office thru the front as R/O Fuerst, Herald towards to Rios.

EVENT # 10158 - IN SUMMARY: While on routine patrol at 5102 S. Western, this observer, Victims 2,3

He had a Gov." R/O Campbell entered the office thru the front as R/O Fuerst, Herald towards to Rios "Wester

44. All Running from the office at above location; Victims 2 & 3 yelled to Rios Fuerst, Herald Towards to Rios. The Road

AREA 1 REVIEWED

| REPORTING OFFICER NAME | STAR NO |
|---|---|
| P/O FUERST | 9441 |
| P/O Campbell | 5193 |

CONTINUATION
OF The location. As PO Campbell entered the office

Offender #1 was standing in the rear of the office

summons, thru a desk, Offender was holding a

BlueSteel revolver. Offender #1 looked up towards RLO

Campbell and Fired with the Gun in its right hand thru

The rear door of the office. Offender can N/a Thur offt.

Ordering them to Face the wall and lay down as victims

2+3 were getting down, Victim #4 made a move towards

The rear door. Offender #1 Grabbed victim #4 and victims 2+3

at Victim #4, Front Door. Victim 4 got away from

Offender #1 and also ran out front door.

RLO's Station. He observed the Plorbeviez Driver of Patr

This Having just first Approached RLO's with the vehicle

RLO's having Just First Approached RLO's

A weapon Offenders were Positive I.D. by RLO's. Witnesses

d victim's. RLO Robkel Positive to the vehicle.

BT 902 to scene to Process - BT 930-920.00 scene



The fear door of the office.

The offender #1 ordered them to face the wall and lay down as victims

<table>
<tr><td colspan="8">FOR USE BY BUREAU OF INVESTIGATIVE SERVICES ONLY</td></tr>
</table>

PREPARED BY - SIGNATURE

APPROVED BY - SIGNATURE

300

# SUPPLEMENTARY REPORT

**CHICAGO POLICE**

| | | | INDEX REPORTING DATE OF OCCURRENCE – TIME |
|---|---|---|---|
| 1A. OFFENSE CLASSIFICATION LAST PREVIOUS REPORT | | ADDRESS OF ORIG. INCIDENT/OFFENSE ☐1 VERIFIED ☐2 CORRECTED | 1 OCT 98   1708 |
| ARMED ROBBERY / HANDGUN | | 5102 S WESTERN | 3. HEAT OF OCCUR. 915 |
| 5. VICTIM'S/SUBJECT'S NAME AS SHOWN ON LAST PREVIOUS REPORT | | CORRECT | 6. FIRE RELATED | 7. BEAT ASSIGNED |
| BEALS CLARENCE M, MEGEE, ELLISE, JONES Timy L | ☒YES ☐2 NO | ☐1 YES ☐2 NO | 947 |
| 8. VICTIM'S/SUBJECT'S ADDRESS | 9. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED | | LOCATION CODE |
| 5102 S WESTERN | BUSINESS OFFICE | | 140 |

10. DESCRIBE PROPERTY IN NARRATIVE    T = TAKEN;    R = RECOVERED
FILL IN THE FULL AMOUNT OF ONLY THOSE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE ORIGINAL CASE REPORT OR THE LAST PREVIOUS SUPPLEMENTARY REPORT.

**PROPERTY**

| 1 MONEY ☐T $ ☐R | 2 JEWELRY ☐T $ ☐R | 3 FURS ☐T $ ☐R | 4 CLOTHING ☐T $ ☐R | 7 OFFICE EQUIPMENT ☐T $ ☐R | 8 TV, RADIO, STEREO ☐T $ ☐R | PROPERTY INVENTORY NO(S). |
|---|---|---|---|---|---|---|
| 9 HOUSEHOLD GOODS ☐T $ ☐R | 0 CONSUM. GOODS ☐T $ ☐R | L FIREARMS ☐T $ ☐R | 6 NARC./DANGEROUS DRUGS ☐T $ ☐R | 5 OTHER ☐T $ ☐R | 6 NONE ☐T ☐R | |

**OFFENDERS**

| 11. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 12. HOME ADDRESS | 13. SEX–RACE–AGE CODE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. |
|---|---|---|---|---|---|---|---|
| 1 PATTERSON, KEVIN | 9642 S LOWE | m/1/47 | 602 | 175 | bro | blk | med |
| 2 AKBAR, JAMAL ALI | 4343 S Michigan | m/1/45 | 501 | 124 | bro | blk | med |

| 14 C.B. NO | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER REL. CODE | C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER M.O. CODE | 15. NO. ARRESTED | ARREST UNIT NO. |
|---|---|---|---|---|---|---|---|
| OFF. 1 14010873 | | 24 | OFF. 2 | | 24 | 2 | 947 |

| 16. OFF.'S VEHICLE ☒OSED ☐STOLEN | YEAR 86 | MAKE KAD | BODY STYLE 2DR | COLOR GREY | V.I.N. 166 C047816421 8233 | STATE LICENSE NO. XSS961 | STATE IL |
|---|---|---|---|---|---|---|---|

80. NARRATIVE

R/o's responded to a call of a suspicious auto at 2212 w 50th pl that fit the description of an auto used in an armed robbery earlier at 5102 s western. Bt 920 arrived and positively identified the auto as the one that was used in the robbery. Bt 920 obtained a description and sent a flash of 2 m/1's heading w/B on foot from 2212 w 50th pl. R/o's along with bt 906 & bt 920 observed both offenders on the corner of 50th & oakley. offender #1 walked w/B and when R/o's #906 approached he fled on foot and after a short chase was taken into custody by R/o's & bt 906. offender #2 walked s/B on OAKLEY & was taken into custody by bt 920 & bt 955. offender #1 was taken to 5102 s western and was positively identified by 3 victims as the subject that displayed & fired a handgun at then. offender #1 was advised of his rights & transported to 009. offender #2 was identified by a witness as the subject that drove the escaping

**CONTINUED OTHER SIDE ☐**

17. RD NO.
O22

| 90. EXTRA COPIES REQUIRED (NO. & RECIPIENT) | 91. DATE THIS REPORT SUBMITTED – DAY  MO.  YR. 1 Oct 98 | TIME 1900 | 92. SUPERVISOR APPROVING (PRINT NAME) Sgt W. LEE | STAR NO. 1788 |
|---|---|---|---|---|
| 93. REPORTING OFFICER (PRINT NAME) B. McDermott | STAR NO. 8852 | 94. REPORTING OFFICER (PRINT NAME) P Greenan | STAR NO. 19169 | SIGNATURE |
| SIGNATURE B. McDermott | SIGNATURE P Greenan | 95. DATE APPROVED (DAY–MO.–YR.) 02-Oct 98 | TIME 0105 | |

CPD.11.411.A (REV. 8/86)    *MUST BE COMPLETED IN ALL CASES

Exhibit 3

CONTINUATION OF NARRATIVE

vehicle. offender # 2 was also identified as being a former employee
5102 s western. offender # 2 was advised of his rights +
transported to 009.

on scene : Bt 906  GIGLIO # 12658
          Bt 920  Sgt McMurray # 1962
          Bt 955  DWYER # 16603 & ALAGNA # 6049

R.D. NO. C630222
         C630222

I HAVE REVIEWED THIS REPORT AND BY MY
SIGNATURE INDICATE THAT IT IS ACCEPTABLE.

SUPERVISOR'S SIGNATURE     STAR NO. | DATE (DAY-MO.-YEAR)
                                    | 020498

ExLibiT 3A

**...AL PROGRESS REPORT**
**...TIVE DIVISION/CHICAGO POLICE**

| | DATE OF ORIG. CASE REPORT | DATE OF THIS REPORT |
|---|---|---|
| | DAY MONTH YEAR | DAY MONTH YEAR WATCH |
| | 1 OCT 98 | 1 OCT 98 3 |

FIELD CLASSIFICATION–LAST PREVIOUS REPORT | VICTIM'S NAME AS SHOWN ON CASE REPORT | BEAT/UNIT ASSIGNED
HTT H/R | (EXXEXIONS) | 513 X

This form is designed for recording handwritten notes and memoranda which are made during the conduct of investigations, including: inter-watch memoranda (handwritten or typewritten), witness and suspect interview notes, on-scene canvass notes, and any handwritten personal notes made by detectives during the field investigation of violent crimes which are used to prepare official Department case reports.

BEALS, CLARENCE, NMI M/1, 4V

8-14-53

1401 E 55th St. 712-N 60615. 773 363 6728

SS# 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

Was in front of ... when ... entered ... St. Leonard talk with Beals Problem goes tells Beals to walk to back office where other employees are. Has gun on Beals, goes in back office tell all victim to lie on floor all kneel down. Offender tells Beals to get up and move to center of office. "I'm sick of you M.F. taking peoples money" Victim Mc Leen pleads with offender not to shoot. Beals then attempts to flee back. Offender chases after Beals and they struggle. Offender fire gun near Beals head to left ear. They continue wrestle. Beals knock offender to floor. Beals then runs to front or flees out front door all victim flee to outside saw police

R.D. NO.

EPORTING OFFICER'S SIGNATURE–STAR NO.
Killy, 20550

RECEIVED BY SUPERVISOR'S SIGNATURE–STAR NO.
Murphy 2009

DAY–MO.–YR. TIME

PD-23.122 (Rev. 2/83)

*Exhibit 4*

**GENERAL PROGRESS REPORT**
**DETECTIVE DIVISION/CHICAGO POLICE**

| DATE OF ORIG. CASE REPORT | DATE OF THIS REPORT |
| DAY   MONTH   YEAR | DAY   MONTH   YEAR   WATCH |
| 1   Oct 88 | 1 Oct 88   3 |

| OFFENSE CLASSIFICATION/LAST PREVIOUS REPORT | VICTIMS NAME AS SHOWN ON CASE REPORT | BEAT/UNIT ASSIGNED |
| Att Armed Robbery | Connexions | 5124 |

This form is designed for recording handwritten notes and memoranda which are made during the conduct of investigations, including: inter-watch memoranda (handwritten or typewritten), witness and suspect interview notes, on-scene canvas notes, and any handwritten personal notes made by detectives during the field investigation of violent crimes which are used to prepare official Department case reports.

O/V #1 - Patterson, Kevin identified as same after O changed. O took off shirt & tie & baseball type jacket before being apprehended.

| | R.D. NO. (handwritten vertical) |

REPORTING OFFICER'S SIGNATURE—STAR NO.　Itic..37　20169

RECEIVED BY: SUPERVISOR'S SIGNATURE—STAR NO.　Murphy 289　DAY—MO.—YR.　TIME

CPD-23.122 (Rev. 2/83)

*Exhibit 4A*

GENERAL PROGRESS REPORT
DETECTIVE DIVISION/CHICAGO POLICE

| DATE OF ORIG. CASE REPORT | DATE OF THIS REPORT |
| DAY MONTH YEAR | DAY MONTH YEAR WATCH |
| 1 OCT 98 | 11 OCT 98 3 |

| CASE CLASSIFICATION—LAST PREVIOUS REPORT | VICTIM'S NAME AS SHOWN ON CASE REPORT | BEAT/UNIT ASSIGNED |
| ATT 415 | CONNEXIONS | 512-X |

This form is designed for recording handwritten notes and memoranda which are made during the conduct of investigations, including inter-watch memoranda (handwritten or typewritten), witness and suspect interview notes, on-scene canvas notes, and any handwritten personal notes made by detectives during the field investigation of violent crimes which are used to prepare official Department case reports.

McGee, Felise m/1, 39 yrs DOB 11/26/58
1523 Deer Creek Lane, Ford Heights
(708) 757-6032  - SS# 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

Walk in & was paying the rent for two clients. The O walked & represented himself as a client. Gave money to Tom Jones & he was counting the money. McGee tells Jones to put the money away because of the O sitting there & he was not known to them. Jones puts the money in the top drawer of the desk. Jones gives McGee a grocery list & $200 to go shopping for the office. O was brought into Mr. Billy's desk & pulls gun on Mr. Beck. O walks Mr. Beck back to Jones desk. O tells McGee & Jones to stand up & lay face down on the floor behind the desk. McGee sat on floor & faced O asking him not to kill them. O keeps telling them to lay down & shut-up. As McGee is pleading with the O, Mr. Beck runs to the back door & opens door. Hears a shot go off as McGee was out the front door. A police car is there & McGee calls out for them to help because there is a O inside with a gun. Police began to pursue as Mr. Jones is pointing out the ~~O as he is fleeing. O jumps on the~~ ~~~~ ~~~~ Mr. Jones told the police that one of former employees was Jamal Akbar.

| REPORTING OFFICER'S SIGNATURE-STAR NO. | RECEIVED BY SUPERVISOR'S SIGNATURE-STAR NO. | DAY-MO.-YR. TIME |
| 14963A 7761 | C.J. Murphy 2019 | |

CPD-23.122 (Rev. 2/83)

Exhibit 5

75329

**GENERAL PROGRESS REPORT**
**DETECTIVE DIVISION/CHICAGO POLICE**

| | DATE OF ORIG. CASE REPORT | DATE OF THIS REPORT |
|---|---|---|
| | DAY MONTH YEAR | DAY MONTH YEAR WATCH |
| | 1  OCT  98 | 1  OCT  98  3 |

OFFENSE CLASSIFICATION—LAST PREVIOUS REPORT | VICTIM'S NAME AS SHOWN ON CASE REPORT | BEAT/UNIT ASSIGNED

HIT & RUN | (CARE X LERS) | 511  1

This form is designed for recording handwritten notes and memoranda which are made during the conduct of investigations, including: inter-watch memoranda (handwritten or typewritten), witness and suspect interview notes, on-scene canvas notes, and any handwritten personal notes made by detectives during the field investigation of violent crimes which are used to prepare official Department case reports.

AKBAR, Jamal
IR# 924631

PATTERSON, KEVIN M/1, 42yrs. 1/16/51    Parole A/Robb.
9642 S. Lowe – 1150 – (773) 239-4441    IR# 207106
SS# 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 – SELF-EMPLOYED

*Walking in the area in an attempt to solicit funds for a Rescue program for ex-offenders.*

| REPORTING OFFICER'S SIGNATURE–STAR NO. | RECEIVED BY SUPERVISOR'S SIGNATURE–STAR NO. | DAY–MO.–YR. | TIME |
|---|---|---|---|
| | Murphy 209 | | |

CPD-23.127 (Rev. 2/83)    D20382  72.05

Ex<sub></sub>Exhibit 5A

R.D. NO.  H93-222

**GENERAL PROGRESS REPORT**
**DETECTIVE DIVISION/CHICAGO POLICE**

| | DATE OF ORIG. CASE REPORT | DATE OF THIS REPORT |
|---|---|---|
| | DAY / MONTH / YEAR | DAY / MONTH / YEAR / WATCH |
| | 1 DEC 98 | 1 DEC 98 15 |

| OFFENSE CLASSIFICATION–LAST PREVIOUS REPORT | VICTIM'S NAME AS SHOWN ON CASE REPORT | BEAT/UNIT ASSIGNED |
|---|---|---|
| D/P / Agg. | Connexions | 512 √ |

This form is designed for recording handwritten notes and memoranda which are made during the conduct of investigations, including: inter-watch memoranda (handwritten or typewritten), witness and suspect interview notes, on-scene canvas notes, and any handwritten personal notes made by detectives during the field investigation of violent crimes which are used to prepare official Department case reports.

JONES, TIMMY L.  M/1/41 - 36
12-25-61
6728 S. RIDGELAND  3-N
tel 773 493 2558
SS 343 60 5950
WK 773 778 C928 -
CONNEXIONS. - HOMELESS AGENCY
5102 S WESTERN

In Office when Offender enters - states he was
from St LEONARDS HOUSE - (a Ex con RE HAB)
Sat in Chair - got up and introduces himself
to Clarence Beeks as a Rep of St Leonard House
then produces. tells all to get on floor face down
V get on floor - kneeling position. Mr Beeks
attempts - Handcuffs them close. Offender & Beel
start to wrestle. shot is fired. Jones + Mc Gee
flee office. Beeks still in Office. Offender flees
office through back door. Police already there —
Chase Offender. Away Offender get into a car.
Becomes One as shot of a former employee. Police
bring back Offender. to office Ph.

| REPORTING OFFICER'S SIGNATURE–STAR NO. | RECEIVED BY SUPERVISOR'S SIGNATURE–STAR NO. | DAY–MO.–YR. | TIME |
|---|---|---|---|
| Foley    7C350 | J.S. Murphy | | |

CPD-23.122 (Rev. 2/83)

Exhibit 6

R.D. NO. [vertical right margin] ✓ ✓ H 4 7 3

1    19169, currently assigned to the 9th District,

2    Chicago Police Department.

3         Q.    Sir, there is a business called

4    Connexions which on October 1st, 1998, was located

5    at 5102 South Western in Chicago, Cook County,

6    Illinois?

7         A.    Yes.

8         Q.    In that business on October 1st at about

9    5:08 in the afternoon were employees Clarence

10   Beals, Timothy Jones, and Felice McGee; is that

11   correct?

12        A.    Yes.

13        Q.    McGee and Jones had just finished

14   counting out money and putting it in the desk; is

15   that correct?

16        A.    Yes.

17        Q.    At that time an individual later found

18   out to be Kevin Patterson entered into the

19   building; is that correct?

20        A.    Yes.

21        Q.    What did Patterson then do?

22        A.    He proceeded to the rear of the

23   business, he instructed all the employees to lay

24   down and face on the floor.   Then he attempted to

*Exhibit 7*

4

1    enter the cash drawer.

2         Q.    Was Patterson armed?

3         A.    Yes, he was.

4         Q.    Was he armed with a handgun?

5         A.    Yes, he was.

6         Q.    When he ordered the three individuals

7    down; Beals, Jones, and McGee, did Beals attempt

8    to flee?

9         A.    Yes, he did.

10        Q.    What happened to Beals when he tried to

11   get away?

12        A.    Mr. Patterson held him, a struggle

13   ensued.

14        Q.    Did Patterson shoot a firearm at Beals

15   but fortunately missed him?

16        A.    Yes.

17        Q.    When this happened to Beals, did Jones

18   and McGee then flee out another way?

19        A.    Yes.

20        Q.    Beals was also able to flee; is that

21   correct?

22        A.    Yes.

23        Q.    A Chicago police car came by containing

24   Officer Campbell; is that correct?

*Exhibit 8*

1        A.    Yes, it did.

2        Q.    Did Campbell enter the building after

3    the three employees fled out?

4        A.    Yes, he did.

5        Q.    Did Campbell have occasion to see

6    Patterson trying to get the money out of the

7    drawer?

8        A.    Yes, he did.

9        Q.    What did Patterson then do?

10        A.    Mr. Patterson then fled out the back

11    door.

12        Q.    There was a car waiting for him?

13        A.    Yes.

14        Q.    The engine was on?

15        A.    Yes.

16        Q.    There was a driver in the car?

17        A.    Yes, there was.

18        Q.    And did Patterson flee into this car and

19    sped away?

20        A.    Yes, he did.

21        Q.    A person named Hipolito Rodriguez saw

22    the vehicles and gave the plates to the police; is

23    that correct?

24        A.    Yes.

Exhibit 9

1    Q.   Was he found -- strike that.

2        Was he chased and apprehended?

3    A.   Yes, he was.

4    Q.   Was he dressed in the same clothes as

5  when he was inside Connexions?

6    A.   No, he was not.

7    Q.   But he was identified by Beals, Jones,

8  and McGee and Officer Campbell as the person who

9  had had a handgun inside Connexions?

10    A.   Yes, he was.

11    Q.   Akbar was also identified and found near

12  the car?

13    A.   Yes, he was.

14    Q.   And he is the same person who owned the

15  car and used to work for Connexions?

16    A.   Yes, he is.

17    Q.   Did a citizen names Ruiz have occasion

18  to see what happened to Patterson's original

19  clothing and to his handgun?

20    A.   Yes, he did.

21    Q.   What did Patterson do with his original

22  clothes and the handgun?

23    A.   He was disposing of the handgun and his

24  clothes in a trash can in the alley.

Exhibit 10

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The Grand Jurors chosen, selected, and sworn, in and for the County of Cook, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oaths present that on or about October 1, 1998 at and within the County of Cook

KEVIN PATTERSON
JAMAL AKBAR
also known as          JAMAL ARBAR

committed the offense of ATTEMPT ARMED ROBBERY

in that   THEY, WITH THE INTENT TO COMMIT THE OFFENSE OF ARMED

ROBBERY BY THREATENING THE IMMINENT USE OF FORCE AND WHILE ARMED

WITH A DANGEROUS WEAPON, TO WIT: A GUN, DID ANY ACT, TO WIT:

ATTEMPTED TO REMOVE UNITED STATES CURRENCY FROM THE PERSON OF

CLARENCE BEALS WHICH CONSTITUTED A SUBSTANTIAL STEP TOWARDS THE

COMMISSION OF THE OFFENSE OF ARMED ROBBERY IN VIOLATION OF

CHAPTER 720, ACT 5, SECTION 8-4(720-5\18-2) OF THE ILLINOIS

COMPILED STATUTES 1992, AS AMENDED, AND

contrary to the Statute, and against the peace and dignity of the same People of the State of Illinois.

CHARGE ID CODE: A1105000

*Exhibit 11*

STATE OF ILLINOIS )
                 ) SS.
COUNTY OF COOK   )

### AFFIDAVIT OF THERESA SMITH

I, Theresa Smith, being duly sworn under oath, as affiant, deposes and states that:

1. I am the sister of Kevin Patterson, Petitioner/Defendant (herefore referred to as Petitioner) in case No. 98 CR 30064.

2. That affiant does now and at all times relevant to this cause lived in the city of Chicago, County of Cook.

3. That on October 1, 1998, affiant received a phone call during the late p.m. hours from the Petitioner at the Bridge Port police station located at 35th and lowe, in chicago. Who informed affiant that he was in jail on a charge unknown to him at that time, and that he would be going to court the following day after which he would call affiant then. Petitioner did not know where he would appear in court.

4. Affiant did not hear from the Petitioner again until October 7, 1998, when he called from the Cook County Jail. Petitioner stated he had just appeared in court on October 6, 1998, at 51st and Wentworth after being transferred 3 times to different stations before appearing in court.

5. Affiant informed the Petitioner that on October 2, 1998, when the Petitioner did not come home and affiant and other family members did not hear from Petitioner. Affiant called the Bridge Port Police Station on October 3, 1998, and inquired about the Petitioner's whereabouts resulting from his arrest on October 1, 1998.

1 of 2

*Exhibit 12*

6. Affiant was told by Bridgeport station personnel that the petitioner was not at the station, the record did not reflect the petitioner as having been at the station. If petitioner had been at the station, it was only for questioning and afterwards he would have been transferred, and it was suggested that affiant call other stations in the area.

7. That affiant called other stations which included area 002 located at 51st and Wentworth and area 001 located at 11th and State St.

8. Affiant states that each station she called, affiant was told that the petitioner was either in the process of being transferred to another station or was enroute to another station.

9. That at no time did any of the stations contacted allow the petitioner to contact affiant or any member of the family or state why petitioner was being held during his detainment therein.

Further affaint sayeth not.

So sworn,

_Theresa Smith_

Affiant Theresa Smith

SUBSCRIBED AND SWORN BEFORE ME THIS _02_ DAY OF ___NOV___ ,2004.

OFFICIAL SEAL
DEBORAH S BURST
NOTARY PUBLIC STATE OF ILLINOIS
MY COMMISSION EXP. MAY 23,2006

_Deborah S Burst_
NOTARY PUBLIC

_Exhibit 12A_

CLERK'S OFFICE
## APPELLATE COURT FIRST DISTRICT
### STATE OF ILLINOIS
160 NORTH LASALLE STREET, RM S1400
CHICAGO, ILLINOIS 60601

STEVEN M. RAVID
CLERK

April 4, 2002

Kevin Patterson
Reg. No. A-83515
P. O. Box 1900
Canton, IL 61520

In Re: 02-0694

Dear Mr. Patterson:

Enclosed and being returned to you is your proposed Late
Notice of Appeal and supporting Affidavit.

A timely notice of appeal from the decision in 98CR30064 was
filed on your behalf in the Circuit Court, and the appeal has now
been docketed in the Appellate Court. Your appeal has been
assigned appeal number 02-0694.

The Circuit Court appointed the Public Defender, 69 W.
Washington, 15th Floor, Chicago, Illinois 60602, (312) 603-0600,
to represent you.

Please contact the Public Defender if you need additional
assistance.

Very truly yours,

Cindy Wile
Administrative Attorney

CW/cb

*Exhibit 13*

*I would like to request this document
be returned to me.       Thank you
                    Kev. Patterson A-83515*

*From The Desk Of...*                                    8-27-02

## Connie Davis, Mailroom Supervisor

I/M Patterson   A83515   1C68

<u>outgoing since 3/1/02</u>

3-29-02 — Clerk of Courts, 160 N. LaSalle
Chicago, Il

4-11-02 — Atty. Charles Therman
3623 W. Lawrence
Chicago, Il.

7-2-02 — Atty. James Reddy
69 W. Washington
Chicago, Il.

— Criminal Appeals Div.
300 Daley Center
Chgo, Il.

— Criminal Appeals Div.
2650 So. California
Chgo

I.R.C.C.  — Clerk Appl. Court
160 N. La Salle
Chgo, Ill.     Exhibit 14

First Division

No. 1–02–0694

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS | ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| v. | ) | 98 CR 30064 |
| KEVIN PATTERSON, | ) | Honorable Ronald A. Himel, |
| Defendant-Appellant. | ) | Judge Presiding. |

### ORDER

This cause coming before the court on the *pro se* motion of Defendant-Appellant Kevin Patterson to stay the trial court's judgment and set an appeal bond, all parties having been notified and the court being fully advised in the premises, finds as follows:

1.  Defendant is represented by the Cook County Public Defender.

2.  Defendant's counsel filed the notice of appeal in this matter on February 6, 2002, and has since filed two motions for extension of time to file the record.

3.  When a defendant is represented by counsel, he has no right to "some sort of hybrid representation" and has no authority to file *pro se motions. People v. Handy*, 278 Ill.App.3d 829, 836 (1996). Under such circumstances, the court may not consider defendant's *pro se* motions. *Handy*, 278 Ill. App. 3d at 836.

Therefore, defendant's *pro se* motion is **not considered**

ORDER ENTERED

JUL 2 2 2002

APPELLATE COURT, FIRST DISTRICT

Presiding Justice

*Exhibit 15*



office of the
## COOK COUNTY PUBLIC DEFENDER

69 WEST WASHINGTON • 15TH FLOOR • CHICAGO, IL. 60602 • (312) 603-0600

Rita A. Fry • Public Defender

July 23, 2002

Mr. Kevin Patterson
A-83515
Box 1900
Canton, Illinois  61520          Re: 02-0694

Dear Mr. Patterson:

I enclose a copy of the Court's order, refusing to consider your pro
se motion.  If you wish to proceed pro se in this appeal, you should
file a motion with the Court, seeking leave to proceed pro se.

Sincerely yours,

James H. Reddy
Chief, Appeals Division

*Exhibit 16*

Printed on Recycled Paper

August 7, 2002

Rita A. Fry - Director
Public Defenders Office
69 W. Washington
Chicago Illinois 60602

Dear Ms. Fry

My name is Kevin Patterson and I have a appeal pending before the Appellate Court of Cook County, First District (case # 02-0894) and your office has been appointed to represent me. On July 1, 2002 I filed (pro-se) a motion to stay judgement and set appeal bond and on July 26th I received a response back from the court through the appeal division of your office, Mr. James Reddy along with a letter attached to the courts decision from Mr. Reddy.

While the procedure for communicating with me as a client may have been prompt, the representation on the entire issue of counseling on the filing of that motion, was ineffective at best and border lining on denial of legal representation.

To give you some idea to what happened. On or about the first week in April I learned that My appeal had been filed, docketed in the Appellate court and your office assigned to represent me on that appeal. (see exb. A) It was at that time I called your office and was transferred to the appeals division where I was told that no attorney had been assigned to me and that I would need to talk to Mr. Reddy but he was on vacation. Subsequently I was told to call back on or about a given date

When I called back I talked to Mr. Reddy and I informed him that I wanted to file for a appeal bond. Mr. Reddy's response was very condescending, antagonistic and out right adversarial. Mr. Reddy stated that I would never be set an appeal bond and stated the main reason for this was because I was never out on bond prior to trial, as well as other reasons why I could not get a bond. When I informed Mr. Reddy that I was in fact out on bond for three (3) years prior to trial. He then asked how much was the bond? I told 50K 10% to apply. Mr. Reddy then stated that if the court set a bond it would be 50K cash this time. I then told Mr. Reddy that it appeared as if he thought I wanted his office to file the motion but I told him that I planned on filing the motion and that I was letting his office know of my intentions since the court appointed the PD's office to represent me on appeal. Mr. Reddy said, ok and asked that I send a courtesy copy to his office addressed to him for the file.

After doing the research and putting the motion together I sent a copy to the Public Defender's Office, addressed to Mr. Reddy. A week later I called and talked to Mr. Reddy. At that time Mr. Reddy stated he had no recollection of our prior conversation, could not remember receiving the motion and could not find the motion. He came back to the phone and stated that it was probably received and when his office receives pro-se motions/petitions, the are put in a file. I then stated that I was also calling to ask if there was anything I needed to do or be aware of before filing the motion. He said "NO" and that I would hear from the court in a week or two with their decision. I filed the motion in July, 02 (see exb. B)

I received a copy of the states reply to the motion I filed, (see exb. C). I did not see a need to reply and I did not want to talk to Mr. Reddy again since I felt I would get no assistance. Several days later I received a decision from the Appellate court through your office, from Mr. Reddy with a note attached to it which to me was insulting, dismissing my motion stating I could not proceed pro-se because the Public Defenders office was assigned to represent me and so pro-se motion would be honored. (see exb. D)

I received no legal counseling or direction on this matter from your office after your office was appointed by the court to represent my interest on appeal. I did not rob anyone or attempt to rob anyone yet I was not given benefit of the law showing my innocence because I am a ex-offender. I had a business and responsibilities that continuously go neglected because of my absence.

*Exhibit 17-17A*

I would like for your office to review my motion and re-file it through your office. Everything in the motion is true. I have a partial copy of my trial transcript that was ordered during trial, the testimony of the three (3) complainants, my grand jury transcript, copy of the police report and other records from my attorney. If you have any questions I will be happy to answer upon your inquiry. Tank you in advance for your assistance in this matter.

Kevin Patterson A-83615
PO Box 1900
Canton Illinois 61520

Exhibit 17 A



office of the
## COOK COUNTY PUBLIC DEFENDER

69 WEST WASHINGTON • 16TH FLOOR • CHICAGO, IL 60602 • (312) 603-0600

Rita A. Fry • Public Defender

August 15, 2002

Kevin Patterson, A83515
Box 1900
Canton, IL 61520

Mr. Patterson:

This is to acknowledge receipt of your letter dated August 7, 2002 seeking my assistance on
issues surrounding your case. Towards that end, I am turning the matter over to Lauren B.
Simon, James Reddy's supervisor, for investigative follow-up. I anticipate you hearing from Ms.
Simon in the near future.

For information purpose, Ms. Simon's mailing address and phone are the same as that listed at
the top of this letterhead. Please direct future communications to her.

Good luck, and God speed.

Very truly yours,

Rita A. Fry
Public Defender

RAF./fq

*Exhibit 18 -*
*SEE NEXT Exhibit (18A.*

Printed on Recycled Paper

STATE OF ILLINOIS )
                  ) SS
COUNTY OF COOK    )          **A F F I D A V I T**

    EMILY EISNER, being first duly sworn on oath, deposes and says:

    1.    I am an Assistant Public Defender assigned to the criminal appeals division.

    2.    The Office of the Public defender was appointed to represent appellant on February 6, 2002.

    3.    The defendant-appellant is in custody.

    4.    The certificate in lieu of record was filed in the reviewing court on August 15, 2002.

    5.    The opening brief was filed on August 21, 2002.  The appellee's answer brief was filed instanter on January 17, 2003.

    6.    The instant reply brief was due on January 31, 2003.

    7.    Counsel was unable to complete the instant reply brief on schedule, because she was devoting time to the appeal, on a final extension, on a 1500-page record in <u>People v. Jamario Pruitt</u>, #01-3523.

    WHEREFORE, it is requested that leave be granted to file the reply brief for Kevin Patterson, instanter.

                      _____
                        EMILY EISNER,
                        Assistant Public Defender

SUBSCRIBED and SWORN TO
Before me this 17th day
of March, A.D., 2003.

_____
NOTARY PUBLIC

OFFICIAL SEAL
**L'AMOUR HOLLOWAY-WHITE**
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 6-17-2008

*Exhibit 18A*



office of the
## COOK COUNTY PUBLIC DEFENDER

69 WEST WASHINGTON • 15TH FLOOR • CHICAGO, IL 60602 • (312) 603-0600

Rita A. Fry • Public Defender

August 19, 2002

Mr. Kevin Patterson
Reg. no. A-83515
Illinois River Correctional Center
Rt. 9 West
P.O. Box 999
Canton, IL  61520

Dear Mr. Patterson:

I am the attorney who will be representing you on your appeal of your convictions for attempt armed robbery and eighteen-year sentence.

I will be writing a brief, which I will file in the appellate court on your behalf.  The brief raises all of the things that went wrong with your trial and sentencing hearing. You will receive your copy of the brief as soon as it is filed, which will be in about a week.

The brief argues as follows:

1)  that there was no evidence of an attempt to take property or money from the persons of Beals, McGee, and Jones, and that there was a fatal variance between the indictment and the proof; and

2)  that you were not eligible for "Class X" sentencing, which was above the maximum sentence, where your prior history was too old to be properly useable under the law.

I will be asking the appellate court to reverse your convictions for attempt armed robbery outright, or alternatively, to vacate your unfair sentence and give you a new sentencing hearing.

After the brief is filed, the State has 35 days (and may take longer) to file its answer brief.  Then I have 14 days to file what is called a reply brief, if I believe one is necessary.

Please understand that an appeal is not a second trial and, unfortunately, I can only argue the things that went wrong with your first trial and sentencing hearing.  I cannot present any witnesses or present any evidence or exhibits.  Everything I do must appear in the written record.  Also, I cannot reargue matters such as that the State's witnesses were liars, because the appellate court has no power to view anyone in person to determine one's credibility.

*Exhibit 19-19A*

After the appellate process in the appellate court is completed, the appellate court may take several months, or sometimes longer, to decide your appeal in a written decision giving reasons. I know that this all takes a long time, but it is the only way to attempt to get some relief for you.

If you have any questions about the appellate process, please call collect or write me directly at the above address. You will be receiving your copy of your transcript.

Sincerely,

Emily Eisner,
Assistant Public Defender

*Exhibit 19A*



Law Office of the
**COOK COUNTY PUBLIC DEFENDER**

69 W. WASHINGTON • 16TH FLOOR • CHICAGO, IL 60602 • (312) 603-0600

Rita A. Fry • Public Defender

August 20, 2002

Mr. Kevin Patterson
Reg. No. A-83515
Box 1900
Canton, IL 61520

RE:　02-0694

Dear Mr. Patterson:

Your letter to Ms. Fry has been referred to me for response.

There is no copy of your pro se motion for appeal bond in our file and I must conclude that this Office did not receive a copy at the time you filed your pro se motion. Your decision to file a pro se motion instead of waiting to speak to an attorney assigned to handle your appeal was yours and yours alone. As the Appellate Court properly noted, you have no right to "hybrid" representation: you must either represent yourself on appeal or work through your appointed attorney.

You complain that you received "no legal counseling" on this matter from the Public Defender. Appointed counsel does not provide legal counseling on how to proceed pro se. That is what Mr. Reddy meant when he wrote you that, **if** you wished to proceed pro se, you needed to file a motion seeking that status.

Mr. Reddy's discouragement of your earlier attempt to obtain an appeal bond was based upon his 27 years of appellate experience: the vast majority of such requests are denied.

As you now know (see enclosed letter of 8/19/02), Assistant Public Defender Emily Eisner has been assigned to your appeal and she is in the process of preparing a brief for you. Mr. Reddy is giving the copy of your pro se motion that you sent to Ms. Fry to Ms. Eisner, with directions to file a motion with the Court, seeking an appeal bond for you.

If you have any further questions on your case you should contact Emily Eisner. I hope this clarifies matters for you and I wish you the best of luck.

Sincerely yours,

Lauren B. Simon
Director, Countywide Operations

enclosure/s/

*Ex Libit 20*



office of the
## COOK COUNTY PUBLIC DEFENDER

69 WEST WASHINGTON • 15TH FLOOR • CHICAGO, IL 60602 • (312) 603-0600

**Rita A. Fry • Public Defender**

August 21, 2002

Mr. Kevin Patterson
Reg. no. A-83515
Illinois River Correctional Center
Rt. 9 West
P.O. Box 999
Canton, IL 61520

Dear Mr. Patterson:

Enclosed please find your copy of the opening brief that I
filed on your behalf in the appellate court. It raises the
issues that I discussed in my previous letter to you.

It has also come to my attention that you filed a motion
pro se requesting an appeal bond. I shall be doing this for
you. (The appellate court does not allow a client who is
represented by an attorney to act pro se so your motion had not
been considered).

I may need some more information from you (i.e. some
personal information like job prospects, and amount of money
available for bond), in which case you will be hearing from me
again shortly with a form to fill out. On the other hand, I may
already have all the information I need to prepare the motion.
I will let you know as soon as I get to it, which will be as
soon as I can. I hope all is well in the meantime.

Sincerely,

Emily Eisner,
Assistant Public Defender

*Exhibit 21*

Printed on Recycled Paper

Sept.
August 16, 2002

TO: Attorney Emily Eisner
    Public Defenders Office
    69 W. Washington, 15th Fl.
    Chicago IL. 60601

From: Kevin Patterson A-83515

Re. Appeal - #02-0694

Dear Ms. Eisner
I am writing you this letter regarding my appeal in which you filed a brief on or about the week of August 19, 2002. I have some serious concerns about the brief in which you filed in my behalf. The first and really major concern is that you filed the brief without talking or communicating with me. The last time I spoke with someone in your office was on or about the first part of July. At that time, I talked to Mr. James Reedy concerning the pro-se motion I submitted requesting an appeal bond, (which he ill advised me on). At that time I was told your office had not received a copy of my transcript so no attorney had been appointed to my case. I was also told that samething(I guess a secretary) who answered the phone. After I received a dismissal of my motion form the appellate court which stated I could not proceed pro-se when represented by counsel, I filed a complaint letter against Mr. Reddy to Ms Rita Fry. Two (2) weeks later (on August 23rd) I receive a letter from you stating you had been assigned to my case and you were filing a brief in y behalf in a week. Upon receipt of that letter I tried to reach you the same day with no success. The next day (August 24th) I received a copy of the brief. I again called your office but you were not available. On Monday, (August 26th) I received a partial copy of my transcript. I say partial because the testimony of the three (3) complainants was not enclosed with the transcript. Again all this took place with you talking to me once or allowing me chance to contact you.

Since being at this institution I have researched what I considered to be appealable issues of record and while I am a layman, I meticulously went through the transcript you sent me and I have questions concerning other issues that are linked to the fatal variance issue and another issue concerning the accuracy of the transcript of the proceeding.

The first issue of concern was surrounding the failure of accuracy of the transcript of the proceeding.

The first issue of concern was surrounding the failure of my counsel to object to the line of questioning of the police officer who claims to have seen me going into a desk I was standing by. On pages E-3 and E-4 of the transcript, as well as in the Motion to arrest judgement my counsel, Attorney Chuck Murphy stated because of what was stated in the police report and the indictment he knew the state could not prove their case of Att. Armed Robbery. Yet he allowed the state on direct examination to question a witness about something that was outside of the

*Exhibit 22.*

charge stated in the indictment by failing to object. Subsequently, Judge Himel, in finding me guilty of armed robbery at first, then settling on attempt armed robbery used the testimony of that officers statement as the basis for his decision.

The second issue of concern surrounds the state's attorney offering a copy of a 1978 conviction for armed robbery to Judge Himel as a validation for the U.U.W. by a Felon indictment before the state rested it's case. (Transcript page D-14) The court then asked my counsel, Mr. Murphy if he had any objections and he said "NO". (same page, D-14) The state after tendering this document as an exhibit then rested it's case. (Transcript page D-15) I think this was very prejudicial and violated my right to an impartial verdict. I have found case law to support that.

Both issues are of such magnitude they should have been raised on appeal in my opinion. Case law states that if there is a failure enter a timely objection during trial the issue is exempted from raising the issue on appeal unless it is of such a magnitude that it deprives the defendant of a fair trial. I believe this issue is of that magnitude. Other wise the issue can be raised under ineffective assistance of counsel. Either way, the issue can be raised and I believe should have been raised.

Then there is the issue about my transcript. There are some distinct variations from what happened in court to what was transcribed. Some of them has been altered at great length. In one instance there is three (3) pages of statements during the motion hearing by Judge Himel that never happened. In that statement (that took all of about 30 seconds) Judge Himel exploded and his verbatim statement was that he was aware of that law and "in his opinion if that's the law, the law is stupid and it's wrong, Motion denied". I am presently in the process of getting affidavits from people in court who heard him state that. All of the information that is recorded on pages E4-E6 most to all of it never took place.

Judge Himel also asked the states attorney for priors when the state offered a copy of my 1978 conviction for armed robbery before rendering his decision. The Judge Himel request has been excluded from the transcript.

However, I could not tell you any of this because you never talked to me prior to filing this brief. I think the issues you did file on are well articulated and presented. However, you did lose me on the part of your argument on the issue of the extended sentence. But once again, that's something that could have been discussed if you had talked to me prior to filing this brief.

I have a problem with the way this is going. I took a hands off approach listening to my Attorney Chuck Murphy and I am sitting in prison with eighteen (18) years for something I did not do or attempted to do with eighteen (18) years. Mr. Murphy lied to me on several occasions telling me certain information was not in the police report that now that I have a copy I see that it is. Also there is a issue of the police transferring me from station to station for six days before taking me to court on this case. I talked to the states attorney (Ms. Gemeski) the day I was arrested, the police at the station I was taken to had to call her supervisor because after talking to me and the victims she did not support the charges the police wanted to file. I see from the record that there is no report from her and the detective that was in the room makes it appear in the record that she was only contacted to approve charges. That's not true. But that is an issue for post conviction since that was not raised in direct proceeding. Also, did you know that the police jumped on me

*Exhibit 22A*

at the time of arrest? This is supported by medical record but no action was taken because there was no witnesses? Just food for thought.

At any rate, I have called you at least ten, (10) or more times, sometimes leaving messages in your message box. But I have yet to hear from you in regard to those calls. I have been continuously told that the best time to catch you is in the afternoon after court but when I call you are never available. Are you avoiding talking to me Ms. Eisner? If so, let me know and I will stop calling.

But I/we do need to resolve the issues at hand A.S.A.P. I am not satisfied with the counseling, representation and ethical practices of the Public Defenders Office since your office's appointment to represent me. I think this brief was rushed because of my allegations against Mr. Reedy, so thus, you by passed talking to me. I also think issues for appeal that are clearly supported by case law and constitute due process violations are being intentionally overlooked. It just seems to be more convenient, and a lot easier to put someone back in prison who has a background innocent or guilty. But, the fact remains "I did not do this".

At any rate, we need to talk. I will call you Friday, August 20th between 3-4 PM or 4-5PM. If I am unable to reach you, I will call Monday August 23rd. Sorry for the lack of preciseness, but I am in prison. Thank you.....

Sincerely

Kevin Patterson A-83515
P.O Box 1900
Canton IL 61520

cc:Ms Rita Fry · Director Public Defenders Office
   Appellate Court
   file

*Exhibit 22B*

State of Illinois )
                  ) SS
County of Christian )                    Affidavit

I, Kevin Patterson, Petitioner in this cause (herefore refered to as affiant) being duly sworn under oath deposes and states that:

1.  Affiant was detained, and arrested on an unknown charge by members of the Brigdeport Police Department, (District Station #009) in Chicago on Oct. 1, 1998.

2.  That while at District Station #009, and at all times prior to Affiants first court appearance on Oct 6, 1998 was Affiant was never told what he was being arrested for.

3.  That Affiant was apprehended by Officer Giglio and beaten by him and other members of District Station #009 of the Chicago Police Department on Oct 1, 1998 in which Affiant received a busted ear, bruised ribs, knee and other injuries that was medically recorded at the Cook County Jail.

4.  Affiant filed a complaint with the Office of Professional Standards in or about Nov. 1998 after his release on bond on Oct 20, 1998 from the arrest of Oct. 1, 1998, from the beating he suffered from that arrest.

5.  That if Affiant had testified at trial, Affiant would testify to the folling facts.

6.  That Affiant had a friend, Sharon Jenkins who died in one of Connextions residential living facilities from an alleged drug overdose.

7.  That the reason why Sharon Jenkins was in that facility was at the insistence of Affiant to help her get off drugs. Ms. Jenkins was a life long friend.

8.  That all while Sharon's Residency at the connextions facility, Sharon repeatedly warned Affiant of constant sexual and abusive harassment from the three (3) connextion employee's, Clarence Beals, Felise McGee, and Tim Jones which included a battery and attempt rape and that she was scared.

9.  Affiant thought at the time that Sharon was having "cold feet" about enduring the withdrawal and encouraged her to hang tough.

10. Shortly after several conversations with Sharon, about those allegations, Affiant had to leave town on a job related assignment and upon his return Affiant learned that Sharon was dead, and had died at the facility from an alleged overdose.

11. That Affiant talked to other residents of the facility and police about Sharon's death and after those inquiries, Affiant believed that Clarence Beals, Felise McGee and Tim Jones had something to do with Sharon's death.

12. Affiant conveyed his belief and basis for his belief to the police, but was told nothing new was determined after a few days to warrant futher investigation.

*Exhibit 23*

13.   That Affiant went to connextions for the purpose of putting Clarence Beals, Felise McGee and Tim Jones on notice that people was aware of their actions and that it was going to stop.

14.   That Affiant went to connextions to talk to Clarence Beals, Felise McGee and Tim Jones.  Not to shoot or rob connextions or anyone.

15.   That Affiant made one statement; you all are using this organization to murder, rape, rip people off, the shit is going to stop here and now.

16.   Clarence Beals, Felise McGee and Tim Jones started yelling and pacing uncontroably stating "he's going to kill us".

17.   That Affiant attempted to regain control of the situation trying to assure them that Affiant was there to talk.

18.   That Affiant finally got the three (3) to settle down after yelling "shut the hell up".  Affiant then stated "you are going to hear what I have to say, and as I said, the bullshit is going to stop here and now".  Clarence Beals, Felise McGee and Tim Jones went ballistic again.

19.   At that point, Affiant again yelled "shut the fuck up" and further stated, "you all are going to hear what I have to say, get on the floor".

20.   Suffice to say Clarence Beals did not lay on the floor, rather he ran down the hallway that began at the southend of the back desk, and a struggle between Affiant and Beals ensued in the hallway, when Beals grabed the gun.  When Affiant pulled the gun away, Beals, fired the gun which was pointing at the ceiling, at the time.

21.   Affiant pushed Beals from him stating "are you crazy, I just want to talk to you" and Beals hesitated, then pulled boards from a door, where he exited the building.

22.   Affiant returned to the front of the office to retrieve his brief case.  Upon returning to the front, when Affiant exited the hallway, he stopped and was standing by the desk where Affiant had layed his brief case.

23.   A few seconds later movement in the office alerted Affiant to a police officers presence.  Affiant grabed at his brief case pulling it across the desk.  Affiant did not have a firm grip on the cloth brief case and when the case cleared the desk, it fell to the floor behing the desk.  Affiant bent over, picked up the brief case, then ran out the back door.

24.   Affiant never touched any desk, had any knowledge of money being at connextions giving intent to rob connextions or hurt anyone.  Affiant had something to say, and if allowed to testify, this is what Affiant would have testified to and more.

Further Affiant sayth not.

_Kev Patterson_
                                                  Affiant

Subscribed and sworn to before me this day _22^nd_ of November, 2004.

_Lana Whedman_
                                                  Notary

Exhib. = #23 A

"OFFICIAL SEAL"
Lana Wildman
Notary Public, State of Illinois
My Commission Exp. 04/27/2008

State of Illinois    )
                     )  SS
County of Christian  )

### AFFIDAVIT

Now comes Kevin Patterson (herefore known as Affiant) being duly sworn upon oath depose and state that:

1.  He (Affiant is the Petitioner/Defendant in this cause before the court case numbered 98 CR 30064.

2.  That being a Defendant in that case, Affiant hired an attorney, Charles G. Murphy, of the law firm of Murphy, Peters', Davis & O'Brien on or about February of 1999 as counsel on the case numbered 98 CR 30064.

3.  Affiant states that outside court appearences, that Affiant had three (3) consultation periods with Attorney Murphy to discuss issues concerning the case of 98 CR 30064.

4.  That during these consultation periods, the six (6) day dentention of Affiant after his arrest and prior to his first appearence in court was one of the main topic's discussed between Affiant and Attorney Murphy.

5.  Affiant told Attorney Murphy that he (Affiant) never attempted to rob anyone and based on what happened at the police station after his arrest. (Station #009)  Affiant thought he may be charged with U.U.W. by a felon, and that Affiant did not know what he was charged with until his first appearance in court on October 6, 1998, six (6) days after his arrest.

6.  Affiant also told Attoney Murphy that he was sure the police reports on this case was re-written because the police at District Station #009 wanted charges approved for Attempt Murder, and had written & typed up reports consistent with that charge prior to the arrival of a States Attorney at the station.

*Exhibit 24*

7. Attorney Murphy was further told that the States Attorney did not want to file charges after talking to the alleged victims and Affiant and that the police got angry and called her (the States Attorney's) supervisor.

8. That minutes after the call, the police station (among themselves but in the presence of Affiant) that they had to go over the "bitch's" head to get charges approved by calling her supervisor and they finally got her to approve "A" charge. What the charge was, was never stated.

9. Affiant told Attorney Murphy that minutes later, he was placed in lock-up at District Station #009 until on or about 2 AM when he was transfered to District Station #002 at 51st Wentworth where (Affiant) remained two (2) days until October 4, 1998, at which time Affiant was transfered to District Station #001 at 11th and State where he remained until his appearance in court on October 6, 1998.

10. Affiant also told Attorney Murphy that Affiant was allowed to make a phone call at District Station #009 on or about 10 PM on October 1, 1998 and was not allowed to make another phone call until his placement in the Cook County Jail after October 6, 1998. Neither did Affiant talk to anyone in an official capacity during the extended five (5) day detainment about the case in which he was arrested or any other case.

11. Affiant told Attorney Murphy his belief that the charge did not reflect what the police was trying to question him about, what Affiant believed police at District Station #009 was trying to charge him with and what the reports was based on prior to the State's Attorney's arrivial at the station.

12. Affiant expressed his belief to Attorney Murphy that the delay in bringing Affiant to court was because the police at District Station #009 needed time to re-write the reports because the alleged victims felt Affiant was there to hurt them, and at no time did Affiant ever hear anyone state or allude to Affiant attempting to rob anyone or anything.

*Exhibit 24A*

13. Attorney Murphy stated "I know, I believe you because no where in these reports did these guys ever say you tried to rob them." Affiant states he never saw any police reports until after his conviction and sentencing.

14. Attorney Murphy also stated to Affiant that the police would say that the failure to take Affiant to court was inadvertant and if the reports were late it is detectable because on the date of filing, police procedure states that all police reports were to be date/time stamped to varify the date of filing. Attorney Murphy stated he would see when all the reports had been tenered on discovery. Affiant never heard anything else about that issue.

15. Affiant states he told Attorney Murphy during consultation of Affiant's wish to testify once the case went to trial. Attorney Murphy and Affiant even went over questions that would be asked if Affiant did testify. Attorney Murphy re-iterated Affiant would testify if necessary.

16. That after the State had rested it's case and before Attorney Murphy rested the defense, Affiant told Attorney Murphy's of Affiant's wish/need to testify due to the courts stated belief that the State had proven it's case against Affiant in that Affiant had committed an Armed Robbery.

17. Attorney Murphy told Affiant "no" there was no need for Affiant to testify because the State had not proven it's case and despite the fact of the denial of the Motion of Directed Finding by the court, no need for Affiant to testify. Attorney Murphy then turned around and walked away.

18. Subsequently, Attorney Murphy then rested and argued for the defense. The court denied the argument and found Affiant guilty of Attempt Armed Robbery.

Further Affiant Sayth Not.

_Kev— Patterson_
Affiant

Subscribed and sworn to before me this ___17TH___ day of _November_, 2004.

_Maria Nachtwey_
Notary

"OFFICIAL SEAL"
Maria Nachtwey
Notary Public, State of Illinois
My Commission Exp. 04/24/2007

_Exhibit 24B_

Date: 9-8-04

To: Dorothy Brown - Clerk, Circuit Court

Case# 98CR30064

From: Kevin Patterson

Subject: Common Law Record Documents

Dear Ms. Brown

I am writing to you a second time requesting copies of files from my common law record under case # 98CR30064. I am filing a post conviction, pro-se, pursuant to my case and I need a copy of my signed complaints filed Oct 6, 1998 which commenced prosecution against me (CL. 13-14) and a copy of the Motion in arrest of judgement, file Dec 19, 2001. (CL. 51-52)

Thank you in advance for your consideration in this matter.

Sincerely,

Kev- Patterson

Kevin Patterson - A83515
Box 900
Taylorville IL 62568

Exhibit 25

Criminal Div.
2650 S. California
Chicago, Illinois
(773) 869-
Fax (773) 869-
www.cookcountyclerk



# OFFICE OF THE CLERK OF THE CIRCUIT COURT OF COOK COUNTY

Date:

To:

Dear:

The Clerk's Office is in receipt of your inquiry dated

Additional information is required to process your request. We are returning your correspondence because:

[X] A case number is required.  CP#

[ ] The case number provided does not match the name.

[ ] Other information provided is not correct or inconsistent

[X] If no case number is available, we require an IR number, date of birth, correct spelling of name used upon arrest, and date of arrest.

[ ] We are unable to determine what you are requesting.

~~Your request has been forwarded to:~~  Please forward your request directly to the office listed below:

[ ] State's Attorney's Office
Richard J. Daley Center
Chicago, Illinois 60602

[ ] Public Defender's Office
69 West Washington
Chicago, Illinois 60602

[ ] State's Attorney's Office
2650 S. California 11D54
Chicago, Illinois 60608

[ ] Court Reporter's Office
2650 S. California 4th Floor
Chicago, Illinois 60608

[ ] Your petition was filed in the Criminal Division on:

[ ] Other Information/Comments:

Sincerely,
Criminal Division
Motion Section
(773) 869-6967

Exhibit 26

Date: 10-20-04

To: Dorothy Brown - Clerk, Circuit Court

From: Kevin Patterson - pro-se        Case # 98CR30064
                                       Appeal # 02-0694

Subject: File Records

Dear Ms. Brown

   This is my 3rd request to your office requesting copies of files to wit <u>Complaints</u> filed in the circuit court against me on Oct. 6, 1998 and the <u>Motion in Arrest of Judgement</u> filed Dec 19, 2001. I am filing a post conviction pro-se and I need a copy of the requested file records. Your response to my second letter dated 9-8-04 you requested a case number. Below is the list of number's to assist you in your search for those documents as requested.

        CR# : 98CR30064
        IR# 207100
        Dob: 1-16-57
        Date of Arrest: Oct 1, 1998
   Name Arrested Under: Kevin Patterson

Thank you!
                                       Sincerely
                                       Kevin Patterson
                                       Kevin Patterson - A13357
                                       Box 900
        Exhibit 27                     Taylorville IL 62568

10-20-04

To: Court Reporter's office

CASE# 98CR30064
Appeal # 02-0694

FROM: KEVIN PATTERSON

SUBJECT: COMMON LAW RECORD DOCUMENTS

TO WHOM IT MAY CONCERN
ON 9-8-04 I forwarded a letter to CIRCUIT COURT
CLERK, DOROTHY BROWN's office REQUESTING copies of
CERTAIN documents listed in my COMMON LAW RECORD.
I am filing a POST CONVICTION PETITION PRO-SE and
I am in NEED of COPIES of the complaints filed in
COURT ON OCTOBER 6, 1998 which commenced prosecution
against me listed in the COMMON LAW RECORD under
CASE NUMBER #98CR30064 OR APPEAL CASE NUMBER #02-069
The documents can be found in the RECORD under CL-13-14
I also NEED a copy of the MOTION IN ARREST OF JUDGEMENT
filed DECEMBER 19, 2001 listed in the RECORD under
(CL-51-52)
Thank you for your ASSISTANCE.

SINCERELY
Kev - Patterson
KEVIN PATTERSON - A83575
BOX 900
Taylorville IL. 62568

Exhibit 28

1   assisting.

2       You are not going to hear any testimony that

3   my client came into that premise and announced a

4   stick-up or robbery.  He never said anything to that

5   effect.  You will hear from the prosecution witnesses

6   that what he did say, though, is that he was "sick and

7   tired of you motherfuckers taking good people's money

8   and stuffing your pockets with it," or words to that

9   effect. These are the words that will be attributable

10  to my client, nothing about what stickup.

11      There were three, at least three people who

12  were present in the rear of the office at that time.

13  One of the individuals, and I believe that

14  individual's name is Mr. Beals, undoubtedly because he

15  saw a handgun, was concerned for his own well-being

16  for this own safety, what he chose to do -- I'm not

17  being critical of this  -- what he chose to do was to

18  push my client, who was standing there with a gun

19  announcing his dissatisfaction with how they were

20  treating people, grabbed at my client with the gun.

21  The gun did go off, but there was no specific intent,

22  I believe you will conclude, to fire the gun at that

23  individual, nor is there even a knowing attempt to

24  fire the gun.

A-10

*Exhibit "29*

1  you were seated at your desk, is that right?

2       A    Yes.

3       Q    When he came back there, you testified here

4  today that he said to you that he wanted you to get

5  up, turn around and get on the ground?

6       A    No.  He indicated that -- told me to get up,

7  turn around and walk to the back of the office.

8       Q    And he said that he had a gun?

9       A    Yes.

10      Q    Showed you that he had a gun?

11      A    After I looked up the second time, I saw that

12  he had a gun, yes.

13      Q    At least initially, you complied with what he

14  told you to do. By that I mean you got up and started

15  to walk to the back, did you not?

16      A    Yes.

17      Q    You testified here today that he said --

18  someone was asking him why he was there or what he was

19  doing and you said here today that he brought up some

20  philosophical concerns he had about money, is that

21  correct?

22      A    More so about people, in terms of poor people

23  and money.

24      Q    He never said to you that he was there to rob

*Exhibit #30*

1    you, did he?

2        A    No.

3        Q    He never said to you or any one else in the

4    back, back of the office, that he wanted your money or

5    their money, is that correct?

6        A    That's correct.

7        Q    He never attempted to take money -- I don't

8    know if you had any money on you, but he never

9    attempted to take anything from you personally,

10   did he?

11       A    No.

12       Q    Same question of the other two people that

13   were in the back of the office. Did he attempt to take

14   anything from them?

15       A    No, sir.

16       Q    Sir, you decided that you had an opportunity

17   to escape. You chose to attempt to escape through the

18   back door, isn't that right?

19       A    Yes.

20       Q    And the back door had on it two wooden

21   two-by-fours, or something like that, and they were

22   lodged in the back as security bars, were they not?

23       A    Yes.

24       Q    You testified that when you made that

Exhibit #31

1        A        Yes.

2        Q        What happened after you got out the front

3    door?

4        A        Immediately after I exited the building, I

5    headed north toward 51st and Western. I saw a police

6    car there. I flagged the police car down. I told him

7    there was a guy in there with a gun, he had just shot

8    one of my colleagues.

9        Q        Did you see where the police went at this

10   time?

11       A        They immediately jumped out of the car. They

12   ran inside the building. The next thing I saw, because

13   I was on 51st and Western at that point, was the young

14   lady and a man --  the police officer chasing Mr.

15   Patterson down the alley.  He ran across 51st Street,

16   continued to run north until he was out of my sight.

17       Q        And do you recall what the Defendant was

18   wearing?

19       A        Yes, I do.

20       Q        What was he wearing?

21       A        He was wearing a black satin jacket, white

22   shirt, tie, dark-colored die.  I'm not sure what color

23   tie it was.

24       Q        You said he had a handgun.  In addition to

A-42

$Exhibit$ #32

1    Q    Yes, Mr. Beals was in front of him?

2    A    He was right behind Mr. Beals with the gun.

3    Q    You saw Mr. Patterson seated at the front in

4  the reception area, did you not?

5    A    Yes.

6    Q    Your view of him was unobstructed, was it

7  not?

8    A    What do you mean "unobstructed"?

9    Q    There was nothing between you and him from

10  seeing something?

11    A    No.

12    Q    When Mr. Patterson got to the location where

13  you were seated, which is before you get to the rear

14  door, did he tell you to give him the money that was

15  in the desk drawer?

16    A    No.  He didn't ask me about the money.

17    Q    Now, you testified that you heard a shot

18  fired.  When you heard the shot fired you turned

19  around a little bit to see if everything was okay?

20    A    Well, I really didn't have to turn too far,

21  because the office is not that big of an office.  I

22  looked to the side.  It was right on the side. I could

23  look to see if Mr. Beals was okay.

24    Q    Was he and Mr. Beals at that point, when the

A-58

*Exhibit #33*

1    Q    Were you on patrol then?

2    A    Yes.

3    Q    Were you on foot or in a car?

4    A    I was in a squad car.

5    Q    Who were you working with?

6    A    Officer Lane Campbell.

7    Q    As you approached the area of 5102 South

8 Western, what happened?

9    A    Three gentleman came running out of a

10 business office at that location and stopped our squad

11 car.

12    Q    What happened after they stopped the squad

13 car?

14    A    They were yelling at us that there was

15 somebody inside the building with a gun; that he was

16 there now.  He had a gun.

17    Q    What did you do when you heard that?

18    A    My partner and I exited the vehicle.  I was

19 driving. My partner was running to the front door.

20 So, I notified him that I would head to the rear door,

21 started heading toward the back of the building.

22    Q    How did you go in order to get to the back of

23 the building?

24    A    There was not a gangway at 5102, so I had to

Exhibit #34

1  Artesian northbound.

2      Q    And when you saw that, what did you do?

3      A    I waited in the alley until I could see what

4  direction they were going to turn.  When they got into

5  the alley, I was giving a flash message over the

6  radio, the description of the car.

7      Q    Did you later see the Defendant who had run

8  past you in the alley and got in this car?

9      A    Yes, ma'am, I did, when another arresting

10  officer brought him to the scene.

11      Q    When you say "the scene", 5102?

12      A    5102.

13      Q    South Western?

14      A    Yes, ma'am.

15      Q    And approximately how much later was that

16  from the time you saw him running through the alley?

17      A    I would say it was about 15 to 20 minutes.

18      Q    Can you describe the car that you saw this

19  Defendant getting into?

20      A    It was of light color, like a light gray

21  Cadillac with a dark vinyl roof, a black vinyl roof.

22      Q    Could you see the driver of the car, of the

23  Cadillac?

24      A    Just the back of his head, ma'am.

Exhibit #35

1      Q    Did anyone you know of open or shut doors

2   while you were present before the --

3      A    No, sir, nobody touched that desk while I was

4   there but I was gone for a while.

5      Q    Would it be correct, sir, the view you had of

6   this desk from your vantage point not only would not

7   have permitted you to see the desk drawers you would

8   not have known from your vantage point whether or not

9   a desk drawer was opened or shut because you couldn't

10  see the drawers, is that correct?

11     A    I could see him with his hand down rummaging.

12     Q    You could see him bent over with his arm

13  down, is that correct?

14     A    That's correct.

15     Q    When he fled out the back door am I correct

16  or maybe I'm incorrect, did you see him with a bag?

17     A    Yes.  He had -- well I thought it was a case

18  but it turned out to be a bag.

19     Q    You could not actually see the drawer that

20  you say that he was rummaging in, is that right?

21     A    When I first walked in, no I couldn't see it.

22     MR. MURPHY:  I have nothing else.

23     MS. HOWARD:  I have no questions.

24     THE COURT:  Thank you, sir.  Unless state has

*Exhibit #36*

OFFICIAL COURT REPORTERS

1    50th Street and the other one by the alley.

2       Q.   Which of the two men was by 50th Street?

3       A.   The tallest one.  I don't know his name.

4       Q.   And then the man near the alley would be the

5    other man you have identified as Mr. Akbar?

6       A.   Yes, he is the one who asked me for the

7    water.

8       Q.   After you went inside your house what did you

9    see this defendant Akbar do?

10          MS. HOWARD:  Objection.  Leading.  Asked and

11   answered.

12          THE COURT:  Overruled.  Overruled.

13          THROUGH THE INTERPRETER:  A.  Well, they were

14   just pacing back and forth, desperate.  One on 50th,

15   one by the alley.  When the police came, then they

16   locked the car and ran.  They ran.  When the police

17   came I told them they were on 50th and that is where

18   they got 'em.

19          MS. KURUC:  Q.  Who?  Who?

20          THROUGH THE INTERPRETER:  A.  What's the

21   question?

22       Q.   Who?  You said you saw the car being locked.

23   Who locked the car?

24       A.   The one who was closest to me, the one who

D-8

*Exhibit #37*

OFFICIAL COURT REPORTERS

1    asked me for water.  Locked the car and then they ran.

2         Q.  Before the car was locked, did you see this

3    defendant do anything else?

4         MS. HOWARD:  Objection, leading.  Asked and

5    answered.

6         THE COURT:  Now, why is that leading?  Just

7    tell me leading is stating the fact that you want to be

8    in evidence and asking yes or no.  Asking a question

9    which gives the witness an opportunity to respond is

10   not leading.

11        MS. HOWARD:  She has asked the question at

12   least three times and he has answered it three

13   different times saying they were standing --

14        THE COURT:  Not exactly.  Go ahead.  Overruled.

15        MS. KURUC:  Did you need me to repeat the

16   question?

17        THROUGH THE INTERPRETER:  Yes, please.

18        MS. KURUC:  Q.  Before you saw the defendant

19   Akbar lock the car, did you see him do anything else?

20        THROUGH THE INTERPRETER:  A.  Oh, yes.  He

21   threw a bag.  I don't know what bag it was but he threw

22   it inside the garbage can.

23        MS. KURUC:  Q.  After this defendant and the

24   other man ran away did the police come?

Exhibit #38

1                       *(WHEREUPON, People's Exhibit*

2                         *No. 18 was so received*

3                         *into evidence.)*

4        MS. DILLON:  And this is a defense exhibit that

5    was already admitted.  State rests.

6    [STATE RESTS]

7        THE COURT:  Anything?  State rests.

8        MR. MURPHY:   May I address the court?

9        THE COURT:  Please.

10        MR. MURPHY:   On behalf of my client, Judge, I

11   would be moving at this time for a directed finding of

12   not guilty as to the allegations regarding attempt

13   first degree murder.

14        THE COURT:  Sustained.

15        MR. MURPHY:   Aggravated --

16        THE COURT:  Plea of not guilty; finding not

17   guilty, attempt murder.

18        MR. MURPHY:   I would move simultaneously in

19   regard to Count No. 2, the aggravated discharge of a

20   firearm.

21        THE COURT:  That will be denied.

22        MR. MURPHY:   Attempt robbery's count 3.  And I

23   wish to argue.

24        THE COURT:  Well, you can argue in the light

*Exhibit 39*

1   most favorable to the state.  At this time I believe

2   they proved an armed robbery.  But go ahead.  We are

3   taking the light most favorable to the state.  Just

4   because he didn't get away with the proceeds in the

5   drawer doesn't make this an attempt.  I think in the

6   light most favorable to the state, they have proved a

7   shooting that may or may be an accident, but I think in

8   the light most favorable to the state, they didn't

9   prove an attempt robbery, they proved an armed robbery.

10        MR. MURPHY:  Well, undoubtedly, sir, you

11   recall that no one's testified that any property from

12   any person of any type was taken.

13        THE COURT:  That's my point exactly.  My point

14   is just because property wasn't taken, it doesn't mean

15   that your client wasn't attempting to remove or find

16   something.

17        MR. MURPHY:  Okay.

18        THE COURT:  I believe that there is such a

19   thing as an armed robbery.  Even if you accost somebody

20   on the street and they don't have any money or anything

21   to take, I still think it's an armed robbery.  And if

22   he missed the money in the drawer, shame on him.  But I

23   think that they established an armed robbery and I

24   think that the State's Attorney's office was a little

Exhibit #40

OFFICIAL COURT REPORTERS

1   light in charging.  But that's besides the point.

2          MR. MURPHY:   All right.  One second to speak

3   with my client.

4          THE COURT:  Did you wish to address me as far

5   as your client?  He can take his time.  I will allow

6   him.  But at the close of the state's evidence, in the

7   light most favorable to the state I think they proved

8   an armed robbery against Kevin Patterson.

9          MS. HOWARD:  On behalf of Mr. Jamal Akbar, I

10  make a motion for judgment of acquittal.  Even looking

11  at the evidence in the light most favorable to the

12  state, they haven't proved anything.

13         THE COURT:  I'll tell you exactly what they

14  have.  They have him putting the stuff in the garbage

15  can.  There are fifty million reasons why he is doing

16  something after the fact that wouldn't make him

17  accountable for this act without anything.  But with

18  that one gesture, in the light most favorable to the

19  state, he does look like he is taking part in this

20  entire scenario.  But, you know, in my own mind I can

21  think of fifty different innocent reasons why he would

22  do what he did under these circumstances without any

23  prior conversation, any planning, any scheme, any

24  statements offered in furtherance of this joint

Exhibit #41

*money, is that correct?"  He responded, "That's*

*correct."*

*"He never attempted to take money -- I don't*

*know if you had any money on you -- but he never*

*attempted to take anything from you personally, did he?*

*'No.'"  I then said same question of the other two*

*people that were in the back of the office.  "Did he*

*attempt to take anything from them?  'No, sir.'"*

My client is charged in three of the counts

with attempt armed robbery.  In regard to the way the

charging document reads, count 3, it alleges that my

client, while he was armed with a handgun, attempted to

remove United States currency from the person of

Clarence Beals.  Beals denied that my client attempted

to take any currency from him.

As to the next count.  It alleges again that

my client, while he was armed with a handgun but now

alleges that he attempted to remove United States

currency from the person of Timmy Jones.  Well, he

never did that either.  The next count is that my

client committed the offense of attempt armed robbery

in that he was armed with a handgun, attempted to

remove United States currency from a person of

Felice McGee.  Well, he never did any of those things.

Exhibit #42

OFFICIAL COURT REPORTERS

1      The prosecution's theory in this case, as I

2   understand it now, is that my client was trying to take

3   United States currency that was in a drawer but not

4   from the person of any person who was in the business

5   premises.  The prosecution's theory is that my client

6   was bending over when the officer came in and rummaging

7   around in the drawer.  Well, you now know, and the

8   officer had conceded, that he couldn't see my client's

9   hand in any drawer because he was looking at the wrong

10   side of the desk.  What we do know is my client at some

11   point in time left the premises with a gun and at some

12   point in time placed it in a bag and placed that bag

13   inside of another bag which wound up in a garbage can.

14   It is equally likely my client when the officer saw him

15   bending over was placing the gun in the bag.

16      In any event, nothing was taken from the

17   drawer either.

18      The charging document was very specific in

19   what it alleged in regard to the offense of attempt

20   armed robbery, it alleges he was attempting to take

21   property from the person of three different individuals

22   who were present and there is not one scintilla of

23   evidence to support the contention that that is what he

24   did.  Indeed the prosecution -- very briefly, at the

Exhibit #43

OFFICIAL COURT REPORTERS

1    risk of repeating myself -- will argue to you he was

2    there to take the currency from Connections, an entity

3    not a person.

4            In regard to the second count, the aggravated

5    discharge of a firearm.  The evidence --

6        THE COURT:  Not guilty.  Not guilty.  Move on.

7    Not guilty.  Aggravated discharge.

8        MR. MURPHY:   I suggested to you in my opening

9    remarks and I was willing to concede then that the

10   prosecution's evidence would establish the offense of

11   UUW by felon.  I think the evidence bore that out.   I

12   suggested then that that would be an appropriate

13   finding and I make that same suggestion now.

14       MS. DILLON:  Judge, I think you have to look at

15   the evidence as it came in as a whole and where this

16   attempt armed robbery starts is when this defendant

17   walks into Connections, and as he waits in Connections

18   Tim Jones and Felice McGee are in the back.  They are

19   counting money.  You heard them tell you how when they

20   saw the defendant who was sitting in that big open

21   room, as you can see from the photographs, they took a

22   measure to put the money away because they were in a

23   big open room and the defendant was sitting there and

24   they didn't know the defendant.

Exhibit #44

OFFICIAL COURT REPORTERS

1          Is it just a coincidence that as soon as they

2     put the money in the drawer the defendant is up and

3     over to Mr. Beals, displays that gun, and makes

4     Mr. Beals go to the back where Felice McGee and

5     Tim Jones are and wants them to lie down?  This is

6     clearly what the defendant is doing here.  He is trying

7     to rob the people at Connections.

8          Tim Jones, Felice McGee, Clarence Beals, who

9     had an opportunity to observe, you saw their demeanor

10    and they told you what happened there.  This defendant

11    armed with that handgun was trying to rob them.  And

12    just because he wasn't able to get the money right

13    there as they are sitting there, well they try and

14    escape, they try and run, and that's why it is the

15    defendant is then rummaging through the desk.

16         You have a Chicago police officer who has

17    been flagged down, seeing the defendant trying to

18    complete his crime, trying to go through that desk,

19    trying to get that money.  Judge, the evidence in this

20    case is clear as to what the defendant was doing.

21         And remember what Officer Fudash (Phonetics)

22    said to you.  He said that he could see the defendant

23    rummaging.  And one important thing that he said was,

24    "When he looked up and he saw me, he dropped something

Exhibit #45

1  from his hand.  It wasn't a gun."  The defendant

2  clearly at that point startled by the police officer

3  being there, dropped whatever he has and then flees.

4      Judge, we ask that you find the defendant

5  guilty of the attempt armed robbery and of the charges

6  related to the gun.

7      THE COURT:  Which victims?

8      MS. KURUC:   Judge, all three victims, the part

9  of the crime.  Felice McGee and Tim Jones are in the

10  back and then the defendant himself.

11      THE COURT:  Okay.  How about part of counsel's

12  argument where it charges specifically attempted to

13  remove United States currency from the person without

14  the added word or presence of Clarence Beal,

15  Timmy Jones, Felice McGee?

16      MS. DILLON:  Judge, I believe the case law

17  supports the fact taking from something from the

18  presence of someone.  It doesn't have to be exactly on

19  the person.

20      THE COURT:  He is charged with "from the

21  person."

22      MS. KURUC:   Well, on the person.  The case law

23  as well would --

24      THE COURT:  Include presence?

Exhibit ___#6

1        MS. DILLON:  Yes.

2        THE COURT:  On the persons or in their

3  presence?

4        MS. DILLON:  That's correct.  And case law --

5        THE COURT:  You are secure in that these

6  charging documents are sufficient to support the facts

7  as testified to in this case?

8        MS. DILLON:  Yes, Judge.

9        THE COURT:  Okay.  Go ahead.

10       MS. DILLON:  Judge, I believe that the case law

11  supports that even as charged from the person it's been

12  held that the person, it doesn't have to be taken out

13  of their pocket or any direct action like that.  The

14  way this case is charged from the person, from the

15  defendant's actions when he first goes back there with

16  the gun to Felice McGee to Tim Jones to Clarence Beals,

17  he is in the process of committing this attempt armed

18  robbery.  He takes substantial steps in going back

19  there with that gun, forcing them to the ground to

20  accomplish that end.  He isn't able to accomplish the

21  actual taking and he is able to at least run out of the

22  building but then he is caught by the Chicago Police

23  Department.  We ask that you find him guilty.

24       THE COURT:  I have pretty much heard the

Exhibit #47

1   evidence.  I believe based on the evidence that I heard

2   that Kevin Patterson went there, like Robinhood to rob

3   from someone he disagreed with, to maybe it wasn't for

4   his own personal use, but he went there to rob this

5   place and did in fact take substantial step towards

6   that by not getting any proceeds.  But he went there

7   armed with a .38.  They proved to me beyond a

8   reasonable doubt that Kevin Patterson is guilty of

9   attempt armed robbery, three counts, and felony

10  possession of a weapon based on a prior armed robbery

11  conviction and him being armed with that .38.  I

12  certainly believe that an aggravating feature is the

13  discharge of this gun during the course of this, what I

14  believe, is an armed robbery.

15          Certainly the specific intent was to commit

16  armed robbery and a substantial step was taken.  The

17  only thing missing was proceeds and certainly the armed

18  robbery was done in the presence of the three

19  individuals who are named as victims.  It is clear to

20  me that the state's evidence proved to me beyond a

21  reasonable doubt that Kevin Patterson, not by accident,

22  not by misadventure, not by any other stretch of the

23  imagination was he there to rectify some other wrong

24  perceived by him, but went there to rob this place of

$Exhibit \ \pi \ 48$

1      THE CLERK:  Kevin Patterson

2      MR. MURPHY:   Judge Himel, I'm Chuck Murphy.  Mr.

3   Patterson is standing next to me.  With your

4   permission this morning I filed a document entitled a

5   Motion in Arrest of Judgment and also hand up a copy

6   of a case which I believe supports the position in the

7   defendant's motion.  I tender a copy not only of the

8   motion to you but the state's attorney.  Might it be

9   wise to pass the case?

10      THE COURT:  Let me take a look here.  Okay.

11            Are you ready to argue?

12      MR. MURPHY:  I am.

13      THE COURT: 'I'm not familiar with this case.

14   Judge Louis Garippo, 1977?  All right.  Motion in

15   Arrest of Judgment.  Argue.

16      MR. MURPHY:  Judge, undoubtedly you recall by my

17   opening comments at the bench trial as well as closing

18   comments I conceded to you that I believed that the

19   prosecution had established something during the

20   course of trial; and what I was eluding to, of course,

21   was the count or counts, if it were multiple, of

22   unlawful use of a weapon by felon.

23            I was unwilling to concede that the

24   prosecution could establish other matters which were

Exhibit #49

1  set forth the way that they were pled.  In this

2  particular case which I have cited which is a good

3  discussion of the law -- the facts in that case,

4  though, are the other side of the legal coin of the

5  way that the indictment read in this particular case.

6          In this case, Mr. Patterson's case, the

7  way the indictment was formed it's alleged little my

8  client purportedly took or attempted, I should say, to

9  take money from the presence of the three named

10  individuals who testified.  The State elected for

11  reasons I would not know not to include in the

12  charging document that this attempt was done merely in

13  the presence of those three people.

14          What I did is I relied upon the charging

15  document in the preparation of my defense.  I relied

16  upon the fact that I did not believe that the

17  prosecution could establish that my client attempted

18  to take property from these three named individuals.

19          Now, the way the case developed, the way

20  the testimony came out, I did ask those three named

21  individuals when they would testify if my client ever

22  attempted, commanded, or directed them to give

23  property to him; and, of course, they agreed with what

24  I thought was going to be their obvious answer, having

E3          Exhibit 50

1    read the police reports, that my client never did

2    that.

3           In sum what I did is I relied upon that

4    charging document.  I did not ask for a 402 Conference

5    in this particular case because I believe the

6    prosecution had confined themselves to proof that

7    would show, if they could do it, that my client sought

8    to take property from those people.  The evidence did

9    not support that theory.

10          Mr. Patterson and his attorney relied

11    upon it.  It's not being raised for the first time on

12    appeal.  It was raised at trial, and it's been

13    reviewed again at this juncture of the proceedings in

14    a post-trial fashion.

15          I believe that there was a fatal

16    variance, and that Mr. Patterson, the defendant, is

17    entitled to the benefit of the doubt where it exists.

18    It does exist.

19      THE COURT:  State?

20      MS. DILLON:  Judge, our position was that the

21    defendant did attempt to take --

22      THE COURT:  Well, I think I made my position

23    pretty clear on this.  Not only did he attempt, I

24    think he completed the armed robbery.  You know, I

Exhibit #51

1    think we have an office. We have got a place where

2    the evidence would show that the rents were collected,

3    that there was money present in the place, and the man

4    comes in with the gun and accosts three people in the

5    officer there and is rummaging around. All the

6    elements of an armed robbery was proven except that he

7    didn't get away with the proceeds.

8             It's clear to me that if this is the law

9    in the United States of America, that's a joke.

10   Because the overall facts would make what you're

11   saying a real joke because the facts themselves are

12   clear. The facts as stated in this Court showed an

13   armed robbery took place. He's charged with attempt

14   armed robbery. The facts overwhelmingly proved to me

15   that he, with the intent to commit a robbery armed

16   with a gun, went into this establishment and attempted

17   to remove items from that establishment by threatening

18   the people involved there with a gun.

19            There's no question about his guilt.

20   You citing me that this case is paramount to you

21   saying that if in fact somebody comes up to somebody

22   with a gun and then turns their back maybe and it's

23   outside their presence, he's going through all the

24   drawers in the house, that would not be an armed

1    robbery.  I say to you that's ridiculous.  I say your

2    argument is ridiculous.  Motion in Arrest of Judgment

3    is denied.

4           The evidence is clearly that

5    overwhelmingly that he entered this place for the

6    purpose of robbing it, that the only thing he didn't

7    do was to get away with the proceeds from this armed

8    robbery.

9           The State indicted him for attempt

10   because he didn't get away with the proceeds.  I think

11   robbery -- the armed robbery is completed even if he

12   doesn't get the proceeds by the mere fact he went in

13   there, he made his wishes known in the manner in which

14   he spoke.  It's the clear meaning.  The facts would

15   indicate that he was there to take money.  His Robin

16   Hood approach that the money was going to be given to

17   somebody else more worthy than the people in this

18   establishment, it is something that should be done in

19   court, not at gunpoint by an individual vigilante.

20           He may have every friend in the world,

21   but this man committed an armed robbery.  He was only

22   charged with attempt armed robbery.  I found him

23   guilty of attempt armed robbery.  There's a judgment

24   on my finding.  Your motion in arrest of judgment is

Exhibit #53

1     THE COURT:  On Kevin Patterson, I did admonish him

2    on rights of appeal.

3           Let's bring out Mr. Patterson again,

4    please.

5     MR. MURPHY:  In the interest of saving time would

6    you appoint the Public Defender's Office?

7     THE COURT:  Yes.

8           Okay.  Sentence of the court, 18 years

9    Illinois Department of Corrections.  The defendant to

10   receive ninety-seven (97) days time credit.

11          Certainly, young man, you do have a

12   right to appeal.  You have thirty days from today's

13   date to file with this Court a written motion

14   indicating your Notice of Appeal and Petition for

15   Stenographic Transcript of these Proceedings.  That

16   must be in writing; and, certainly, if you are

17   indigent I will appoint the Public Defender to perfect

18   your rights to appeal.  Do you understand those

19   rights?

20     DEFENDANT PATTERSON:  Yes, I do.

21     MR. MURPHY:  That is his request.

22     THE COURT:  Okay.

23          Public Defender appointed to perfect

24   rights to appeal.

Exhibit #54

Index

1. Introduction – Petition

2. Memorandum of Law, 2 Issues

   (1)  Trial counsel was ineffective on the following grounds:

      (A,B,C,D)

      (A)  Pg(s) 1–5

      (B)  Pg(s) 5–9

      (C)  Pg(s) 9–11

      (D)  Pg(s) 11–16

   (2)  Appellate attorney was ineffective as counsel on the following
      five (5) grounds:  (A,B,C,D,E)

      (A)  Pg(s) 16–21

      (B)  Pg(s) 21–23

      (C)  Pg(s) 23–28

      (D)  Pg(s) 28–33

      (E)  Pg(s) 33–44

      (F)  Request of Court for leave to reserve possible issue on
           Legality of Complaints filed October 6, 1998 against Petitioner
           in court.



RECEIVED
DEC 0 – 2004
CLERK OF THE CIRCUIT COURT
CRIMINAL DIVISION

FILED
DEC 0 2 2004
DOROTHY BROWN
CLERK OF CIRCUIT COURT

List of Exhibits

| | |
|---|---|
| Arrest Report | Ex. 1 |
| Case Report | Ex. 2–2A |
| Supplementary Report | Ex. 3–3A |
| Progress Report (Clarence Beals Statement) | Ex. 4–4A |
| Progress Report (Felise Mcger Statement) | Ex. 5–5A |
| Progress Report (Tim Jones Statement) | Ex. 6 |
| Grand Jury Hearing Transcript  Pg(s) 3,4,5,7 | Ex. 7,8,9,10 |
| Indictment (1 of 3) | Ex. 11 |
| Affidavit of Theresa Smith | Ex. 12–12A |
| Letter from Appellate Court Clerk | Ex. 13 |
| List of outgoing legal mail at IRCC | Ex. 14 |
| Appellate Court Order | Ex. 15 |

Exhibit List Continued

| | |
|---|---|
| Letter from A.P.D Attorney James Reddy | Ex. 16 |
| Letter to *P.D. Rita Fry | Ex. 17-17A |
| Letter from *P.D. Rita A. Fry | Ex. 18 |
| Affidavit of *A.P.D. Emily Eisner | Ex. 18A |
| Letter from *A.P.D. Emily Eisner | Ex. 19-19A |
| Letter from *A.P.D. Lauren Simon | Ex. 20 |
| Letter from A.P.D. Emily Eisner | Ex. 21 |
| Letter to *A.P.D. Emily Eisner | Ex. 22, 22A, 22B |
| Affidavit of Kevin Patterson | Ex. 24, 24A, 24B |
| Second letter to Circuit Court Clerk | Ex. 25 |
| Response form from Circuit Court Clerk | Ex. 26 |
| Third letter to Circuit Court Clerk | Ex. 27 |
| Letter to Court Reporters Office | Ex. 28 |
| Trial Transcripts Pg(s) A10,26,27,42,58,65,68 | Ex. 29-35 |
| Trial Transcripts Pg(s) B15 | Ex. 36 |
| Trial Transcripts Pg(s) E2,3,4,5,6 | Ex. 49-53 |
| Trial Transcripts Pg(s) D8,9,15,16,17,19,20, - 21,22,23,24,25 | Ex. 37-48 |
| Trial Transcript Pg(s) I14 | Ex. 54 |

*P.D. Denotes Public Defender

*A.P.D. Denotes Assistant Public Defender

Ex. Denotes Exhibit

Pg(s) Denotes Pages